EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1400 L Street, N.W., Suite 200
Washington, D.C. 20005

WASHINGTON FIELD OFFICE

2003 JUN 16 P 6: 3h

1400 L ST NW
WASHINGTON D.C. 20005

Janice E. Cobb-Hennix

    Complainant,

    v.

Ernest G. Green, Chairman,
    African Development Foundation,

    Agency.

EEOC No. 100-A2-7581X

Date: June 16, 2003

## AGENCY'S MOTION FOR DECISION WITHOUT HEARING

Pursuant to 29 C.F.R. 1614.109(g)(1), the African Development Foundation moves for a decision without a hearing on all claims raised by Complainant on the basis that there are no genuine issues of material fact and ADF is entitled to judgment as a matter of law. The undisputed facts establish that ADF provided Complainant reasonable accommodations; that Complainant's requested accommodation would impose an undue hardship on the Foundation's operations. Further, the Foundation engaged in a good faith effort to provide Complainant with accommodation; therefore, Complainant is not entitled to compensatory damages. See 42 U.S.C. 12111(9); 29 U.S.C. 791(g).

### I.    STATEMENT OF UNDISPUTED FACTS

The African Development Foundation is a small U.S. Government agency with approximately thirty employees. Unique in its mission, ADF supports the development of community based initiatives aimed at reducing poverty and promoting sustainable development in Africa.

Currently, Complainant is the Grants and Correspondence Management Assistant, GS-7, at the African Development Foundation. [Ex. A] In 1994, she occupied the position of Procurement Assistant, GS-7. [Ex. B] In November 1995, ADF employees were notified that a reduction in force was imminent. The encumbered positions dropped significantly,

1

PLAINTIFF'S EXHIBIT #10

notified that a reduction in force was imminent. The encumbered positions dropped significantly, and Complainant's position was abolished. *See Counselor's Report* at 7 & 8; *Wilson Sworn Statement* at ¶ 4. In lieu of separation, ADF offered Complainant a GS-6 Receptionist position [Ex. C], which she accepted with full knowledge of the parameters of the position and with saved grade and pay. [Ex. D] The RIF was conducted in accordance with governing laws and regulations. [Ex. E] In 1998, the Foundation reassigned Complainant to her current position.

Complainant suffers from systemic lupus erythematosus. Her condition was diagnosed in 1994. [Ex. F] Treatment includes oral doses of Cyclophosphamide, commonly referred to as Cytoxan. Ingestion of this drug requires Complainant to drink large quantities of liquids, resulting in her need to frequently urinate. The basis for this complaint is Complainant's disability, lupus, and ADF's alleged failure to reasonably accommodate that disability. Complainant also maintains that ADF retaliated against her due to her EEO activity. [Ex. G]; *See Counselor's Report* at 1.

The chronology began in 1994.

### A.    1994

In 1994, Complainant submitted certificates from Dr. Calvin Griffin, a rheumatologist, stating that she was "totally incapacitated" from September 29 to October 27 and then again from October 28 to December 4, 1994. (Exs. H & I] Complainant requested 200 hours of advanced sick leave. Her request was approved. [Ex. J] During the same time period, Gregory Smith, ADF President at that time, also approved a request by Complainant to participate in the leave donor program. [Ex. K] Nothing contained in the doctor's notes suggested the nature of Complainant's illness or that she required accommodation. [Exs. H & I]

### B.    1995

In January 1995, Complainant requested [Ex. L], and was granted, an additional 60 hours of advanced sick leave. [Ex. M] The doctor's note submitted stated that Complainant would be incapacitated until February 7, 1995, without revealing the nature of her illness or that she would require accommodations upon her return. [Ex. N]

Complainant was approved to return to work on April 3, 1995. [Ex. O] ADF was then advised that Complainant would not return until April 6, 1995. [Ex. P] On April 21, 1995, Complainant returned to light duty work with ADF's approval limited by her physician to four hours a day. *See Counselor's Report* at 4; [Ex. Q].

In a memorandum, dated August 20, 1995 and addressed to Tom Wilson, Complainant's first line supervisor, Complainant requested a temporary reprieve from her responsibilities associated with mail handling [Ex. R] and attached a July 17 note from her doctor stating that she should "only do sedentary work." [Ex. S] Her request was granted. *See Wilson Sworn Statement* at ¶¶ 1, 2.

On August 31, 1995, Complainant also requested that she be allowed to use her home as an alternate flexible workplace due to what she characterized as a "connective tissue disease." [Ex. T] To this point, none of the submitted documentation provided information sufficient to document the existence or nature of a disease, disability, or Complainant's functional limitations. Nonetheless, Mr. Wilson discussed the possibility with Complainant. Ultimately, however, Complainant's request to work from home was not a viable option given her position with ADF. *See Wilson Sworn Statement* at ¶ 3.

