UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANICE COBB-HENNIX,                      )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )  Civil Action No. 06-1572 PLF
                                         )
NATHANIEL FIELDS, <u>et</u> <u>al.</u>,  )
                                         )
            Defendants.                  )
─────────────────────────────────────── )

<u>MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

Defendants, by and through counsel, hereby move pursuant to

Fed. R. Civ. P. 12(b)(1) and (6) to dismiss this action.  In the

alternative, the Defendants move for summary judgment in their

favor, pursuant to Fed. R. Civ. P. 56.[1]  The Court is

─────────────────────

[1]  To the extent that the Court may rely on matters outside
of the pleadings, the Court may enter summary judgment in favor
of the defendants.  <u>See</u> Fed. R. Civ. P. 12(b); 56.  Plaintiff
should take notice that any factual assertions contained in the
documents in support of this motion may be accepted by the Court
as true unless Plaintiff submits his own affidavit or other
documentary evidence contradicting the assertions in the
documents.  <u>See</u> <u>Neal</u> v. <u>Kelly</u>, 963 F.2d 453, 456-57 (D.C. Cir.
1992), Local Rule 7(h); 56.1 and Fed. R. Civ. P. 56(e), which
provides as follows:

    Supporting and opposing affidavits shall be made on
    personal knowledge, shall set forth such facts as would
    be admissible in evidence, and shall show affirmatively
    that the affiant is competent to testify to the matters
    stated therein.  Sworn or certified copies of all
    papers or parts thereof referred to in an affidavit
    shall be attached thereto or served therewith.  The
    court may permit affidavits to be supplemented or
    opposed by depositions, answers to interrogatories, or
    further affidavits.  When a motion for summary judgment
    is made and supported as provided in this rule, an
    adverse party may not rest upon the mere allegations or
    denials of the adverse party's pleading, but the
    adverse party's response, by affidavits or as otherwise

respectfully referred to the accompanying memorandum of points and authorities in support of this motion.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

_____

provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANICE COBB-HENNIX,                )
                                   )
          Plaintiff,               )
                                   )
     v.                            ) Civil Action No. 06-1572 PLF
                                   )
NATHANIEL FIELDS, et al.,          )
                                   )
          Defendants.              )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

I.   INTRODUCTION

     The African Development Foundation is a small U.S.
Government agency with approximately thirty employees.  Unique in
its mission, ADF supports the development of community based
initiatives aimed at reducing poverty and promoting sustainable
development in Africa.

     Plaintiff has brought this action against the ADF and its
President, claiming that, when she worked as the receptionist at
ADF, the medication she was taking caused her to need frequent
bathroom breaks, which were not properly accommodated by the
agency from February 1996 until the Fall of 1997.  Complaint, ¶¶
17-20, 27.  Plaintiff claims that the reasonable accommodation
she sought was to "go to the restroom without undue delay as
necessary."  Complaint, ¶¶ 23, 30.  Plaintiff concedes that
numerous efforts were made to accommodate her, but complains that
not until the agency reassigned her from the receptionist

position in March 1998 was she truly able to "use the restroom when she needed to do so without any restrictions."   Complaint, ¶¶ 16, 26, 31-32.

Because Plaintiff has failed to establish that her restriction amounted to a substantial limitation on a major life activity, <u>see</u> Complaint, ¶¶ 32, and because only the head of the agency rather than the Agency itself is a proper party under the Rehabilitation Act, Plaintiff has failed to state a claim. Moreover, because Plaintiff admits that she was given various accommodations before she filed the instant action, Complaint, ¶ 35, including, ultimately, an effective one, <u>id.</u>, ¶¶ 31-35, she fails to state a claim.  <u>See Taylor</u> v. <u>Small</u>, 350 F.3d 1286, 1293-94 (D.C. Cir. 2003).  Finally, because the undisputed facts reveal that the agency satisfied its obligations under the Rehabilitation Act, summary judgment in favor of Defendants would be in order.

## II.  STATEMENT OF FACTS

Currently, Plaintiff is the Grants and Correspondence Management Assistant, GS-7, at the African Development Foundation.  Exhibit 1 [Ex. A].[1]  In 1994, Plaintiff occupied the position of Procurement Assistant, GS-7. (Exhibit 2 [Ex. B];

---

[1]  For ease of reference to Plaintiff, Defendants have included after the term "Ex." the number assigned to the various exhibits as they were marked at the administrative stage of proceedings.

Complaint, ¶ 10).  In November 1995, ADF employees were notified that a reduction in force ("RIF") was imminent.  Complaint, ¶ 15. The encumbered positions dropped significantly, and Plaintiff's position was abolished.  See id.; Counselor's Report (Exhibit 3) at 7-8; Wilson Sworn Statement (Exhibit 4), ¶¶ 4-5.  In lieu of separation, ADF offered Plaintiff a GS-6 Receptionist position (Exhibit 5)[Ex. C], which she accepted with full knowledge of the parameters of the position and with saved grade and pay. (Exhibit 5 and Exhibit 6) [Ex. C and Ex. D]; Complaint, ¶¶ 15-16).  The RIF was conducted in accordance with governing laws and regulations.  Exhibit 5 and Exhibit 7 [Ex. C and Ex. E].  In 1998, the Foundation reassigned Plaintiff to her current position.  Complaint, ¶¶ 30-31.

Plaintiff claims to suffer from systemic lupus erythematosus, a condition diagnosed in 1994.  Complaint, ¶¶ 7-10.  Treatment includes oral doses of Cyclophosphamide, commonly referred to as Cytoxan, which requires Plaintiff to drink large quantities of liquids, resulting in her need to urinate frequently.  Complaint, ¶ 8.  The basis for this complaint is Plaintiff's disability, lupus, and ADF's alleged failure reasonably to accommodate that disability from February 1996 until March 1998 by reassigning her receptionist duties. Complaint, ¶¶ 15-31.  Further details of the events are set forth below.

A.   <u>In 1994</u>

In 1994, Plaintiff submitted certificates from Dr. Calvin Griffin, a rheumatologist, stating that she was "totally incapacitated" from September 29 to October 27 and then again from October 28 to December 4, 1994. <u>See</u> Exhibit 8 and Exhibit 9 [Ex. H and Ex. I]. Plaintiff requested 200 hours of advanced sick leave. Her request was approved. Exhibit 10 [Ex. J]; <u>see</u> Complaint, ¶ 9. During the same time period, Gregory Smith, ADF President at that time, also approved a request by Plaintiff to participate in the leave donor program. Exhibit 11 [Ex. K]; <u>see</u> Complaint, ¶ 11. Nothing contained in the doctor's notes suggested the nature of Plaintiff's illness or that she required accommodation. Exhibit 8 and 9 [Ex. H and Ex. I].

B.   <u>In 1995</u>

In January 1995, Plaintiff requested an additional 60 hours of advanced sick leave, which was granted. <u>See</u> Exhibit 12 [Ex. L]; Complaint, ¶ 9; Exhibit 13 [Ex. M]. The doctor's note submitted stated that Plaintiff would be incapacitated until February 7, 1995, without revealing the nature of her illness or that she would require accommodations upon her return. Exhibit 14 [Ex. N].

Plaintiff was approved to return to work on April 3, 1995. Exhibit 15 [Ex. O]. ADF was then advised that Plaintiff would not return until April 6, 1995. Exhibit 16 [Ex. P]. On April

-4-

21, 1995, Plaintiff returned to light duty work with ADF's approval limited by her physician to four hours a day. <u>See</u> Counselor's Report (Exhibit 3) at 4; Exhibit 17 [Ex. Q].

In a memorandum, dated August 20, 1995 and addressed to Tom Wilson, Plaintiff's first line supervisor, Plaintiff requested a temporary reprieve from her responsibilities associated with mail handling (Exhibit 18 [Ex. R]) and attached a July 17, 1995 note from her doctor stating that she should "only do sedentary work." (Exhibit 19 [Ex. S]). Plaintiff's request was granted. <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶¶ 1-2.

On August 31, 1995, Plaintiff also requested that she be allowed to use her home as an alternate flexible workplace due to what she characterized as a "connective tissue disease." (Exhibit 20 [Ex. T]). To this point, none of the submitted documentation provided information sufficient to document the existence or nature of a disease, disability, or Plaintiff's functional limitations. <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶¶ 12, 14. Nonetheless, Mr. Wilson discussed the possibility with Plaintiff. Ultimately, however, Plaintiff's request to work from home was not a viable option given her position with ADF. <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶ 4.