### C.    1996

Complainant's position as a Procurement Assistant was abolished due to a reduction in force. Rather than separating her, ADF offered her the GS-6 Receptionist position in November 1995, with saved grade and pay. [Exs. C & D] Complainant's reassignment to that position became effective in February 1996. [Ex. E] Sometime after the reassignment, Complainant began to complain that she needed to use the restroom often and that the individuals appointed to relieve her were taking too long to respond to her calls. ADF did not know, and Complainant never suggested or offered, that her need to urinate was urgent or the result of a disability. *See Wilson Sworn Statement* at ¶ 11; *Fields Sworn Statement* at ¶ 2. Nevertheless, as early as 1996, ADF President at that time, William Ford, responded to her concerns by authorizing Complainant to use the restroom at her discretion if the individuals designated to relieve her were unavailable. [Ex. U at 4, Issue II (authored by Complainant in response to her performance appraisal for that rating period)]

### D.    1997

On January 11, 1997, Complainant procured a letter from a Urologist, Dr. Frederick Hendricks, stating that she has a "bladder condition that causes unavoidable urges to urinate . . . at least every hour or two." [Ex. V] When Complainant actually provided this letter to an ADF official is unknown. At that time, Complainant's tour of duty began at 8:30 a.m. and ended at 5:00 p.m. *See Wilson Sworn Statement* at ¶ 5. In addition to restroom breaks, Complainant had two fifteen minute breaks throughout the day, one in the morning and one in the afternoon, as well as, an hour lunch break. *Id.*

3

In a memorandum dated January 28, 1997, Complainant levied accusations that ADF had failed to accommodate her need for frequent restroom breaks, and as a result, her "bladder condition" was aggravated "to the extent that [Complainant] had to have surgery in December 1996, and is presently [sic] under medical treatment." [Ex. W] Prior to January 11, 1997, ADF had no knowledge of the existence of a "bladder condition." See *Wilson Sworn Statement* at ¶ 11; *Fields Sworn Statement* at ¶ 2. In fact, by Complainant's own admission, she did not report it to ADF officials until January 11, 1997. [Ex. X at 2]

On January 29, 1997, Mr. Wilson attached Complainant's letter to a memorandum written to William Ford, ADF President at that time, setting forth three possible approaches to accommodating Complainant. [Ex. Y] ADF had already named and designated four relief persons to cover the front desk while Complainant used the restroom. See *Wilson Sworn Statement* at ¶¶ 6, 7. ADF officials reiterated their position to Complainant that she could take bathroom breaks whenever necessary even if doing so would leave the reception area unattended. [Ex. Z]; See *Wilson Sworn Statement* at ¶ 12; *Fields Sworn Statement* at ¶ 3. The President himself even offered to provide relief if Complainant so needed. [Ex. AA] In fact, Complainant was advised that the entire Foundation staff was at her disposal to cover the phones. If she was unable to find relief, she could leave the reception area unattended provided that she lock the front door for security purposes. See *Wilson Sworn Statement* at ¶ 12. It is important to note that at all times the restroom was readily accessible to Complainant as it was approximately 44 feet from her workstation. See *Sworn Statement A*.

In a letter dated April 15, 1997 and addressed to Mr. Wilson, Dr. Griffin wrote:

> Ms. Cobb-Hennix has a chronic medical disability which is characterized by remissions and exacerbation.
>
> Please provide her with the necessary work environment that will not further complicate her disability.

[Ex. BB] In order to effectively address Complainant's specific needs, on May 19, 1997, Mr. Wilson wrote Complainant to request more definitive information concerning the nature and effect of her illness. Specifically, Mr. Wilson requested "information which will clearly and specifically identify the nature and effect of the 'chronic medical disability' identified by Dr. Griffin and information which will clearly and specifically identify the 'necessary work environment' mentioned. . ." [Ex. CC] Without responding to Mr. Wilson's memorandum, on June 19, 1997, Complainant initiated contact with an EEO counselor alleging that ADF failed to reasonably accommodate her disability. See *Counselor's Report* at 9. Agency officials became aware of the existence of Complainant's lupus sometime after the filing of the informal complaint. See *Counselor's Report* at 3 & 4; *Wilson Sworn Statement* at ¶ 13; *Fields*

4

*Sworn Statement* at ¶ 1. On June 20, 1997, Complainant responded to Mr. Wilson's inquiry and attached a letter from Dr. Griffin. [Ex. DD] It is unclear whether Complainant attached the above referenced letter again [Ex. BB], or a letter written by Dr. Griffin in connection with a worker's compensation claim filed in 1997. [Ex. EE]

As part of the requested remedies listed in the informal complaint, Complainant asked for "removal of receptionist duties from her job." Complainant was the receptionist. To accommodate this request would require a reassignment and no vacant positions were available at that time. *See Fields Sworn Statement* at ¶ 8. A component of the receptionist position was preparing travel documents and vouchers. [Ex. C] In an attempt to lighten Complainant's workload, however, ADF began to train others to take over Complainant's travel voucher responsibilities. On July 3, 1997, by memorandum, Complainant accused ADF of taking this action to retaliate against her for filing an EEO complaint. [Ex. FF] ADF did not transfer Complainant's travel voucher responsibilities. [Ex. GG] However, by September, Complainant informed Mr. Wilson that performing her duties as a receptionist while, simultaneously, working on travel documents was not possible given her disability. [Ex. HH]; *See Wilson Sworn Statement* at ¶ 14. Mr. Wilson reminded Complainant of ADF's earlier attempt to accommodate her by training others to perform travel voucher and authorization preparation. Nevertheless, in order to accommodate Complainant's concerns, Mr. Wilson offered to seek, and Complainant received authorization to use compensatory time to work on travel vouchers provided there was work to be done. *See id.*