C.    <u>In 1996</u>

Plaintiff's position as a Procurement Assistant was abolished due to a reduction in force. <u>See</u> Complaint, ¶ 15.

Rather than separating Plaintiff, ADF offered her the GS-6 Receptionist position in November 1995, with saved grade and pay. Id.; Exhibit 5; Exhibit 6 [Ex. C and Ex. D]. Plaintiff's reassignment to that position became effective in February 1996. Complaint, ¶¶ 15-16. Sometime after the reassignment, Plaintiff began to complain that she needed to use the restroom often and that the individuals appointed to relieve her were taking too long to respond to her calls. See Complaint, ¶¶ 17-19; Wilson Sworn Statement (Exhibit 4), ¶ 11. ADF did not know, and Plaintiff never suggested or offered, that her need to urinate was urgent or the result of a disability. See Wilson Sworn Statement (Exhibit 4), ¶ 11; Fields Sworn Statement (Exhibit 21), ¶¶ 2-3. Nevertheless, as early as 1996, ADF President at that time, William Ford, responded to her concerns by authorizing Plaintiff to use the restroom at her discretion if the individuals designated to relieve her were unavailable. Complaint, ¶¶ 18-20, 27; Exhibit 22 [Ex. U] at 4, Issue II (authored by Plaintiff in response to her performance appraisal for that rating period).

    D.    In 1997

    On January 11, 1997, Plaintiff procured a letter from a Urologist, Dr. Frederick Hendricks, stating that she has a "bladder condition that causes unavoidable urges to urinate . . . at least every hour or two." Complaint, ¶ 19; Exhibit 23 [Ex.

-6-

V].  When Plaintiff actually provided this letter to an ADF official is unknown.  At that time, Plaintiff's tour of duty began at 8:30 a.m. and ended at 5:00 p.m.  <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶¶ 5-6.  In addition to restroom breaks, Plaintiff had two fifteen minute breaks throughout the day, one in the morning and one in the afternoon, as well as, an hour lunch break.  Complaint, ¶ 16; Wilson Sworn Statement (Exhibit 4), ¶ 7.

In a memorandum dated January 28, 1997, Plaintiff levied accusations that ADF had failed to accommodate her need for frequent restroom breaks, and as a result, her "bladder condition" was aggravated "to the extent that [Plaintiff] had to have surgery in December 1996, and is presently [sic] under medical treatment."  <u>See</u> Complaint, ¶ 19; Exhibit 24 [Ex. W].  Prior to January 11, 1997, ADF had no knowledge of the existence of a "bladder condition."  <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶ 11; Fields Sworn Statement (Exhibit 21), ¶ 2.  In fact, by Plaintiff's own admission, she did not report any bladder condition to ADF officials until January 11, 1997.  Exhibit 25 [Ex. X] at 2.

On January 29, 1997, Mr. Wilson attached Plaintiff's letter to a memorandum written to William Ford, ADF President at that time, setting forth three possible approaches to accommodating Plaintiff.  Exhibit 26 [Ex. Y].  ADF had already named and

-7-

designated four relief persons to cover the front desk while Plaintiff used the restroom. <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶¶ 6-7. ADF officials reiterated their position to Plaintiff that she could take bathroom breaks whenever necessary even if doing so would leave the reception area unattended. Exhibit 27 [Ex. Z]; <u>see</u> Wilson Sworn Statement (Exhibit 4), ¶ 12; Fields Sworn Statement (Exhibit 21), ¶ 3. The President of ADF himself even offered to provide relief if Plaintiff needed it. <u>See</u> August 15, 1997 Letter from William Ford (Exhibit 28) [Ex. AA]. In fact, Plaintiff was advised that the entire Foundation staff was at her disposal to cover the phones. If she was unable to find relief, she could leave the reception area unattended provided that she lock the front door for security purposes. <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶ 12. At all times the restroom was readily accessible to Plaintiff as it was only feet from her workstation. <u>See</u> Exhibit 27 (Ex. Z).

In a letter dated April 15, 1997 and addressed to Mr. Wilson, Dr. Griffin wrote:

> Ms. Cobb-Hennix has a chronic medical disability which is characterized by remissions and exacerbation.
>
> Please provide her with the necessary work environment that will not further complicate her disability.

Exhibit 29 [Ex. BB]. In order effectively to address Plaintiff's specific needs, on May 19, 1997, Mr. Wilson wrote Plaintiff to request more definitive information concerning the nature and

effect of her illness.  Specifically, Mr. Wilson requested
"information which will clearly and specifically identify the
nature and effect of the 'chronic medical disability' identified
by Dr. Griffin and information which will clearly and
specifically identify the 'necessary work environment' mentioned.
. ."  Exhibit 30 [Ex. CC].  Without responding to Mr. Wilson's
memorandum, on June 19, 1997, Plaintiff initiated contact with an
EEO counselor alleging that ADF failed to reasonably accommodate
her disability.  See Counselor's Report at 9; Complaint, ¶ 23.
Agency officials became aware of the existence of Plaintiff's
lupus sometime after the filing of the informal complaint.  See
Counselor's Report (Exhibit 3) at 3-4; Wilson Sworn Statement
(Exhibit 4), ¶ 13; Fields Sworn Statement (Exhibit 21), ¶ 2.  On
June 20, 1997, Plaintiff responded to Mr. Wilson's inquiry and
attached a letter from Dr. Griffin.  See Exhibit 31 [Ex. DD];
Complaint, ¶ 24.  It is unclear whether Plaintiff attached the
above referenced letter again (Exhibit 29 [Ex. BB]), or a letter
written by Dr. Griffin in connection with a worker's compensation
claim filed in 1997.  Exhibit 32 [Ex. EE]

    As part of the requested remedies listed in the informal
complaint, Plaintiff asked for removal of receptionist duties
from her job.  Fields Sworn Statement (Exhibit 21), ¶ 8
Plaintiff, however, was the receptionist.  Complaint, ¶¶ 16, 31-
32.  To accommodate this request, therefore, would have required

a reassignment and no vacant positions were available at that time.  See Fields Sworn Statement (Exhibit 21), ¶ 8.  A component of the receptionist position was preparing travel documents and vouchers.  Exhibit 5 [Ex. C].  In an attempt to lighten Plaintiff's workload, however, ADF began to train others to take over Plaintiff's travel voucher responsibilities.  In a July 3, 1997 memorandum, Plaintiff accused ADF of taking this action to retaliate against her for filing an EEO complaint.  Exhibit 33 [Ex. FF].  ADF did not transfer Plaintiff's travel voucher responsibilities.  Exhibit 34 [Ex. GG].  However, by September, Plaintiff informed Mr. Wilson that performing her duties as a receptionist while, simultaneously, working on travel documents was not possible given her disability.  Exhibit 35 [Ex. HH]; see Wilson Sworn Statement (Exhibit 4), ¶ 14.  Mr. Wilson reminded Plaintiff of ADF's earlier attempt to accommodate her by training others to perform travel voucher and authorization preparation. Nevertheless, in order to accommodate Plaintiff's concerns, Mr. Wilson offered to seek, and Plaintiff received authorization to use compensatory time to work on travel vouchers provided there was work to be done.  See id.; Exhibit 35 [Ex. HH].

In an e-mail to Tom Wilson dated September 29, 1997, Plaintiff alleged that preparing travel vouchers while performing receptionist duties had "jeopardized [her] health."  Exhibit 36 [Ex. II].  On the same day, Mr. Wilson advised Plaintiff that he

would enlist the help of a co-worker in order to accomplish the task.  Exhibit 37 [Ex. JJ].  On October 10, 1997, Mr. Wilson outlined the procedures for requesting overtime in a memorandum to Plaintiff.  Exhibit 38 [Ex. KK].  By October 15, 1997, Plaintiff advised Mr. Wilson that she would not request overtime as his instructions for doing so were too involved.  See Wilson Sworn Statement (Exhibit 4), ¶ 15; Exhibit 39 [Ex. LL].

In her informal EEO complaint, Plaintiff requested a reassignment to a new supervisor.  Exhibit 40 [Ex. G]. Plaintiff's request was granted in October 1997. Exhibit 41[Ex. MM].

In November 1997, meetings between ADF officials and Plaintiff took place to discuss the necessary accommodations.  As for Plaintiff's need to frequently urinate, by this time, five people were named and designated to relieve her, and, as always, she could leave her desk unattended any time she had  the need to do so.  See Fields Sworn Statement (Exhibit 21), ¶ 5.  During one of these November 1997 meetings, Plaintiff stated for the first time that she needed three to four rest breaks per day and specifically requested that the Foundation create a new position for her.  Id., ¶¶ 4-7.