In an e-mail to Tom Wilson dated September 24, 1997, Complainant alleged that examining travel vouchers while performing receptionist duties had "jeopardized [her] health." [Ex. II] On the same day, Mr. Wilson advised Complainant that he would enlist the help of a co-worker in order to accomplish the task. [Ex. JJ] On October 10, 1997, Mr. Wilson outlined the procedures for requesting overtime in a memorandum to Complainant. [Ex. KK] By October 15, 1997, Complainant advised Mr. Wilson that she would not request overtime as his instructions for doing so were too involved. [Ex. LL]

In her informal complaint, Complainant requested a reassignment to a new supervisor. Her request was granted in October 1997. [Ex. MM]

In November 1997, meetings between ADF officials and Complainant took place to discuss the necessary accommodations. As for Complainant's need to frequently urinate, by this time, five people were named and designated to relieve her, and, as always, she could leave her desk unattended any time she had the need to do so. *See Fields Sworn Statement* at ¶ 5. During one of these meetings, Complainant stated for the first time that she needed three to four rest breaks per day and specifically requested that the Foundation create a new position for her.

Effective November 17, 1997, the Foundation began managing a desk relief schedule

5

for Complainant. The following represented her schedule:

| | |
|---|---|
| 8:30 a.m. | arrival time |
| 9:15-9:30 a.m. | break |
| 11:00-11:15 a.m. | break |
| 12:30-1:30 p.m. | lunch |
| 2:00-2:15 p.m. | break |
| 4:00-4:15 p.m. | break |
| 5:00 p.m. | end of day |

[Ex. NN]; see *Fields Sworn Statement* at ¶ 6.

Due to Complainant's failure to provide medical documentation specifically describing lupus and its effects as they related to her requested remedies, on its own accord, the Foundation obtained information on the topic from the Job Accommodation Network. [Ex. OO & PP]

In a letter dated December 3, 1997, and addressed to Nathaniel Fields, Vice President at that time, Dr. Griffin stated his opinion that Complainant suffered bladder damage due to the Agency's alleged failure to accommodate her disability. [Ex. QQ]

In a separate letter also dated December 3 and addressed to Mr. Fields, Dr. Griffin explained for the first time the nature and effects of Complainant's disease, gave a brief history of her illness, and suggested that Complainant would benefit from a work environment similar to her original position as a Procurement Assistant. [Ex. F] This is the first medical document ADF received from Complainant that not only addressed her disability, but also described its effects and explained how ADF could reasonably and effectively accommodate her.

### E.    1998

By January 8, 1998, ADF identified a newly created position, Grants and Correspondence Management Assistant, and offered it to the Complainant. *See Fields Sworn Statement* at ¶ 9. Complainant and ADF collaborated on the duties that would be necessary to the job and how to best accommodate Complainant's needs. *Id.*

On March 9, 1998, ADF reassigned Complainant to the above referenced position elevating her back to a GS-7 job. [Ex. A] In her new position, Complainant participates in flex-time, ADF has advanced her sick leave, flexibly applied the sick leave policy, allowed her to participate in the leave donor program, and authorized her to take breaks at her discretion. *See Counselor's Report* at 7; *Wilson Sworn Statement* at ¶ 15; *Stone-Evans Sworn Statement* at ¶¶ 1, 2, 3. After seven months in her new position with no apparent difficulties, on September 17, ADF invited

Complainant by letter to a meeting to determine whether she had additional needs. [Ex. RR] As the letter explained, the purpose of the meeting was to determine whether Complainant required further accommodation, and, if so, how the parties could most effectively address her needs. ADF received no response to the invitation.

## II.   LEGAL ANALYSIS

Entitlement to reasonable accommodation is predicated upon a complainant's ability to demonstrate that she is a qualified individual with a disability. *See* 42 U.S.C. 12112(b)(5)(A). An employee is a qualified individual with a disability within the meaning of the statute only if the asserted impairment substantially limits one or more major life activities and the employee can perform the essentials functions of his/her job with or without reasonable accommodation. *See* 42 U.S.C. 12111(8). The Complainant bears the initial burden of establishing her status as a qualified individual with a disability as part of a *prima facie* case of failure to provide reasonable accommodation. *See Southerland v. Postmaster General*, 05930714 (1994). For the purpose of this motion only, however, the Foundation assumes that Complainant is a qualified individual with a disability. In the event this motion is denied, ADF reserves the right to present evidence and argument on that issue at the hearing.

### A.   ADF'S KNOWLEDGE OF COMPLAINANT'S DISABILITY

An agency's legal obligation is to provide reasonable accommodation to qualified individuals with disabilities unless doing so would impose an "undue hardship." 42 U.S.C. 12112(b)(5)(A). This requirement, however, only applies to the extent that the agency is made aware of an employee's disability if it is not otherwise obvious. *See id;* 29 C.F.R. 1630.9(a) ("[i]t is unlawful for a covered entity not to make reasonable accommodation to the *known physical or mental limitations* of an otherwise qualified applicant or employee with a disability . . ."); *see also Pascale v. Department of Navy*, 03850092 (1986). It was Complainant's responsibility to apprise ADF officials that she had a medical condition that required accommodation. Complainant failed to do so. ADF officials only became aware that Complainant suffered from lupus after she filed her EEO complaint in June 1997. *See Wilson Sworn Statement* at ¶ 13; *Fields Sworn Statement* at ¶ 1; *Counselor's Report* at 3. Until January 1997, ADF did not know, and Complainant never suggested or offered, that her need for frequent bathroom breaks was the result of a disability. [Ex. X]; *See Wilson Sworn Statement* at ¶¶ 10, 11; *Fields Sworn Statements* at ¶ 2. Previously, Complainant merely stated that those designated to relieve her were taking too long. She did not state that any delay in her ability to urinate could result in bladder damage. *See Wilson Sworn Statement* at ¶ 10. At any point, Complainant could have explained her condition to ADF officials. She did not. Recognizing an employee's desire to keep their medical issues private, those that choose to do so may preclude an employer's ability to

accommodate their needs.