Effective November 17, 1997, the Foundation began managing a desk relief schedule for Plaintiff, with the following schedule:

```
8:30 a.m.           arrival time
9:15-9:30 a.m.      break
```

```
11:00-11:15 a.m.        break
12:30-1:30 p.m.         lunch
2:00-2:15 p.m.          break
4:00-4:15 p.m.          break
5:00 p.m.               end of day
```

Exhibit 42 [Ex. NN]; Fields Sworn Statement (Exhibit 21), ¶ 6.

Due to Plaintiff's failure to provide medical documentation specifically describing lupus and its effects as they related to her requested remedies, on its own accord, the Foundation obtained information on the topic from the Job Accommodation Network. See Exhibit 43 and Exhibit 44 [Ex. OO & PP]. In a letter dated December 3, 1997, and addressed to Nathaniel Fields, Vice President at that time, Dr. Griffin stated his opinion that Plaintiff suffered bladder damage due to the Agency's alleged failure to accommodate her disability. Exhibit 45 [Ex. QQ].

In a separate letter also dated December 3, 1997, and addressed to Mr. Fields, Dr. Griffin explained for the first time the nature and effects of Plaintiff's disease, gave a brief history of her illness, and suggested that Plaintiff would benefit from a work environment similar to her original position as a Procurement Assistant. Exhibit 46 [Ex. F]. This is the first medical document ADF received from Plaintiff that not only addressed her disability, but also described its effects and explained how ADF could reasonably and effectively accommodate her. See id.

-12-

E.    In 1998

By January 8, 1998, ADF identified a newly created position, Grants and Correspondence Management Assistant, and offered it to the Plaintiff. See Fields Sworn Statement (Exhibit 21), ¶¶ 9-10; Exhibit 1 [Ex. A]. Plaintiff and ADF collaborated on the duties that would be necessary to the job and how to best accommodate Plaintiff's needs. Id.

On March 9, 1998, ADF reassigned Plaintiff to the Grants and Correspondence Management Assistant position, placing her back in a GS-7 position. Exhibit 1 [Ex. A]. In the Grants and Correspondence Management Assistant position, Plaintiff participates in flex-time, ADF has advanced her sick leave, flexibly applied the sick leave policy, allowed her to participate in the leave donor program, and authorized her to take breaks at her discretion. See Counselor's Report (Exhibit 3) at 7; Wilson Sworn Statement (Exhibit 4), ¶ 15; Stone-Evans Sworn Statement (Exhibit 47), ¶¶ 1-3. After seven months in her new position with no apparent difficulties, on September 17, 1998, ADF invited Plaintiff by letter to a meeting to determine whether she had additional needs. Exhibit 48 [Ex. RR]. As the letter explained, the purpose of the meeting was to determine whether Plaintiff required further accommodation, and, if so, how the parties could most effectively address her needs. Id. ADF has not received, and Plaintiff has not alleged that she has

-13-

made, any response to the invitation.  See id.; Complaint, ¶¶ 31-34.

Plaintiff admits that she was given a medication that required her to take large amounts of water, but that she was fully able to perform the essential functions of her job as a typist, because she was able to take frequent restroom breaks and she required no accommodation.  Complaint, ¶¶ 7-10.

Plaintiff also admits that her dispute over her freedom to take immediate and frequent restroom breaks was resolved by the Fall of 1997, when she was "allowed to go to the restroom freely. . ."  Complaint, ¶¶ 27, 34-35.  Similarly, Plaintiff admits that by March 1998, her major concern, that she be relieved of her receptionist duties, was addressed when her receptionist duties were reassigned.  Complaint, ¶ 31.

### III.  ARGUMENT

#### The Proper Defendant

Plaintiff's claim against the ADF must be dismissed, because the head of the agency rather than the agency itself is the only proper defendant in a claim under the Rehabilitation Act or Title VII.  Wilkins v. Daley, 49 F.Supp.2d 1, 3 (D.D.C. 1999) ("In a suit against the federal government under either Title VII or the Rehabilitation Act, only the 'head of the department' may be sued, 42 U.S.C. § 2000e-16(c); 29 U.S.C. § 794a(a)(1).  The claims against all other defendants will be dismissed for failure

-14-

to name a proper party defendant.")  Plaintiff's claim against the agency itself should therefore be dismissed.

### Plaintiff Was Accommodated at the Administrative Stage

The Court of Appeals has held that when an employer resolves a claim for accommodation brought by an employee during the administrative processing of an EEO complaint, that resolution precludes a subsequent suit to recover under Title VII or the Rehabilitation Act.  See Taylor v. Small, 350 F.3d 1286, 1293-94 (D.C. Cir. 2003).

In Taylor, the Court reasoned as follows:

> We agree with the four other circuits to have addressed the question:  An employer may cure an adverse employment action -- at least one of the sort here alleged -- before that action is the subject of litigation.  See White v. Burlington Northern & Santa Fe Railway Co., 310 F.3d 443, 452 (6th Cir. 2002) (reinstatement that "puts the plaintiff in the same position she would have been in absent the suspension constitutes the 'ultimate employment decision,' thereby negating a potentially adverse intermediate employment decision"), reh'g en banc granted and judgment vacated, 321 F.3d 1203 (2003); Pennington v. City of Huntsville, 261 F.3d 1262, 1267-68 (11th Cir. 2001) (no adverse employment action where plaintiff initially denied but shortly thereafter received promotion); Brooks v. San Mateo, 229 F.3d 917, 929-30 (9th Cir. 2000) (retaliatory lowering of performance evaluation not adverse employment action where evaluation was "on appeal" and might have been corrected if plaintiff had not quit her job while appeal was pending); Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998) ("We need not address whether a mere delay in promotion constitutes an adverse employment action because [plaintiff] received the promotion with retroactive pay and seniority"); cf. Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc) ("there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were

-15-

not intended to fall within the direct proscriptions of
... Title VII").
As the district court reasoned:
> Permitting employers the opportunity to
> correct workplace wrongs prior to litigation
> is the objective of the EEO process.  If a
> plaintiff were permitted a right to sue even
> if his or her employer had corrected the
> grievance, there would be absolutely no
> incentive for employers to make adjustments
> for past conduct during the EEO process.

Mem. Op. at JA 60, <u>citing</u> <u>Martini</u> v. <u>Federal
Nat'l Mortgage Ass'n</u>, 178 F.3d 1336, 1338
(D.C. Cir. 1999) (remanding to district court
with instructions to dismiss plaintiff's suit
as untimely because "Title VII requires
complainants to wait 180 days before suing in
federal court so that the Commission may
informally resolve as many charges as
possible").  Because Hedlin corrected her
error in rating Taylor and increased Taylor's
bonus accordingly before Taylor filed suit,
there was no unremedied adverse employment
action when the suit was filed and the
district court properly granted summary
judgment in favor of the Smithsonian on Count
I.

<u>Taylor</u> v. <u>Small</u>, 350 F.3d 1286, 1293-94.

Plaintiff instituted this action in September 2006,
Complaint at 1, after she had already received the accommodation
she had sought from the agency.  <u>Id.</u>, ¶¶ 23, 27, 30-35.
Therefore, she cannot prevail.

<u>Disability</u>

Defendants move to dismiss on the ground that plaintiff does
not have a "disability" within the meaning of the ADA, because
the Complaint does not indicate that the alleged impairment - the
need to take frequent restroom breaks - has substantially limited

any of Plaintiff's major life activities.  The Rehabilitation Act prohibits "discrimination against individuals with disabilities by recipients of federal funds." Chevron U.S.A. v. Echazabal, 536 U.S. 73, 82 n.4 (2002).  The Supreme Court has "limited the application of the term 'discrimination' in the Rehabilitation Act to a person who is a member of a protected group and faces discrimination 'by reason of his handicap'." Olmstead v. L.C. by Zimring, 527 U.S. 581, 619 (1999) (citation omitted).  The purpose of the Act "is to guarantee that individuals with disabilities receive evenhanded treatment relative to those persons without disabilities." Id. at 620 (citation and internal quotation marks omitted).