An employer is entitled to documentation from an individual requesting accommodation which would show that the individual has a covered disability for which they require a reasonable accommodation. *See Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* at ¶¶ 3, 6 (October 17, 2002); *see also Tucker v. USPS*, 01985638 (2000). Despite Mr. Wilson's efforts in May 1997, ADF did not receive competent medical documentation describing her disease or how best to accommodate it until on or about December 3, 1997, after she filed her EEO complaint. Prior to that letter, documentation submitted by Complainant to ADF pertained only to her bladder condition, and, as noted, ADF had long before encouraged her to use the restroom at her discretion. [Exs. U, Z, AA]; *See Fields Sworn Statement* at ¶¶ 3, 5; *Wilson Sworn Statement* at ¶ 12. Despite its lack of knowledge regarding the existence of Complainant's disability, as discussed in detail below, ADF has provided reasonable accommodation to Complainant since 1994.

### B. ADF PROVIDED COMPLAINANT WITH REASONABLE ACCOMMODATIONS

A reasonable accommodation includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. 1630.2(o)(ii) app.; *see also* 42 U.S.C. 12111(9).

Complainant claims that ADF failed to provide her reasonable accommodation in connection with her lupus. Assuming Complainant is able to establish that she is a qualified individual with a disability and ADF was sufficiently made aware of that disability, the undisputed facts of this case demonstrate that ADF fulfilled its accommodative obligation to Complainant.

#### 1. THE FOUNDATION REASONABLY ACCOMMODATED COMPLAINANT BY APPROVING LEAVE REQUESTS

Complainant was diagnosed with lupus in 1994. ADF granted her over seven months of uninterrupted leave from September 1994 to April 1995 despite Complainant's failure to inform ADF of the nature, effect, or even existence of her condition. When Complainant returned in 1995, ADF approved another leave request from May 11 - 19. [Ex. SS] Complainant was also permitted to participate in the leave donor program during this time. [Ex. TT] In 1996, the Foundation approved approximately 82 hours of advanced sick leave and allowed Complainant to participate in the leave donor

program. [Exs. UU - YY] In 1997, Complainant requested, and ADF officials approved, 80 hours of advanced sick leave. [Ex. ZZ] The Foundation approved 88 hours of advanced sick leave in 1998. [Ex. AAA] For the year 1999, 173 hours of advanced sick leave was approved for Complainant. [Exs. BBB - FFF] In 2000, ADF officials approved 130.5 hours of advanced sick leave. [Exs. GGG - III] For 2001, Complainant requested, and the Foundation approved over 135 hours of advance sick leave. [Exs. JJJ - MMM] Last year, ADF officials approved 126 hours of advanced sick leave at the Complainant's request. [Exs. NNN - QQQ] This year, Complainant has received 56 hours of advanced sick leave. [Exs. RRR & SSS] Complainant has participated in the leave donor program since 1995 and continues to do so. *See Stone-Evans Sworn Statement* at ¶ 1. Currently, Complainant participates in flex-time, ADF has advanced her sick leave, flexibly applied the sick leave policy, allowed her to participate in the leave donor program, and authorized her to take breaks at her discretion. *See Wilson Sworn Statement* at ¶ 15; *Stone-Evans Sworn Statement* at ¶¶ 1, 2, 3.

It is well settled that the Commission acknowledges leave grants as a form of reasonable accommodation. *See Marriott v. USPS*, 01994803 (2001) ("[a]llowing an employee to take disability-related leave is a form of accommodation."); 29 C.F.R. 1630.2(o) app. (". . . other accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment."); *Enforcement Guidance: Reasonable Accommodation* at ¶ 22 (October 17, 2002) ("modified schedule may involve adjusting arrival or departure times, providing periodic breaks, altering when certain functions are performed, allowing an employee to use accrued paid leave, or providing additional unpaid leave."); *Technical Assistance Manual*, "Disability Discrimination," at p. 796 ("[p]ermitting the use of accrued paid leave, or unpaid leave, is a form of reasonable accommodation when necessitated by an employee's disability. An employer does not have to provide paid leave beyond that which is provided to similarly situated employees.") Not only did the Foundation permit Complainant to exhaust her annual and sick leave each year, it approved hundreds of hours of advanced sick leave to ensure that she maintained an income during that leave. This is in addition to her participation in the leave donor program, which she has used since 1995. *See Stone-Evans Sworn Statement* at ¶ 1. As early as 1994, ADF voluntarily accommodated Complainant despite her failure to reveal the existence of a medical condition.