> [T]he Supreme Court has previously upheld dismissal of an ADA action for failure to state a claim where the plaintiffs failed adequately to allege how their impairment substantially limited them in the major life activity of working.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 488-89, 494, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).  Accordingly, plaintiff's complaint must adequately allege facts sufficient to support the claim that he has a ""disability"" within the meaning of the ADA, or else be subject to dismissal.
>
> Construing the complaint in the light most favorable to plaintiff, it certainly can be read, as described more expansively in plaintiff's brief, as alleging that plaintiff must avoid all types of work-related stressful situations due to his medical condition, which essentially limits him to administrative duties. Pl. Mem. at 22-25.  However, the legal conclusion asserted by plaintiff - that he is therefore substantially limited in the major life activity of working - is not consistent with the law. As the Supreme Court stated in Sutton:
>
> When the major life activity under

consideration is that of working, the
statutory phrase ""substantially limits""
requires, at a minimum, that plaintiffs
allege they are unable to work in a broad
class of jobs. . . . . To be substantially
limited in the major life activity of
working, then, one must be precluded from
more than one type of job, a specialized job,
or particular choice of job. If jobs
utilizing an individual's skills (but perhaps
not his or her unique talents) are available,
one is not precluded from a substantial class
of jobs. Similarly, if a host of different
types of jobs are available, one is not
precluded from a broad range of jobs.

Sutton, 527 U.S. at 491-92, 119 S.Ct. 2139; see also
Duncan v. Washington Metro. Area Transit Auth., 240
F.3d 1110, 1115 (D.C. Cir. 2001) ("a plaintiff must
allege and prove that in his particular circumstances,
taking into account the appropriate factors, his
impairment prevents him from performing a 'substantial
class' or 'broad range' of jobs otherwise available to
him'"). Here, plaintiff's complaint concedes that he
is capable of performing as a police officer with
administrative duties - the duties in his present
position. The complaint does not suggest a limitation
of any other major life activity-nor does plaintiff's
brief. Therefore, the Court concludes that plaintiff
has failed to allege facts suggesting that he is
substantially limited in a major life activity and,
hence, that he has not sufficiently alleged that he is
disabled under the law. Accordingly, plaintiff's claim
of disability discrimination under the ADA will be
dismissed for failure to state a claim.

Mitchell v. Yates, 402 F.Supp.2d 222, 228-29 (D.D.C. 2005)

(footnotes omitted).[2]

---

[2] Where Defendants have relied on cases interpreting the
Americans with Disabilities Act ("ADA"), they have done so
because the same standards apply to the ADA as apply to the
Rehabilitation Act. See Dage v. Leavitt, Civil Action No. 04-221
JGP, slip op. at 10, 2007 WL 81961 at *5, n.8 (D.D.C. Jan. 9,
2007) (and cases cited therein).

Plaintiff has admitted that the only reason she was limited in her work at the agency was her need to take frequent restroom breaks.  Complaint, ¶¶ 8, 10.  Plaintiff has not alleged, and cannot establish, that her need to take such breaks prevents her from performing a substantial class or broad range of jobs otherwise available to her.  Rather, if Plaintiff is to be believed, she was only unable to perform as a receptionist because she could not lock the doors quickly enough when no one else could take over for her at the reception desk.  Complaint, ¶¶ 16, 20, 32.  She admits that the remaining class of jobs she could perform (involving typing or grants administration) did not require such quick door-locking abilities or otherwise interfere with her frequent restroom breaks.  See Complaint, ¶¶ 10, 31.

It Is Undisputed That Plaintiff Was Properly Accommodated

In any event, "[i]t is well-settled that in asserting discrimination based on failure to accommodate, the moving party must establish that 'an accommodation was needed' in order to carry out the essential functions of the position'" Dage v. Leavitt, Civil Action No. 04-221 JGP, slip op. at 13,  (D.D.C. Jan. 9, 2007)(citing Bissell v. Reno, 74 F.Supp. 2d 521, 528 (D. Md. 1999)).  An employer does not have to choose the best accommodation available or the accommodation that the employee prefers.  Id., slip op. at 13 (citing Salmon v. Dade County Sch. Bd., 4 F.Supp. 2d 1157, 1160-61 (D. Fla. 1998) (citation

-19-

omitted)).  A reasonable accommodation includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. 1630.2(o)(ii) app.; see also 42 U.S.C. § 12111(9).

As set forth herein, Plaintiff has failed to state a claim for relief under the facts at hand.  She was continually offered accommodations, providing her with sick leave, advanced sick leave, participation in the leave donor program, an opportunity for overtime, compensatory time and flex-time, back-up support to staff the Receptionist desk when Plaintiff needed to use the restroom, authority to lock the doors if no one was immediately available to take over for her, and ultimately a position as a Grants and Correspondence Management Assistant.  Even though the agency attempted numerous other methods to accommodate Plaintiff's claimed needs before providing her the new position, it indisputably provided Plaintiff numerous reasonable accommodations along the way.

Plaintiff claims that ADF failed to provide her reasonable accommodation in connection with her lupus.  Assuming Plaintiff is able to establish that she is a qualified individual with a disability and ADF was sufficiently made aware of that disability, the undisputed facts of this case demonstrate that

-20-

ADF fulfilled its accommodative obligation to Plaintiff.

The foundation reasonably accommodated Plaintiff by approving leave requests. Plaintiff was diagnosed with lupus in 1994. ADF granted Plaintiff over seven months of uninterrupted leave from September 1994 to April 1995, despite Plaintiff's failure to inform ADF of the nature, effect, or even existence of her condition. When Plaintiff returned in 1995, ADF approved another leave request from May 11 - 19. Exhibit 49 [Ex. SS]. Plaintiff was also permitted to participate in the leave donor program during this time. Exhibit 50 [Ex. TT]. In 1996, the Foundation approved approximately 82 hours of advanced sick leave and allowed Plaintiff to participate in the leave donor program. Exhibit 51; Exhibit 52 [Ex. UU; Ex. YY]. In 1997, Plaintiff requested, and ADF officials approved, 80 hours of advanced sick leave. Exhibit 53 [Ex. ZZ]. The Agency approved 88 hours of advanced sick leave in 1998. Exhibit 54 [Ex. AAA]. For the year 1999, 173 hours of advanced sick leave was approved for Plaintiff. Exhibit 55 and Exhibit 56 [Ex. BBB - Ex. FFF]. In 2000, ADF officials approved 130.5 hours of advanced sick leave. Exhibit 57; Exhibit 58 and Exhibit 59 [Exs. GGG - III]. For 2001, Plaintiff requested, and the Foundation approved over 135 hours of advance sick leave. Exhibits 60- 63 [Exs. JJJ - MMM]. More recently, ADF officials approved 126 hours of advanced sick leave at the Plaintiff's request. Exhibits 64-67 [Exs. NNN -

QQQ].   And even more recently, Plaintiff has received 56 hours of advanced sick leave.  Exhibit 68 and Exhibit 69 [Exs. RRR and SSS].  Plaintiff has participated in the leave donor program since 1995 and continues to do so.  See Stone-Evans Sworn Statement (Exhibit 47), ¶ 1.  Currently, Plaintiff participates in flex-time, ADF has advanced her sick leave, flexibly applied the sick leave policy, allowed her to participate in the leave donor program, and authorized her to take breaks at her discretion.  See Wilson Sworn Statement (Exhibit 4), ¶ 15; Stone-Evans Sworn Statement (Exhibit 47), ¶¶ 1-3.  Such accommodations are contemplated in such circumstances.  See 29 C.F.R. § 1630.2(o) app. (". . . other accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment.").  Not only did the ADF permit Plaintiff to exhaust her annual and sick leave each year, it approved hundreds of hours of advanced sick leave to ensure that she maintained an income during that leave.  This is in addition to her participation in the leave donor program, which she has used since 1995.  See Stone-Evans Sworn Statement (Exhibit 47), ¶ 1.  As early as 1994, ADF voluntarily accommodated Plaintiff despite her failure to reveal the existence of a medical condition.