2. **THE FOUNDATION REASONABLY ACCOMMODATED COMPLAINANT BY MODIFYING HER WORK SCHEDULE**

In 1995, ADF allowed Complainant to work a modified schedule (part-time) of 4 hours per day from April to June and then 6 hours per day from June 12 to June 26, 1995. [Ex. TTT] In 1997, upon Complainant's request, the Foundation implemented a receptionist relief schedule that included two fifteen minute breaks in the morning, a hour lunch break, and two more fifteen minute breaks in the afternoon. [Ex. NN] The

Foundation was also prepared to allow Complainant to conduct her travel voucher duties on compensatory time, but Complainant rejected the Foundation's accommodation because she thought the necessary paperwork was too involved. All Foundation employees are allowed to engage in flex time and Complainant is no exception. Arrival times are 7:30 a.m. to 9:30 a.m. Departure times are 4:00 p.m. to 6:00 p.m. The Foundation has always been particularly flexible with Complainant's arrival times. *See Stone-Evans Sworn Statement* at ¶¶ 2, 3.

Modified work schedules are specifically acknowledged in Commission regulations as forms of reasonable accommodation. *See* 29 C.F.R. 1630.2(o)(2)(ii) ("[r]easonable accommodation may include but is not limited to . . . part-time or modified work schedules"); *Enforcement Guidance: Reasonable Accommodation* at ¶ 22 (October 17, 2002) ("modified schedule may involve adjusting arrival or departure times, providing periodic breaks, altering when certain functions are performed, allowing an employee to use accrued paid leave, or providing additional unpaid leave); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 335-36 (2d. Cir. 2000) (allowing employee to return to work on part-time basis while recovering may be a reasonable accommodation); 42 U.S.C. 12111(9) ("reasonable accommodation may include part-time or modified work schedules"). Since 1995, the Foundation has provided Complainant a modified work schedule.

Complainant alleges that the Foundation treated Nancy Williams, another receptionist, more favorably by allowing Ms. Williams to work flexible hours. *See Counselor's Report* at 2. Essentially, Complainant alleges disparate treatment. To establish a *prima facie* case of disparate treatment, Complainant must demonstrate that she is a member of protected class, that the Foundation took some employment action, and that in taking the action, the agency treated her differently than similarly situated employees outside of the protected class. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Complainant's argument fails. Ms. Williams was not employed by the Foundation. Ms. Williams' services were secured through a temporary agency for only a brief period of time. Complainant asserts that Ms. Williams did not have a disability. However, Complainant provides no evidence to that effect. Complainant was not similarly situated to Ms. Williams. Complainant requested that she be allowed to work from home while she was a Procurement Assistant, not a receptionist. Her duties were separate from Complainant's and time limited. Her work for the Foundation took place prior to the reduction in force. Ms. Williams coordinated her schedule with the temporary agency she worked for not the Foundation. *See Stone-Evans Sworn Statement* ¶ 4.

3. **COMPLAINANT'S REQUEST TO WORK FROM HOME WAS NOT FEASIBLE AND WOULD HAVE PROVED AN UNDUE BURDEN ON THE AGENCY**

Prior to filing her complaint in 1997, Complainant suggested that she be allowed to work from home. Complainant's request to work from home was not viable. Her primary duties involved preparing documents and filing them in cabinets maintained at ADF, and working with people and documents all physically located at the Foundation. [Ex. B]; *See Wilson Sworn Statement* at ¶ 3. Taking into account the small size of the Foundation, prior to the reduction in force the agency employed a little over fifty full time employees, Complainant's presence at the work site was required. The Foundation had but one office. There were no facilities closer to Complainant.

Accommodating this request would have placed an undue burden on the Foundation. According to Commission regulations at 29 C.F.R. 1630.9(a), ADF is required to provide a reasonable accommodation unless doing so would impose an undue hardship on the agency's operations. *See* 42 U.S.C. 12112(b)(5)(A). An accommodation would impose an undue hardship if it requires "significant difficulty or expense." 42 U.S.C. 12111(10)(A). "'Undue hardship' refers to any accommodation that would be unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business." 29 C.F.R. 1630.2(p)(1). Commission Enforcement Guidance on Reasonable Accommodation at ¶ 34 (October 17, 2002), specifically addresses requests to work from home:

> An employer must modify its policy concerning where work is performed if such a change is needed as a reasonable accommodation, but only if this accommodation would be effective and would not cause an undue hardship. (footnote omitted) Whether this accommodation is effective will depend on whether the essential functions of the position can be performed at home. There are certain jobs in which the essential functions can only be performed at the work site -- e.g., food server, cashier in a store. For such jobs, allowing an employee to work at home is not effective because it does not enable an employee to perform his/her essential functions. Certain considerations may be critical in determining whether a job can be effectively performed at home, including (but not limited to) the employer's ability to adequately supervise the employee and the employee's need to work with certain equipment or tools that cannot be replicated at home.

Simply put, Complainant's job could not be accomplished from home. *See also* 42 USC 12111(10)(B) (enumerating factors to be considered in determining whether a request would place an undue burden on agency operations, including the nature and cost of the requested accommodation, the number of individuals employed by agency, the overall financial resources of the facility, the number, type, and location of its

facilities).

Moreover, nothing compelled the Agency to grant such a request absent extraordinary circumstances, and at this point the Foundation was not even aware that Complainant suffered from a disability. *See Vande Zande v. Wisconsin Department of Administration*, 44 F.3d 538, 544-45 (7th Cir. 1995) ("Generally . . . an employer is not required to accommodate a disability by allowing the disabled worker to work, by himself, without supervision, at home. . . . [I]t would take a very extraordinary case for the employee to be able to create a triable issue" precluding summary judgment).