The Agency also reasonably accommodated Plaintiff by modifying her work schedule.  In 1995, ADF allowed Plaintiff to

work a modified schedule (part-time) of 4 hours per day from April to June and then 6 hours per day from June 12 to June 26, 1995. Exhibit 70 [Ex. TTT]. In 1997, upon Plaintiff's request, the ADF implemented a receptionist relief schedule that included two fifteen minute breaks in the morning, a hour lunch break, and two more fifteen minute breaks in the afternoon. Exhibit 42 [Ex. NN]. The ADF was also prepared to allow Plaintiff to conduct her travel voucher duties on compensatory time, but Plaintiff rejected the accommodation because she thought the necessary paperwork was too involved. See Wilson Sworn Statement (Exhibit 4), ¶ 15. All ADF employees are allowed to engage in flex-time and Plaintiff is no exception. See Stone-Evans Sworn Statement (Exhibit 47), ¶ 4. Arrival times are 7:30 a.m. to 9:30 a.m. Departure times are 4:00 p.m. to 6:00 p.m. The ADF has always been particularly flexible with Plaintiff's arrival times. See Stone-Evans Sworn Statement (Exhibit 47), ¶¶ 2-3.

Modified work schedules are specifically acknowledged in Equal Employment Commission regulations as forms of reasonable accommodation. See 29 C.F.R. 1630.2(o)(2)(ii) ("[r]easonable accommodation may include but is not limited to . . . part-time or modified work schedules"); see also Parker v. Columbia Pictures Indus., 204 F.3d 326, 335-36 (2d. Cir. 2000) (allowing employee to return to work on part-time basis while recovering may be a reasonable accommodation); 42 U.S.C. § 12111(9)

("reasonable accommodation may include part-time or modified work schedules"). Since 1995, the Foundation has provided Plaintiff a modified work schedule.

The ADF reasonably accommodated plaintiff by approving her request for light duty. Job restructuring is also noted as a reasonable accommodation under Commission regulations. See 29 C.F.R. 1630.2(o)(2)(ii) ("[r]easonable accommodation may include but is not limited to . . . job restructuring"); see also 42 U.S.C. 12111(9) (recognizing job restructuring as a form of reasonable accommodation).

As to the request for light duty made in 1995, i.e., temporary relief from mail processing, Plaintiff's request was granted. Specifically, Plaintiff requested that she be required to perform only that "work which can be accomplished sitting or involves occasionally standing and walking." Exhibit 18 [Ex. R]. Processing the mail, however, involved just that, walking approximately 10 feet from Plaintiff's workstation, placing the incoming mail in the appropriate mail slots, and taking the outgoing mail to the first floor of the building once a day. See Wilson Sworn Statement (Exhibit 4), ¶ 2. Tom Wilson granted Plaintiff's request. Id. Moreover, consistent with Dr. Griffin's July 17, 1995 note, all three positions held by Plaintiff during the relevant time period were already sedentary in nature. Exhibit 1; Exhibit 2; Exhibit 5 [Exs. A, B and C].

-24-

Plaintiff's suggestion that she was not allowed to use the restroom, and as a consequence she developed bladder damage, see Complaint, ¶¶ 8, 10, 31, is contrary to the evidence. Plaintiff was never prevented from using the restroom. No one disciplined Plaintiff for leaving her post to use the restroom, nor was she told that she may not leave her desk to use the restroom. See Fields Sworn Statement (Exhibit 21), ¶ 4; Wilson Sworn Statement (Exhibit 4), ¶¶ 8-9.

Until January 1997, ADF had no knowledge of Plaintiff's specific condition, nor was it an obvious effect of Plaintiff's lupus. See Exhibit 25 [Ex. X]; Wilson Sworn Statement (Exhibit 4), ¶¶ 11-12, 14. On January 28, 1997, Plaintiff wrote a memorandum addressed to Tom Wilson wherein she accused ADF of failing to accommodate a condition that ADF did not know existed, for which, by Plaintiff's own admissions, ADF had already provided accommodation by allowing her to take bath room breaks whenever necessary. Exhibits 22; 25; 27; 28 [Exs. X, U, Z, AA].

Once ADF was made aware that Plaintiff's need to frequently urinate was the result of a condition, ADF reiterated its position that Plaintiff could leave the receptionist area and phones unattended if needed and designated five co-workers to relieve Plaintiff. The President of the Foundation, the Vice President of the Foundation, in fact, the entire staff was at Plaintiff's disposal to cover the front desk at anytime. Exhibit

-25-

28 [Ex. AA].  The Agency granted Plaintiff four 15 minute breaks
during the day not including her one hour lunch break.  <u>See</u>
Fields Sworn Statement (Exhibit 21), ¶ 6.

Answering the phones is an essential function of the
receptionist position, Exhibit 5 [Ex. C], and as such ADF was
under no obligation to redistribute that work.  <u>See</u> <u>Mole</u> v.
<u>Buckhorn Rubber Prods.</u>, 165 F.3d 1212, 1218 (8th Cir. 1999)
(finding employer is not required to redistribute essential job
functions to existing or additional employees); <u>Donahue</u> v.
<u>Consolidated Rail Corp.</u>, 224 F.3d 226, 232 (3d Cir. 2000)
(holding employer is not required to have other employees "cover"
for train dispatcher who sometimes loses consciousness where the
ability to monitor train tracks is an essential function of the
job); <u>Smith</u> v. <u>Blue Cross Blue Shield of Kansas</u>, 102 F.3d 1075,
1076 (10th Cir. 1996) (concluding employer need not remove
telephone responsibilities from correspondent position).
Nevertheless, ADF provided those accommodations to Plaintiff.

Plaintiff's assertion of delay in securing her non-
receptionist position is similar to the claim made in <u>Clayborne</u>
v. <u>Potter</u>, 448 F.Supp.2d 185, 192-93 (D.D.C. 2006):

> . . . Ms. Clayborne contends that the 12-month delay
> from the time she went on sick leave to the time she
> returned to work in her new position in Registered Mail
> operations was unreasonable and thus USPS discriminated
> against her by failing to provide a reasonable
> accommodation.  In <u>Jay</u> v. <u>Intermet Wagner Inc.</u>, 233
> F.3d 1014 (7th Cir. 2000), the plaintiff made a similar
> claim, alleging that a 20-month delay before

-26-

reassignment was unreasonable.  In <u>Jay</u>, the plaintiff
was a millwright who went on medical leave when he tore
his Achilles tendon.  Thereafter, he was precluded from
performing any job that involved climbing.  When he
requested to be reinstated as a millwright, his
employer refused because climbing was an integral part
of the millwright's job.  The employer instead placed
Mr. Jay on an extended medical leave and considered him
weekly for reinstatement to a position that did not
require climbing.  Twenty months later, the employer
assigned Mr. Jay to a new position.  The court found
that the employer acted reasonably and in good faith.
"It simply took a long time for a position to become
available which met Jay's work restrictions and for
which Jay's seniority qualified him." <u>Id</u>. at 1017.

Although USPS was not required to modify Ms.
Clayborne's essential duties as a mail processing
clerk, . . ., USPS did so.  Later, in September of
2003, when Ms. Clayborne could no longer function as a
mail processing clerk because her disability threatened
her own safety, USPS put her on sick leave and referred
her to the accommodation committee, DRAC.  In February
2004, the DRAC requested medical information from Ms.
Clayborne, and in March 2004 the DRAC met with her and
with a representative from the Lighthouse for the
Blind. . . . .  In April 2004, the DRAC met again to
consider alternative jobs that Ms. Clayborne could
perform. On June 21, 2004, representatives from the
Lighthouse for the Blind conducted an on-site visit,
and on July 5, 2004, the Lighthouse for the Blind
recommended that Ms. Clayborne could manually sort mail
with the assistance of the Olympia CCTV. Lighthouse for
the Blind provided this equipment to the USPS in
September 2004.  <u>Id</u>. The equipment was installed in the
Registered Mail operations, where Ms. Clayborne was
reassigned and returned to work on September 29, 2004.
This course of events demonstrates that USPS acted
reasonably and in good faith in accommodating Ms.
Clayborne's disability. This process simply took a
year.  Because USPS adequately accommodated Ms.
Clayborne, the Court will grant USPS's motion for
summary judgment.

<u>Clayborne</u> v. <u>Potter</u>, 448 F.Supp.2d at 192-93.  Plaintiff, like

the Plaintiff in <u>Claiborne</u>, is unable to establish, under the

undisputed facts of this case, that she was not treated

reasonably and in good faith.

IV.  <u>CONCLUSION</u>

For these reasons, this action should be dismissed or summary judgment entered in favor of the Defendants.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney

_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney

_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

-28-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANICE COBB-HENNIX,                    )
                                       )
          Plaintiff,                   )
                                       )
     v.                                ) Civil Action No. 06-1572 PLF
                                       )
NATHANIEL FIELDS, <u>et al.</u>,       )
                                       )
          Defendants.                  )
_____)

<u>STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE</u>

Pursuant to Local Civ. Rule 7(h), Defendants submit that the following facts are not in genuine dispute and they demonstrate that Defendants are entitled to judgment in their favor:

1.   Currently, Plaintiff is the Grants and Correspondence Management Assistant, GS-7, at the African Development Foundation.  (Exhibit 1 [Ex. A].