Complainant further alleges that the Foundation treated Nancy Williams more favorably by allowing her to work from home. Again, Ms. Williams was not an ADF employee. Her schedule was coordinated with the temp agency, not the Foundation. Ms. Williams never worked for ADF from home. If Ms. Williams was unable to work on any given day, the temp agency would send someone else. *See Stone-Evans Sworn Statement* at ¶ 4.

### 4. THE FOUNDATION REASONABLY ACCOMMODATED COMPLAINANT BY APPROVING HER REQUEST FOR LIGHT DUTY

Job restructuring is also noted as a reasonable accommodation under Commission regulations. *See* 29 C.F.R. 1630.2(o)(2)(ii) ("[r]easonable accommodation may include but is not limited to . . . job restructuring"); *see also* 42 U.S.C. 12111(9) (recognizing job restructuring as a form of reasonable accommodation).

As to the request for light duty made in 1995, *i.e.*, temporary relief from mail processing, Complainant's request was granted. Specifically, Complainant requested that she be required to perform only that "work which can be accomplished sitting or involves occasionally standing and walking." [Ex. R] Processing the mail, however, involved just that, walking approximately 10 feet from Complainant's workstation, placing the incoming mail in the appropriate mail slots, and taking the outgoing mail to the first floor of the building once a day. *See Wilson Sworn Statement* at ¶ 2. Tom Wilson granted Complainant's request. Moreover, consistent with Dr. Griffin's July 17, 1995 note, all three positions held by Complainant during the relevant time period were already sedentary in nature. [Exs. A, B, C]

### 5. THE FOUNDATION PROVIDED REASONABLE ACCOMMODATION FOR COMPLAINANT'S BLADDER CONDITION

Complainant's allegation that she was not allowed to use the restroom, and as a consequence she developed bladder damage is unsupported by the evidence. [Ex. UUU] She was never prevented from using the restroom. No one disciplined

12

Complainant for leaving her post to use the restroom, nor was she told that she may not leave her desk to use the restroom. *See Fields Sworn Statement* at ¶ 4; *Wilson Sworn Statement* at ¶¶ 8, 9.

Until January 1997, ADF had no knowledge of Complainant's condition. [Ex. X] Nor was it an obvious effect of Complainant's lupus. On January 28, 1997, Complainant wrote a memorandum addressed to Tom Wilson wherein she accused ADF of failing to accommodate a condition that ADF did not know existed, for which, by Complainant's own admissions, ADF had already provided accommodation by allowing her to take bath room breaks whenever necessary. [Exs. X, U, Z, AA]

Once ADF was made aware that Complainant's need to frequently urinate was the result of a condition, ADF reiterated its position that Complainant could leave the receptionist area and phones unattended if needed and designated five co-workers to relieve Complainant. The President of the Foundation, the Vice President of the Foundation, in fact, the entire staff was at Complainant's disposal to cover the front desk at anytime. [Ex. AA] The Foundation granted Complainant four 15 minute breaks during the day not including her one hour lunch break. *See Fields Sworn Statement* at ¶ 6.

Answering the phones is an essential function of the receptionist position, Ex. C, and as such ADF was under no obligation to redistribute that work. *See Mole v. Buckhorn Rubber Prods.*, 165 F.3d 1212, 1218 (8th Cir. 1999) (finding employer is not required to redistribute essential job functions to existing or additional employees); *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 232 (3d Cir. 2000) (holding employer is not required to have other employees "cover" for train dispatcher who sometimes loses consciousness where the ability to monitor train tracks is an essential function of the job); *Smith v. Blue Cross Blue Shield of Kan.*, 102 F.3d 1075, 1076 (10th Cir. 1996) (concluding employer need not remove telephone responsibilities from correspondent position). Nevertheless, ADF provided those accommodations to Complainant.

Complainant further alleges that the Foundation treated Nancy Williams more favorably by giving Ms. Williams breaks, while Complainant had to ask for them. *See Counselor's Report* at 2. The Foundation has routinely allowed all receptionists one fifteen minute break in the morning and one fifteen minute break in the afternoon. *See Wilson Sworn Statement* at ¶ 6; *Stone-Evans Sworn Statement* at ¶ 5. The same amount of breaks allowed Ms. Williams when she was a receptionist were allowed Complainant while she filled the position. Ultimately, however, Complainant was allowed four fifteen minute breaks per day.

### 6. THE FOUNDATION WAS UNDER NO OBLIGATION TO PROVIDE A STRESS-FREE WORKING ENVIRONMENT

Complainant further maintains that her lupus requires that she "maintain an environment of low stress" and that ADF failed to reasonably accommodate her when she was rifted into what she terms "a stressful receptionist position, which exacerbated her condition." *See Counselor's Report* at 1 & 2. However, an employer is not required to accommodate an employee by providing a stress-free workplace. *See e.g., Gonzagowski v. Widnall*, 115 F.3d 744, 747-48 (10th Cir. 1997) (finding employer is not required to restructure job to create work environment free of stress); *Pikora v. Blue Cross & Blue Shield of Mich.*, 970 F.Supp. 591, 596-97 (E.D. Mich. 1997) (holding employer was not required to remove duty of phone contact with customers in response to employee's complaint of stress).