2.   In 1994, Plaintiff occupied the position of Procurement Assistant, GS-7. (Exhibit 2 [Ex. B]; Complaint, ¶ 10).

3.   In November 1995, ADF employees were notified that a reduction in force ("RIF") was imminent.  Complaint, ¶ 15.

4.   The encumbered positions dropped significantly, and Plaintiff's position was abolished.  <u>See</u> <u>id.</u>; Counselor's Report (Exhibit 3) at 7-8; Wilson Sworn Statement (Exhibit 4), ¶¶ 4-5.

5.   In lieu of separation, ADF offered Plaintiff a GS-6 Receptionist position (Exhibit 5)[Ex. C], which she accepted with full knowledge of the parameters of the position and with saved grade and pay. (Exhibit 5 and Exhibit 6) [Ex. C and Ex. D];

Complaint, ¶¶ 15-16).

6.   The RIF was conducted in accordance with governing laws and regulations.  Exhibit 5 and Exhibit 7 [Ex. C and Ex. E].

7.   In 1998, the Foundation reassigned Plaintiff to her current position.  Complaint, ¶¶ 30-31.

8.   Plaintiff claims to suffer from systemic lupus erythematosus, a condition diagnosed in 1994.  Complaint, ¶¶ 7-10.

9.   Treatment includes oral doses of Cyclophosphamide, commonly referred to as Cytoxan, which requires Plaintiff to drink large quantities of liquids, resulting in her need to urinate frequently.  Complaint, ¶ 8.

10.  The basis for this complaint is Plaintiff's disability, lupus, and ADF's alleged failure reasonably to accommodate that disability from February 1996 until March 1998 by reassigning her receptionist duties.  Complaint, ¶¶ 15-31.

11.  In 1994, Plaintiff submitted certificates from Dr. Calvin Griffin, a rheumatologist, stating that she was "totally incapacitated" from September 29 to October 27 and then again from October 28 to December 4, 1994.  See Exhibit 8 and Exhibit 9 [Ex. H and Ex. I].

12.  Plaintiff requested 200 hours of advanced sick leave. Her request was approved.  Exhibit 10 [Ex. J]; see Complaint, ¶ 9.

13.  During the same time period, Gregory Smith, ADF President at that time, also approved a request by Plaintiff to participate in the leave donor program.  Exhibit 11 [Ex. K]; see Complaint, ¶ 11.

14.  Nothing contained in the doctor's notes suggested the nature of Plaintiff's illness or that she required accommodation.  Exhibit 8 and 9 [Ex. H and Ex. I].

15.  In January 1995, Plaintiff requested an additional 60 hours of advanced sick leave, which was granted.  See Exhibit 12 [Ex. L]; Complaint, ¶ 9; Exhibit 13 [Ex. M].

16.  The doctor's note submitted stated that Plaintiff would be incapacitated until February 7, 1995, without revealing the nature of her illness or that she would require accommodations upon her return.  Exhibit 14 [Ex. N].

17.  Plaintiff was approved to return to work on April 3, 1995.  Exhibit 15 [Ex. O].

18.  ADF was then advised that Plaintiff would not return until April 6, 1995.  Exhibit 16 [Ex. P].

19.  On April 21, 1995, Plaintiff returned to light duty work with ADF's approval limited by her physician to four hours a day.  See Counselor's Report (Exhibit 3) at 4; Exhibit 17 [Ex. Q].

20.  In a memorandum, dated August 20, 1995 and addressed to Tom Wilson, Plaintiff's first line supervisor, Plaintiff

-3-

requested a temporary reprieve from her responsibilities associated with mail handling (Exhibit 18 [Ex. R]) and attached a July 17, 1995 note from her doctor stating that she should "only do sedentary work."  Exhibit 19 [Ex. S].

21.  Plaintiff's request was granted.  <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶¶ 1-2.

22.  On August 31, 1995, Plaintiff also requested that she be allowed to use her home as an alternate flexible workplace due to what she characterized as a "connective tissue disease." (Exhibit 20 [Ex. T]).  To this point, none of the submitted documentation provided information sufficient to document the existence or nature of a disease, disability, or Plaintiff's functional limitations.  <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶¶ 12, 14.

23.  Nonetheless, Mr. Wilson discussed the possibility with Plaintiff.  <u>Id</u>.  Ultimately, however, Plaintiff's request to work from home was not a viable option given her position with ADF. <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶ 4.

24.  Plaintiff's position as a Procurement Assistant was abolished due to a reduction in force.  <u>See</u> Complaint, ¶ 15. Rather than separating Plaintiff, ADF offered her the GS-6 Receptionist position in November 1995, with saved grade and pay. <u>Id.</u>; Exhibit 5; Exhibit 6 [Ex. C and Ex. D].

25.  Plaintiff's reassignment to that position became

-4-

effective in February 1996.  Complaint, ¶¶ 15-16.  Sometime after
the reassignment, Plaintiff began to complain that she needed to
use the restroom often and that the individuals appointed to
relieve her were taking too long to respond to her calls.  See
Complaint, ¶¶ 17-19; Wilson Sworn Statement (Exhibit 4), ¶ 11.

26.  ADF did not know, and Plaintiff never suggested or
offered, that her need to urinate was urgent or the result of a
disability.  See Wilson Sworn Statement (Exhibit 4), ¶ 11; Fields
Sworn Statement (Exhibit 21), ¶¶ 2-3.

27.  Nevertheless, as early as 1996, ADF President at that
time, William Ford, responded to her concerns by authorizing
Plaintiff to use the restroom at her discretion if the
individuals designated to relieve her were unavailable.
Complaint, ¶¶ 18-20, 27; Exhibit 22 [Ex. U] at 4, Issue II
(authored by Plaintiff in response to her performance appraisal
for that rating period).

28.  On January 11, 1997, Plaintiff procured a letter from a
Urologist, Dr. Frederick Hendricks, stating that she has a
"bladder condition that causes unavoidable urges to urinate . . .
at least every hour or two."  Complaint, ¶ 19; Exhibit 23 [Ex.
V].  When Plaintiff actually provided this letter to an ADF
official is unknown.  At that time, Plaintiff's tour of duty
began at 8:30 a.m. and ended at 5:00 p.m.  See Wilson Sworn
Statement (Exhibit 4), ¶¶ 5-6.  In addition to restroom breaks,

-5-

Plaintiff had two fifteen minute breaks throughout the day, one in the morning and one in the afternoon, as well as, an hour lunch break.  Complaint, ¶ 16; Wilson Sworn Statement (Exhibit 4), ¶ 7.

29.  In a memorandum dated January 28, 1997, Plaintiff levied accusations that ADF had failed to accommodate her need for frequent restroom breaks, and as a result, her "bladder condition" was aggravated "to the extent that [Plaintiff] had to have surgery in December 1996, and is presently [sic] under medical treatment."  See Complaint, ¶ 19; Exhibit 24 [Ex. W].

30.  Prior to January 11, 1997, ADF had no knowledge of the existence of a "bladder condition."  See Wilson Sworn Statement (Exhibit 4), ¶ 11; Fields Sworn Statement (Exhibit 21), ¶ 2.

31.  In fact, by Plaintiff's own admission, she did not report any bladder condition to ADF officials until January 11, 1997.  Exhibit 25 [Ex. X] at 2.

32.  On January 29, 1997, Mr. Wilson attached Plaintiff's letter to a memorandum written to William Ford, ADF President at that time, setting forth three possible approaches to accommodating Plaintiff.  Exhibit 26 [Ex. Y].

33.  ADF had already named and designated four relief persons to cover the front desk while Plaintiff used the restroom.  See Wilson Sworn Statement (Exhibit 4), ¶¶ 6-7.

34.  ADF officials reiterated their position to Plaintiff

-6-

that she could take bathroom breaks whenever necessary even if doing so would leave the reception area unattended. Exhibit 27 [Ex. Z]; <u>see</u> Wilson Sworn Statement (Exhibit 4), ¶ 12; Fields Sworn Statement (Exhibit 21), ¶ 3.

35. The President of ADF himself even offered to provide relief if Plaintiff needed it. <u>See</u> August 15, 1997 Letter from William Ford (Exhibit 28) [Ex. AA].