### 7. COMPLAINANT RECEIVED REASONABLE ACCOMMODATION WHEN THE FOUNDATION CHANGED HER SUPERVISOR

In the informal EEO complaint, Complainant requested that she be appointed a new supervisor as a reasonable accommodation. [Ex. G] According to Commission Enforcement Guidance, however, an employer does not have to provide an employee with a new supervisor as a reasonable accommodation. *See Enforcement Guidance: Reasonable Accommodation* at ¶ 33 (October 17, 2002). Nevertheless, in October of 1997, ADF reassigned Complainant to Ms. Smith-Field. [Ex. MM]

### 8. THE FOUNDATION REASONABLY ACCOMMODATED COMPLAINANT BY REASSIGNING HER TO A NEWLY CREATED POSITION AND COLLABORATING WITH HER AS TO WHAT HER RESPONSIBILITIES WOULD INCLUDE

In her informal complaint, Complainant requested that she be relieved of her receptionist duties. Complainant was the receptionist. A reassignment would have been necessary to accommodate this request and at that time there were no vacant positions within ADF at her pay grade or lower or for which she qualified. *See Fields Sworn Statement* at ¶ 7. In August 1997, ADF did advertise for a Computer Specialist, GS-14, [Ex. VVV], a position that Complainant, a GS-7, was not otherwise qualified to fill. In any event, the Foundation cancelled the announcement in September due to uncertainties in available funding. [Ex. WWW]

While "reassignment to a vacant position" is listed as a form of reasonable accommodation, ADF had no obligation to create a new position in order to effectuate Complainant's requested reassignment. 42 U.S.C. 12111(9)(B); 29 C.F.R. 1630.2(o)(2)(ii); *see Enforcement Guidance: Reasonable Accommodation* at ¶ 24

(October 17, 2002) ("'Vacant' means that the position is available when the employee asks for reasonable accommodation, or that the employer knows that it will become available within a reasonable amount of time. . . . The employer does not have to bump an employee from a job in order to create a vacancy; nor does it have to create a new position."); *see also White v. York Int'l Corp.*, 45 F.3d 357, 362, 3 AD Cas. (BNA) 1746, 1750 (10th Cir. 1995).

However, by January 1998, ADF was able to identify a newly created position for Complainant. In order to ensure that the reassignment would effectively address Complainant's physical limitations, ADF developed, with Complainant's assistance, a task specific position description tailored to her needs. [Exs. A, XXX & YYY] By March 1998, Complainant was ADF's Grants and Correspondence Management Assistant. Bearing in mind that ADF is a relatively small organization with a staff of about 30 people, this accommodation is significant.

Reassignment to a vacant position is to be considered as an accommodation only when there is no reasonable accommodation that would enable the employee to perform the essential functions of the existing position. *See e.g., Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1019 (8th Cir. 2000) (reassignment to be considered only if employee cannot be accommodated in existing job); *Davoll v. Webb*, 194 F.3d 1116, 1131 (10th Cir. 1999) (finding employer should attempt to accommodate in existing position first); *Kalekiristos v. CTF Hotel Mgmt. Corp.* 958 F.Supp. 641, 662-63 (D.D.C.), *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997) (employer is not required to reassign employee where employer had provided accommodation that would enable employee to perform in existing position).

Additionally, reassignments are characterized by the Commission's policy guidance as "'last resort' accommodation[s] that must be considered if there are no effective accommodations that would enable the employee to perform the essential functions of his/her current job, or if all other possible accommodations would impose undue hardship." *Policy Guidance on Executive Order 13164: Establishing Procedures To Facilitate The Provision of Reasonable Accommodation* at ¶ E(21) (October 20, 2000); see *Patrick v. USPS*, 01976918 (2001) (finding when employee can no longer perform the essential functions of the position because of a disability, and no accommodation is possible in that position, reassignment should be considered as a reasonable accommodation); *Ignacio v. USPS*, 03840005 (1984) (same). Notwithstanding the fact that Complainant had never suggested that she was unable to perform the essential functions of her position as receptionist, ADF reassigned Complainant to the newly created GS-7 position.

15

### C. ADF PROPERLY ENGAGED IN AN INTERACTIVE PROCESS WITH COMPLAINANT

What constitutes a "reasonable accommodation can be a case specific determination. However, Commission regulations suggest that

> it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. 1630.2(o)(3).

This "interactive process" is what ADF and Complainant engaged in with respect to her bladder condition and lupus.

Mr. Wilson discussed the mail processing request with Complainant and granted her request. He discussed the possibility of Complainant working from home with her, but it proved impossible.

As for the bladder condition, Complainant argues that the initial accommodation, *i.e.*, designating relief persons, was not effective. But the effectiveness of an accommodation is defined in terms of permitting the individual to perform the essential functions of the position in question. Restated, a reasonable accommodation is one that enables an employee to perform the essential functions of his or her job. *See Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996) (reasonable accommodation enables employee to perform essential job functions). In *Howard v. Secretary of Treasury*, 01945846 (1996), the Commission noted that although the agency's accommodations did not "precisely mirror" those requested, they were sufficient to permit complainant to perform the essential functions of her position. Nothing contained in Complainant's complaint suggests that she became or ever was unable to perform the essential functions of her position as a receptionist or a procurement assistant. If a provided accommodation proves to be ineffective, the Agency's duty then becomes determining whether an alternative accommodation can be provided. *See Enforcement Guidance: Reasonable Accommodation* at ¶ 32 (October 17, 2002). ADF gave Complainant unfettered discretion to use the restroom even if it meant leaving the reception area unattended or calling the President of ADF to relieve her. ADF never disallowed or prevented her from using the restroom.