36. In fact, Plaintiff was advised that the entire Foundation staff was at her disposal to cover the phones. If she was unable to find relief, she could leave the reception area unattended provided that she lock the front door for security purposes. <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶ 12.

37. At all times the restroom was readily accessible to Plaintiff as it was only feet from her workstation. <u>See</u> Exhibit 27 (Ex. Z).

38. In a letter dated April 15, 1997 and addressed to Mr. Wilson, Dr. Griffin wrote:

> Ms. Cobb-Hennix has a chronic medical disability which is characterized by remissions and exacerbation.
>
> Please provide her with the necessary work environment that will not further complicate her disability.

Exhibit 29 [Ex. BB].

39. In order effectively to address Plaintiff's specific needs, on May 19, 1997, Mr. Wilson wrote Plaintiff to request more definitive information concerning the nature and effect of

her illness.  Specifically, Mr. Wilson requested "information
which will clearly and specifically identify the nature and
effect of the 'chronic medical disability' identified by Dr.
Griffin and information which will clearly and specifically
identify the 'necessary work environment' mentioned. . ."
Exhibit 30 [Ex. CC].

40.  Without responding to Mr. Wilson's memorandum, on June
19, 1997, Plaintiff initiated contact with an EEO counselor
alleging that ADF failed to reasonably accommodate her
disability.  See Counselor's Report at 9; Complaint, ¶ 23.

41.  Agency officials became aware of the existence of
Plaintiff's lupus sometime after the filing of the informal
complaint.  See Counselor's Report (Exhibit 3) at 3-4; Wilson
Sworn Statement (Exhibit 4), ¶ 13; Fields Sworn Statement
(Exhibit 21), ¶ 2.  On June 20, 1997, Plaintiff responded to Mr.
Wilson's inquiry and attached a letter from Dr. Griffin.  See
Exhibit 31 [Ex. DD]; Complaint, ¶ 24.

42.  As part of the requested remedies listed in the
informal complaint, Plaintiff asked for removal of receptionist
duties from her job.  Fields Sworn Statement (Exhibit 21), ¶ 8
Plaintiff, however, was the receptionist.  Complaint, ¶¶ 16, 31-
32.

43.  To accommodate this request, therefore, would have
required a reassignment and no vacant positions were available at

-8-

that time.  See Fields Sworn Statement (Exhibit 21), ¶ 8.

44.  A component of the receptionist position was preparing travel documents and vouchers.  Exhibit 5 [Ex. C].

45.  In an attempt to lighten Plaintiff's workload, however, ADF began to train others to take over Plaintiff's travel voucher responsibilities; but in a July 3, 1997 memorandum, Plaintiff accused ADF of taking this action to retaliate against her for filing an EEO complaint.  Exhibit 33 [Ex. FF].

46.  ADF did not transfer Plaintiff's travel voucher responsibilities.  Exhibit 34 [Ex. GG].

47.  However, by September, Plaintiff informed Mr. Wilson that performing her duties as a receptionist while, simultaneously, working on travel documents was not possible given her disability.  Exhibit 35 [Ex. HH]; see Wilson Sworn Statement (Exhibit 4), ¶ 14.

48.  Mr. Wilson reminded Plaintiff of ADF's earlier attempt to accommodate her by training others to perform travel voucher and authorization preparation.  Nevertheless, in order to accommodate Plaintiff's concerns, Mr. Wilson offered to seek, and Plaintiff received authorization to use compensatory time to work on travel vouchers provided there was work to be done.  See id.; Exhibit 35 [Ex. HH].

49.  In an e-mail to Tom Wilson dated September 29, 1997, Plaintiff alleged that preparing travel vouchers while performing

receptionist duties had "jeopardized [her] health."  Exhibit 36 [Ex. II].

50.  On the same day, Mr. Wilson advised Plaintiff that he would enlist the help of a co-worker in order to accomplish the task.  Exhibit 37 [Ex. JJ].

51.  On October 10, 1997, Mr. Wilson outlined the procedures for requesting overtime in a memorandum to Plaintiff.  Exhibit 38 [Ex. KK].

52.  By October 15, 1997, Plaintiff advised Mr. Wilson that she would not request overtime as his instructions for doing so were too involved.  See Wilson Sworn Statement (Exhibit 4), ¶ 15; Exhibit 39 [Ex. LL].

53.  In her informal EEO complaint, Plaintiff requested a reassignment to a new supervisor.  Exhibit 40 [Ex. G].

54.  Plaintiff's reassignment request was granted in October 1997. Exhibit 41[Ex. MM].

55.  In November 1997, meetings between ADF officials and Plaintiff took place to discuss the necessary accommodations.  As for Plaintiff's need to frequently urinate, by this time, five people were named and designated to relieve her, and, as always, she could leave her desk unattended any time she had  the need to do so.  See Fields Sworn Statement (Exhibit 21), ¶ 5.

56.  During one of these November 1997 meetings, Plaintiff stated for the first time that she needed three to four rest

-10-

breaks per day and specifically requested that the Foundation create a new position for her.  Id., ¶¶ 4-7.

57.  Effective November 17, 1997, the Foundation began managing a desk relief schedule for Plaintiff, with the following schedule:

```
8:30 a.m.           arrival time
9:15-9:30 a.m.      break
11:00-11:15 a.m.    break
12:30-1:30 p.m.     lunch
2:00-2:15 p.m.      break
4:00-4:15 p.m.      break
5:00 p.m.           end of day
```

Exhibit 42 [Ex. NN]; Fields Sworn Statement (Exhibit 21), ¶ 6.

58.  Due to Plaintiff's failure to provide medical documentation specifically describing lupus and its effects as they related to her requested remedies, on its own accord, the Foundation obtained information on the topic from the Job Accommodation Network.  See Exhibit 43 and Exhibit 44 [Ex. OO & PP].

59.  In a letter dated December 3, 1997, and addressed to Nathaniel Fields, Vice President at that time, Dr. Griffin stated his opinion that Plaintiff suffered bladder damage due to the Agency's alleged failure to accommodate her disability.  Exhibit 45 [Ex. QQ].

60.  In a separate letter also dated December 3, 1997, and addressed to Mr. Fields, Dr. Griffin explained for the first time the nature and effects of Plaintiff's disease, gave a brief

history of her illness, and suggested that Plaintiff would benefit from a work environment similar to her original position as a Procurement Assistant.  Exhibit 46 [Ex. F].

61.  This is the first medical document ADF received from Plaintiff that not only addressed her disability, but also described its effects and explained how ADF could reasonably and effectively accommodate her.  See id.

62.  By January 8, 1998, ADF identified a newly created position, Grants and Correspondence Management Assistant, and offered it to the Plaintiff.  See Fields Sworn Statement (Exhibit 21), ¶¶ 9-10; Exhibit 1 [Ex. A].

63.  Plaintiff and ADF collaborated on the duties that would be necessary to the job and how to best accommodate Plaintiff's needs.  Id.

64.  On March 9, 1998, ADF reassigned Plaintiff to the Grants and Correspondence Management Assistant position, placing her back in a GS-7 position.  Exhibit 1 [Ex. A].

65.  In the Grants and Correspondence Management Assistant position, Plaintiff participates in flex-time, ADF has advanced her sick leave, flexibly applied the sick leave policy, allowed her to participate in the leave donor program, and authorized her to take breaks at her discretion.  See Counselor's Report (Exhibit 3) at 7; Wilson Sworn Statement (Exhibit 4), ¶ 15; Stone-Evans Sworn Statement (Exhibit 47), ¶¶ 1-3.

66.  After seven months in her new position with no apparent difficulties, on September 17, 1998, ADF invited Plaintiff by letter to a meeting to determine whether she had additional needs.  Exhibit 48 [Ex. RR].  As the letter explained, the purpose of the meeting was to determine whether Plaintiff required further accommodation, and, if so, how the parties could most effectively address her needs.  Id.  ADF has not received, and Plaintiff has not alleged that she has made, any response to the invitation.  See id.; Complaint, ¶¶ 31-34.

67.  Plaintiff admits that she was given a medication that required her to take large amounts of water, but that she was fully able to perform the essential functions of her job as a typist, because she was able to take frequent restroom breaks and she required no accommodation.  Complaint, ¶¶ 7-10.