The Foundation collaborated with Complainant to establish a task specific position description for the Grants and Correspondence Management Assistant position in order to ensure that the duties were in alignment with her specific limitations.

The undisputed facts further establish that after having provided Complainant with the reasonable accommodations of her choosing, *i.e.*, the reassignment, in 1998, ADF renewed its efforts to ensure that the provided accommodations continued to be satisfactory, but Complainant ignored invitations for further discussion on the matter. Although the Agency bears the burden to initiate the "interactive process," which ADF did long before 1998, and to cooperate with the complainant throughout the process, the complainant must also engage in the process. If the complainant refuses to do so, summary judgment is appropriate.

Dr. Griffin wrote a letter to Mr. Wilson dated April 15, 1997, the following request:

> Ms. Cobb-Hennix has a chronic medical disability which is characterized by remissions and exacerbation.
>
> Please provide her with the necessary work environment that will not further complicate her disability.

[Ex. BB] In an attempt to effectively address Complainant's specific needs, on May 19, Mr. Wilson wrote a memorandum to Complainant requesting more definitive information concerning the nature and effect of her illness. [Ex. CC] Whether Complainant responded by resubmitting Dr. Griffin's April 15 letter or she attached his May 6, 1997, letter [Ex. EE], Complainant failed to provide the additional information requested. The April 15 letter did not identify Complainant's "chronic medical disability," it's nature or a way to accommodate that disability. Like Complainant's January 28 letter [Ex. W], Dr. Griffin's May 6, 1997, letter merely levied accusations against ADF, again, without identifying Complainant's illness or providing information as to what the "necessary work environment" might include. The letter states that Complainant should be allowed to use the restroom whenever she had the urge to urinate. This had already been provided. There was nothing more the Foundation could do to accommodate her with respect to her bladder condition.

Complainant's allegation that ADF failed to provide the necessary accommodations is meritless in light of her failure to provide the requested necessary information concerning her needs. An employer need not guess as to the nature of an employee's disability or their need for accommodation. *See Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361 (11th Cir. 1999) (duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir. 1998) (employer is not required to speculate as to the extent of a disability or need or desire for accommodation). ADF was not obligated to decipher the precise nature of what accommodations would constitute Complainant's "necessary work environment." An agency "may require an employee to provide documentation that is *sufficient* to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested." *Enforcement Guidance: Disability-Related Inquiries and Medical*

17

*Examinations of Employees Under the Americans with Disabilities Act (ADA)* at ¶ B(10) (July 27, 2000) (emphasis in original). ADF appropriately requested more definite information from Complainant and she failed to provide it until she filed her EEO complaint.

Beyond consultation with the disabled individual, the employer may seek an independent verification of those needs, rather than relying solely upon the individual's treating physician. ADF did not require "independent verification." ADF was willing to accept the representations of Complainant's doctor as true. Tom Wilson merely requested additional information to determine Complainant's limitations in order to identify possible accommodations for her. Where, as here, the complainant refuses to engage in the "interactive process" or to provide the agency with the documentation necessary to determine a reasonable accommodation, the agency cannot be held liable. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) (employer cannot be faulted if employee fails to supply information that employer needs); *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617 (10th Cir. 1998) (accommodation claim was precluded by employee's failure to provide medical information necessary to interactive process); *Steffes v. Stephan Co.*, 144 F.3d 1070 (7th Cir. 1998) (medical information provided by plaintiff's doctor was inadequate, and plaintiff failed to provide additional information).

### D.   THE COMPLAINANT IS NOT ENTITLED TO COMPENSATORY DAMAGES

ADF cannot be held liable for compensatory damages where it demonstrates that it made a good faith effort to accommodate Complainant's disability. But if Complainant's substantive claims survive summary judgment, the Commission should grant partial summary judgment on the basis that the undisputed facts establish it has, in good faith, engaged in efforts to provide reasonable accommodation. According to 42 U.S.C. 1981a(a)(3),

> damages may not be awarded under this section where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.

The Commission's interpretive guidance on reasonable accommodations provides that "[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process" between the agency and the employee. 29 C.F.R. 1630.9 (2000). The facts establish ADF's good faith effort to reasonably accommodate Complainant over an extended period of time and its repeated attempts, in consultation with Complainant, to identify and provide the appropriate

accommodations. Where an agency's efforts result in an accommodation, this is a sufficient demonstration of good faith to avoid liability for compensatory damages. *See Luellen v. USPS*, 01951340 (1996) (finding that despite the insufficiency of the agency's efforts to accommodate complainant, agency's good faith efforts precluded complainant's entitlement to compensatory damages). Notwithstanding the inherent difficulties employers face in determining which accommodations to offer an individual with a disability, ADF, in good faith, identified and implemented reasonable accommodations. Even if ADF's demonstrated efforts are found legally insufficient, Complainant is not entitled to receive compensatory damages.

## III. CONCLUSION

There are no genuine issues of material fact. ADF is entitled to judgment as a matter of law. If Complainant's substantive claims survive summary judgment, Complainant is not entitled to compensatory damages, and partial summary judgment would be appropriate.

Respectfully submitted,

_____
Doris Martin
African Development Foundation
1400 I Street, NW, 10th Floor
Washington, DC 20005
(202) 673-3916
(202) 673-3810 fax

General Counsel