68.  Plaintiff also admits that her dispute over her freedom to take immediate and frequent restroom breaks was resolved by the Fall of 1997, when she was "allowed to go to the restroom freely. . ."  Complaint, ¶¶ 27, 34-35.  Similarly, Plaintiff admits that by March 1998, her major concern, that she be relieved of her receptionist duties, was addressed when her receptionist duties were reassigned.  Complaint, ¶ 31.

69.  ADF granted Plaintiff over seven months of uninterrupted leave from September 1994 to April 1995, despite Plaintiff's failure to inform ADF of the nature, effect, or even

existence of her condition.  When Plaintiff returned in 1995, ADF approved another leave request from May 11 - 19.  Exhibit 49 [Ex. SS].

70.  Plaintiff was also permitted to participate in the leave donor program during this time.  Exhibit 50 [Ex. TT].  In 1996, the Foundation approved approximately 82 hours of advanced sick leave and allowed Plaintiff to participate in the leave donor program.  Exhibit 51; Exhibit 52 [Ex. UU and Ex. YY].

71.  In 1997, Plaintiff requested, and ADF officials approved, 80 hours of advanced sick leave.  Exhibit 53 [Ex. ZZ]. The Agency approved 88 hours of advanced sick leave in 1998. Exhibit 54 [Ex. AAA].

72.  For the year 1999, 173 hours of advanced sick leave was approved for Plaintiff.  Exhibit 55 and Exhibit 56 [Ex. BBB and Ex. FFF].

73.  In 2000, ADF officials approved 130.5 hours of advanced sick leave.  Exhibit 57, Exhibit 58 and Exhibit 59 [Ex. GGG, Ex. HHH and Ex. III].

74.  For 2001, Plaintiff requested, and the Foundation approved over 135 hours of advance sick leave.  Exhibit 60; Exhibit 61; Exhibit 62 and Exhibit 63 [Ex. JJJ; Ex. KKK; Ex., LLL and Ex. MMM].

75.  More recently, ADF officials approved 126 hours of advanced sick leave at the Plaintiff's request.  Exhibit 64;

-14-

Exhibit 65; Exhibit 66 and Exhibit 67 [Ex. NNN; Ex. OOO; Ex. PPP; Ex. PPP and Ex. QQQ].

76.  And even more recently, Plaintiff has received 56 hours of advanced sick leave.  Exhibit 68 and Exhibit 69 [Ex. RRR and Ex. SSS].

77.  Plaintiff has participated in the leave donor program since 1995 and continues to do so.  See Stone-Evans Sworn Statement (Exhibit 47), ¶ 1.

78.  Currently, Plaintiff participates in flex-time, ADF has advanced her sick leave, flexibly applied the sick leave policy, allowed her to participate in the leave donor program, and authorized her to take breaks at her discretion.  See Wilson Sworn Statement (Exhibit 4), ¶ 15; Stone-Evans Sworn Statement (Exhibit 47), ¶¶ 1-3.

79.  Not only did the ADF permit Plaintiff to exhaust her annual and sick leave each year, it approved hundreds of hours of advanced sick leave to ensure that she maintained an income during that leave.

80.  This is in addition to her participation in the leave donor program, which she has used since 1995.  See Stone-Evans Sworn Statement (Exhibit 47) at ¶ 1.

81.  The Agency also reasonably accommodated Plaintiff by modifying her work schedule.  In 1995, ADF allowed Plaintiff to work a modified schedule (part-time) of 4 hours per day from

April to June and then 6 hours per day from June 12 to June 26, 1995. Exhibit 70 [Ex. TTT].

82. In 1997, upon Plaintiff's request, the ADF implemented a receptionist relief schedule that included two fifteen minute breaks in the morning, a hour lunch break, and two more fifteen minute breaks in the afternoon. Exhibit 42 [Ex. NN].

83. The ADF was also prepared to allow Plaintiff to conduct her travel voucher duties on compensatory time, but Plaintiff rejected the accommodation because she thought the necessary paperwork was too involved. See Wilson Sworn Statement (Exhibit 4), ¶ 15.

84. All Foundation employees are allowed to engage in flex-time and Plaintiff is no exception. See Stone-Evans Sworn Statement (Exhibit 47), ¶ 4. Arrival times are 7:30 a.m. to 9:30 a.m. Departure times are 4:00 p.m. to 6:00 p.m. The ADF has always been particularly flexible with Plaintiff's arrival times. See Stone-Evans Sworn Statement (Exhibit 47), ¶¶ 2-3.

85. Plaintiff requested that she be required to perform only that "work which can be accomplished sitting or involves occasionally standing and walking." Exhibit 18 [Ex. R]. Processing the mail, however, involved just that, walking approximately 10 feet from Plaintiff's workstation, placing the incoming mail in the appropriate mail slots, and taking the outgoing mail to the first floor of the building once a day. See

-16-

Wilson Sworn Statement (Exhibit 4), ¶ 2.

86. Tom Wilson granted Plaintiff's request. Id. Moreover, consistent with Dr. Griffin's July 17, 1995 note, all three positions held by Plaintiff during the relevant time period were already sedentary in nature. Exhibit 1; Exhibit 2; Exhibit 5 [Ex. A; Ex. B and Ex. C].

87. Plaintiff was never prevented from using the restroom. No one disciplined Plaintiff for leaving her post to use the restroom, nor was she told that she may not leave her desk to use the restroom. See Fields Sworn Statement (Exhibit 21), ¶ 4; Wilson Sworn Statement (Exhibit 4), ¶¶ 8-9.

88. Until January 1997, ADF had no knowledge of Plaintiff's condition; nor was it an obvious effect of Plaintiff's lupus. See Exhibit 25 [Ex. X]; Wilson Sworn Statement (Exhibit 4), ¶¶ 11-14.

89. On January 28, 1997, Plaintiff wrote a memorandum addressed to Tom Wilson wherein she accused ADF of failing to accommodate a condition that ADF did not know existed, for which, by Plaintiff's own admissions, ADF had already provided accommodation by allowing her to take bath room breaks whenever necessary. Exhibit 25; Exhibit 22; Exhibit 27 and Exhibit 28 [Ex. X; Ex. U; Ex. Z and Ex. AA].

90. Once ADF was made aware that Plaintiff's need to frequently urinate was the result of a condition, ADF reiterated its position that Plaintiff could leave the receptionist area and

phones unattended if needed and designated five co-workers to relieve Plaintiff. <u>See</u> Wilson Sworn Statement (Exhibit 4), ¶¶ 10-15.

91.  The President of the Foundation, the Vice President of the Foundation, in fact, the entire staff was at Plaintiff's disposal to cover the front desk at anytime. <u>See</u> Exhibit 28 [Ex. AA]; Wilson Sworn Statement (Exhibit 4), ¶¶ 10-15.

92.  Until January 1997, ADF had no knowledge of Plaintiff's specific condition, nor was it an obvious effect of Plaintiff's lupus. <u>See</u> Exhibit 25 [Ex. X]; Wilson Sworn Statement (Exhibit 4), ¶¶ 11-12, 14.

93.  On January 28, 1997, Plaintiff wrote a memorandum addressed to Tom Wilson wherein she accused ADF of failing to accommodate a condition that ADF did not know existed, for which, by Plaintiff's own admissions, ADF had already  provided accommodation by allowing her to take bath room breaks whenever necessary. <u>See</u> Exhibit 25; Exhibit 22; Exhibit 27 and Exhibit 28 [Ex. X; Ex. U; Ex. Z and Ex. AA] .

94.  Once ADF was made aware that Plaintiff's need to frequently urinate was the result of a condition, ADF reiterated its position that Plaintiff could leave the receptionist area and phones unattended if needed and designated five co-workers to relieve Plaintiff.

95.  The President of the Foundation, the Vice President of

-18-

the Foundation, in fact, the entire staff was at Plaintiff's disposal to cover the front desk at anytime. Exhibit 27 [Ex. AA]; Wilson Sworn Statement (Exhibit 4), ¶ 13.

96. The Agency granted Plaintiff four 15 minute breaks during the day not including her one hour lunch break. <u>See</u> Fields Sworn Statement (Exhibit 21), ¶ 6.

97. Plaintiff commenced this action on September 8, 2006. Complaint at 1.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney

_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney

_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing Defendants' Motion To Dismiss Or, In The Alternative, For Summary Judgment, supporting memorandum, statement of material facts and a proposed order has been made by mailing copies thereof to:

JANICE E. COBB-HENNIX
3104 Ramsgate Place
Fort Washington, MD 20744

on this 22nd day of January, 2007.

_____

W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, DC  20530
(202) 514-7230