EEO Counselor's Report
African Development Foundation
for
Janice Cobb-Hennix

## TABLE OF CONTENTS

**Section:**

1.    Counselor's Summary

2.    Materials Related to Medical Condition

3.    Materials Related to Complainant's Postion

4.    Compensation Claims

5.    Performance Appraisals

6.    Informal Complaint and Agency Responses



EEO COUNSELOR'S REPORT

## A. AGGRIEVED PERSON

**DATE:**                              February 28, 2001

**TO:**                                Constance Smith-Field
                                       Personnel Officer
                                       African Development Foundation

**Complainant:**                       Janice Cobb-Hennix
                                       Grants & Correspondence
                                       Management Assistant, GS-
                                       00303-7 (formerly Office
                                       Assistant, GS-303-6)
                                       African Development Foundation
                                       1400 Eye Street, N.W.
                                       Washington, D.C. 20005

                                       Work Number: 202.673.3916
                                       Home Number: 202.248.7284

## B. CHRONOLOGY OF EEO COUNSELING

**Date of Initial Contact:**           June 19, 1997
**Date of Initial Interview:**         June 19, 1997
**Date of Alleged Discriminatory**
**Event:**                             1996 to present
**Date Counseling Report Submitted:**  March 2, 2001
**Extension of Counseling:**           Both parties agreed
                                       to cessation of
                                       counseling during which
                                       medical determinations
                                       would be made.

## C. BASIS FOR ALLEGED DISCRIMINATION

Disability (lupus) reprisal

## D. ALLEGATIONS OF DISCRIMINATION

Harassment
Denial of reasonable accommodation
Exclusion from staff and in-house trainings

## E. REMEDY REQUESTED

Removal of Complainant from her receptionist duties
Reassignment to a new supervisor

Page 1 of 12 pages

.Flexible work schedule
Authorization of residence as alternative workplace
Continuation of participation in volunteer leave
program
Desk audit for then position as receptionist
Back pay
Appropriate reduction-in-Force (RIF) rights and remedies
Development of a written Agency policy prohibiting
discriminatory and retaliatory harassment
Compensatory damages (up to $300,000)
Award of reasonable attorney fees
Corrected performance evaluation

## F. RIGHTS AND RESPONSIBILITIES TO COMPLAINANT

Ms Cobb-Hennix was informed verbally about the EEO process
and Rights and Responsibilities of the informal EEO
process on July 15, 1997.

## G. SUMMARY OF COUNSELOR'S INQUIRY

1. Personal Contact

    Ms. Constance Smith-Field
    Director, Personnel
    202.673.3916

    Mr. Tom Wilson, Director
    Office of Budget, Finance and Administration

    Ms. Genevieve Peterson
    Administrative Services Officer

2. Documents Reviewed

    Reduction-in-Force (RIF) Notice

    memo to Complainant concerning RIF notice, dated
    November 23, 1995.

    Medical Support for Condition:
    note from doctor concerning limited duty, dated
    July 17, 1995
    memo from Complainant's doctor concerning symptoms,
    dated January 11, 1997
    memo from doctor concerning characterization of
    condition, dated April 15, 1997
    memo from Complainant concerning appointment with
    doctor, dated June 20, 1997

Page 2 of 12 pages

10

memo from doctor concerning Complainant's illness,
dated May 6, 1997
memo from Tom Wilson concerning medical support, dated
May 19, 1997
letter to Counselor and attached article from
Complainant concerning lupus, dated October 23, 1997
letter to Mr. Fields concerning Complainant's
condition, dated December 3, 1997.

**Requests for accommodation:**

memo from Complainant concerning request for
accommodation, dated August 20, 1995.
memo from Complainant concerning alternative
flexible workplace, dated August 31, 1995.
e-mail from Complainant concerning change in tour of
duty, dated March 15, 1996.
memo from Complainant concerning flexible work
schedule, dated April 12, 1996
e-mail from Tom Wilson concerning parameters for
taking and crediting sick leave, dated September 12,
1996
memo from Complainant concerning accommodating
condition, dated January 28, 1997
e-mail from Complainant concerning request for
flexible work schedule and reason for late
arrivals, dated March 10, 1997.
memo concerning Elimination of My Travel Coordinating
Job Duties, dated July 25, 1997
memo concerning ADF Response to Requested
Accommodations, dated September 26, 1997.
request for accommodation concerning Complainant,
dated December 4, 1997.

**Complainant's claims for compensation**

memo from Complainant concerning Claims for
Compensation, dated May 12, 1997, with attached forms.

**Complainant's position descriptions and appraisal
comments:**

Complainant's Performance Appraisal Record (10-01-94 -
9-30-95)
e-mail from Complainant concerning inclusion of
illness in performance record, dated October 25, 1995.
position description for Office Assistant, GS-00303-6
Complainant's Performance Appraisal Record (2/1/96-
9/30/96)
Page 3 of 12  pages

II

## H. SUMMARY OF INFORMAL RESOLUTION ATTEMPT

The Counselor met with Ms. Janice Cobb-Hennix, hereinafter referred to as Complainant, on June 19, 1997 at her representative, Mr. Joseph D. Gebhardt's, office, 1748 N Street. N.W. Washington, DC and was presented with a statement of issues for counseling and a list of requested remedies (See memo under Exhibit 6). The Counselor then proceeded to interview the Complainant, inform her of her rights and responsibilities and obtain more detail as to the particulars of her allegations.

The Complainant explained her position had been changed from a Procurement Assistant to an Office Assistant pursuant to a reduction-in-force (RIF)action which occurred February 4, 1992 (Exhibit 1).

The Complainant indicated that two officials were primarily responsible for the incidents which are the subject of this informal counseling process. Those individuals were Mr. Tom Wilson, Director, Office of Budget and Finance and the Complainant's supervisor, and Ms. Genevieve Peterson, Administrative Services Officer.

The Complainant stated that the basis for her complaint is her disability, lupus, diagnosed in 1994, and denial of reasonable accommodation pursuant to that disability (Exhibits 2 and 3). The Complainant also maintains that she has been the victim of retaliation due to her involvement in the EEO process (Exhibit 6).

The Complainant stated that she has been diagnosed with lupus, which requires that she maintain an environment of low stress and frequent bathroom breaks due to the medication (Exhibits 2 and 3).

The Complainant maintained that she had requested reasonable accommodation in writing several times, but instead of accommodating her, the Agency gave her a reduction in force (RIF) letter and downgraded her to a what she termed a "stressful" receptionist position, which exacerbated her condition and which did not allow her to take the rest room breaks she needed (Exhibits 1 through 3).

The Complainant indicated that letters explaining her concerns were sent to Mr. Wilson, with no response, and a letter went to Dr. Griffin, who gave her a response which was not satisfactory. A subsequent letter went to Mr. Wilson which was directed to Worker's compensation for examination (Exhibits 2 through 4).
page 5  of 12  pages

1

The Complainant stated that when she returned to work in April 1995, she had a meeting with Mr. Wilson, Ms. Peterson, Ms. Smith-Field, Mr. Fields, Vice President American Development Foundation, (ADF), and Mr. William Ford, then President, ADF, as to the issues and remedies sought.

The Complainant had concerns about the fact she was rifted, was given a receptionist job which was stressful and the fact that Ms. Peterson had exacerbated her condition by yelling at her and treating her differently than Ms. Peterson treated others (Exhibits 1 and 5).

The Complainant indicated that the other receptionist, Ms. Nancy Williams, GS-6 who is not disabled, gets flexible time, and works at home which is in contrast the treatment the Complainant has received as a disabled person and as a person who has made use of the EEO process.

The Complainant indicated that she has been subjected to harassment and verbal abuse from Ms. Peterson, who humiliated her in front of others. Complainant claimed that Ms. Peterson would yell at her and say "don't you hear me talking to you." Complainant contended that Ms. Jennifer Parker, Ms. Cheryl Jones and Ms. Jane Smith observed Ms. Peterson treat the Complainant differently than she has treated others who are not disabled or who have not initiated EEO activity. Complainant indicated that one such example was the fact that although Ms. Peterson was told the Complainant had to be in a non-stressful environment and that stress could cause her a relapse, Ms. Peterson on two occasions told the Complainant to get the mail which was a long walk from her workstation. Complainant maintained that she had to talk to Personnel to get them to tell Ms. Peterson to forego this directive and indicate that the Complainant was on light duty.

Complainant claimed that Ms. Peterson had knowledge of the Complainant's disability because the Complainant had to wear house shoes, had swollen hands and feet and told Ms. Peterson, Mr. Wilson and Ms. Smith-Field the effect the lupus had on her.

Complainant further indicated Ms. Peterson became more demanding and inflexible after she learned of the Complainant's condition. One such example was that Ms. Williams was not required to open the office door at 8:30 am punctually, whereas the Complainant was required to open the office door at 8:30 am and if it was not open then Ms. Peterson would admonish the Complainant. Further, while the other receptionist was given breaks, the Complainant had to page 6 of 12  pages

2

ask for breaks, humiliating herself to Ms. Peterson by asking her to go to the bathroom.

At this meeting, Complainant further alleged Ms. Williams also does less work than the Complainant, answers the telephone, does DEO data entry and works on the travel for the entire Agency (includes passport, photo, voucher and ticket work).

The Counselor first met with Ms. Smith-Field and outlined the schedule of management officials with whom the Counselor would meet to review the Complainant's allegations and discuss the possibility of resolution. Those persons were the following: Ms. Connie Smith-Field, Personnel Officer, Mr. Tom Wilson, Director, Office of Budget, Finance and Administration and Ms. Genevieve Peterson, Administrative Services Officer.

Ms. Smith-Field read over the June 19, 1997 memo to the Counselor concerning the issues which the Complainant considered germane to her complaint, the officials concerned and the remedies sought (Exhibit 6).

Ms. Smith-Field indicated the background of the Agency structure is important in understanding the limited possibilities the Agency had to move the Complainant to a different position.

Ms. Smith-Field explained that when the Agency participated in a RIF, the Complainant's position was advertised.  Ms. Smith-Field stated that the positions which the Agency encumbered went from 50 to 28.  However, the Complainant was offered one of the positions (Office Assistant), which the Complainant accepted, knowing the parameters of the job (Exhibit 5).  Ms. Smith-Field contended that it was from that point, the Complainant's acceptance of the job on or about January 5, 1996, issues such as the Complainant receiving too many calls, having too many responsibilities and taking breaks, occurred.

Ms. Smith-Field stated that the Agency felt that the job the Complainant assumed was of prime importance to the Agency and one of key responsibility, because it was the first line of contact with those on the outside and impressions as to the Agency were derived from that contact.  Secondly, the administrative duties incumbent in the position also enhanced its importance.

Ms. Smith-Field remarked at the outset she did not know the Complainant had lupus until the week before this present discussion. She further indicated that she did not therefore

page 7 of 12 pages

3

understand what accommodations would be appropriate for such a condition or whether the accommodations ADF had already put in place, such as giving the Complainant the breaks in the interim asked for by the Complainant, were enough, or whether a different allocation of break times would be preferable.

Ms. Smith-Field asserted the Complainant had been given advanced sick leave, up to what is allowable under the regulations and when the Complainant came back to work after being out for a period of time, was also allowed to work part time. Ms. Smith-Field put forth the argument she felt the Agency was already in the posture of accommodating the Complainant by taking these and other actions on a voluntary basis.

Ms. Smith-Field asserted Ms. Williams, who also works in the Agency, is a contractor, doing a different job than the Complainant, performing such duties as handling the mail, receiving visitors and the like.

The Counselor spoke with the Complainant's supervisor, Mr. Tom Wilson next. Mr. Wilson maintained the Complainant had not given him any formal statement of her condition, lupus. Mr. Wilson indicated he therefore had no way of determining whether the Agency was properly accommodating the Complainant, and he felt the accommodations sought by the Complainant were continuing to escalate, therefore making it imperative the ADF get a handle on the specific condition the Complainant suffered and what the proper accommodation would be for that condition.

Mr. Wilson also emphasized the Complainant was offered a job after the RIF and accepted it (Exhibit 5). Mr. Wilson stated that it was in the context of the lessening of the number of jobs the Complainant was given the position she then encumbered and accepted. Mr. Wilson added the limited amount of jobs, from 55 to 34 made it very difficult to move the Complainant to another position, if that was one of the accommodations asked for by the Complainant.

Mr. Wilson stated Ms. Peterson was put in charge of the day to day supervision of the Complainant, and noted that the Complainant did come to him, claiming that Ms. Peterson was disrespectful and demanding of the Complainant.

Mr. Wilson contended that he proceeded to investigate the situation immediately, speaking with Ms. Peterson, and telling her that she had to be respectful to the Complainant.

page 8 of 12 pages

4

Mr. Wilson stated that he also told the Complainant she should make her concerns clear to Ms. Peterson.

Mr. Wilson added the supervision of Ms. Peterson will end at the end of September 1997, and Mr. Wilson will assume supervision, therefore ending any difficulties in the formal interaction between the Complainant and Ms. Peterson.

The Counselor spoke with Ms. Peterson, who responded to the allegations of her alleged harassment of the Complainant immediately by contending that she did not treat the Complainant any differently than she did any other employee. Ms. Peterson claimed that she felt she had in fact treated the Complainant better that she treated others, since the Complainant has been more demanding and Ms. Peterson has given in to her demands. Ms. Peterson maintained the Complainant was allowed to take breaks whenever she wanted to, or when scheduled and Ms. Peterson had someone relieve the Complainant. Ms. Peterson contended that she did not harass the Complainant.

Ms. Peterson stated that contrary to what the Complainant states, she did not yell at the Complainant, the Complainant yelled at her. Ms. Peterson asserted the yelling by the Complainant prompted her to write memos to the Complainant as to what she characterized as the Complainant's insubordinate manner.

Ms. Peterson contended that one of the problems the Complainant presented was that she was late at times.

Both management officials felt they had already accommodated the Complainant and, since the condition of the Complainant had not been officially determined at that point, resolution concerning a new position was not feasible.

Subsequent to the meeting with the management officials, the Counselor received a memo from the Complainant's representative concerning "Additional issues to be included", (See Exhibit 6).

This letter contended since the Complainant initiated EEO counseling, she had been excluded from staff meetings and in-house training, which Complainant believes are a retaliatory response to her participation in the EEO process.

Complainant further believes her job functions are being discussed in her absence at these meetings.

page 9  of 12 pages

5

The Counselor met with the Complainant, and her representative, Mr. Fields, Mr. Wilson, Ms. Smith-Field on November 5, 1997 in an effort to mediate the situation. The Counselor recapped to issues to the group and agreement was reached concerning an effort by ADF and the Complainant to clarify the manifestations of her condition, for the Complainant to present appropriate documentation of her condition for medical professionals from both parties to review in conjunction with the Complainant's position description. The parties felt agreements could be reached concerning the ability of the Complainant to perform her duties and/or accommodations made.

During the interim it has been reported to the Counselor, the Complainant assumed the position of Grants and Correspondence Management Assistant, GS-303-7 which Complainant has been performing over a seven month period. The ADF indicated there have been no apparent difficulties in this position.

The ADF made a proposal, dated September 17, 1998, that rather than adhering to the original plan requiring physicians to review the position description, it appeared the best interests of the ADF and the Complainant were to meet to discuss with her whether she perceived there were any problems or issues concerning her ability to perform some or any of the tasks that have been assigned to her in her new position. In that letter, authored by the then General Counsel, Paul Magid, ADF, it was proposed that if there were any issues related to the Complainant's ability to perform certain tasks, both parties might be able to work out reasonable accommodations immediately, obviating the need for further medical assessments.

The letter also indicated that if they were unable to reach agreement on the resolution of any issues raised, or any particular request for accommodation, both parties could then proceed to the step of having the doctors review the situation and provide them with an opinion. The letter acknowledged agreement was not reached by the parties to proceed with this step.

At an October 5, 2000 meeting between the Complainant's representative, Mr. Charles Day and the present ADF General Counsel, Doris Mason Martin, Ms. Martin proposed both parties proceed with an independent medical assessment of the Complainant's condition so the ADF would have an impartial basis for negotiating, but according to Ms. Martin, the Complainant and her representative objected to this.

page 10 of 12 pages

6

The Counselor has been informed the ADF has made all the accommodations it can for the Complainant, but the Complainant will not permit an ADF selected doctor to review her condition as had been planned in earlier discussions between the parties.  Therefore, the final Counselor's Report is submitted on this date.

A January 11, 2001 letter to the Counselor, listed the Complainant's demands for accommodation and the ADF's response to them. The list follows:

1. Removal of receptionist's duties from her jobs: on March 9, 1998 the Complainant was officially reassigned to a position as Grants and Correspondence Management Assistant -- a new position created as a result of an organizational restructuring.

2. Reassignment to a new supervisor: this was accomplished once the Complainant was reassigned to the new position.

3. Flexible work schedule: the Complainant participates in flex-time, and ADF has advanced the Complainant sick leave, flexibly applied the sick leave policy, allows her to participate in the leave donor program, and authorized her to take rest breaks at her discretion.

4. Authorization of residence as alternative workplace: this is not feasible given the Complainant's job requirements. However, ADF makes every effort to ensure the Complainant has all leave advantages possible.

5. Continuation of participation in volunteer leave program: granted.

6. Desk audit for current job [receptionist], going back at least one year: no, this demand became moot once ADF reassigned the Complainant.

7. Back pay: no, the Complainant never lost pay, and therefore was not due any back pay.  ADF advised the Complainant she could buy back leave she used and provided the Complainant necessary forms to do so. However, to this date, the Complainant has not pursued this option.

8. Appropriate RIF rights and remedies: yes, ADF's RIF was conducted according to all applicable laws and regulations.

9. Development of a written Agency policy prohibiting

page  11 of 12 pages

7

discriminatory and retaliatory harassment: no ADF has a
grievance policy that covers these concerns.

10. Compensatory damages (up to $300,000): no.

11. Award of reasonable attorney fees: no.

12. Corrected performance evaluation: yes.


*Clarence Turner, Jr.*
Clarence Turner, Jr.
EEO Counselor

page 12 of 12 pages

8



# AFRICAN DEVELOPMENT FOUNDATION

November 27, 1995

TO:  Ms. Janice E. Cobb

SUBJECT:  Notification of Reduction-in-Force Action

REFERENCES:  (a)  5 CFR Part 351
             (b)  OPM Workforce Restructuring Handbook
             (c)  5 CFR Part 536

ENCLOSURES:  (1)  Office Assistant (Typing), GS-303-6 Position
                  Description
             (2)  Grade and Pay Retention Fact Sheet
             (3)  Offer Acknowledgement Form
             (4)  5 CFR Part 351
             (5)  5 CFR Part 1201
                  5 CFR Part 1209, U. S. MSPB Appeal Form

1.   It is necessary to hold a reduction-in-force in your competitive level.  The retention rights of all employees concerned have been carefully checked.  I regret to inform you that your name has been reached for release from your competitive level and as a result you are to change to a lower grade to the position of Office Assistant (Typing), GS-303-6, at saved pay of $29,990 per annum, Enclosure (1).  The effective date of this action is February 4, 1996.

2.   The reason for this reduction-in-force is due to the agency facing a significant reduction in operating funds and it's response to the National Performance Review's mandate for downsizing.  These actions necessitate a major reorganization of the agency and result in the elimination of your current position.

3.   You are entitled to grade retention for a period of two years and pay retention in accordance with the provisions of 5 CFR Part 536, reference (c).  Enclosure (2) provides information regarding grade and pay retention.

*attachment*

4.    Retention preference information concerning you is as follows:

    Service:  Competitive
    Competitive Area:    African Development Foundation (ADF)
                         Washington, D. C.,
    Competitive Level:  1100
    Tenure Subgroup:    I B
    Service Computation Date:  03-22-71
    Last 3 performance ratings of record:  EFS, FS, FS
    Final Adjusted Service Computation Date:  03-22-57
    Title and Series:  Procurement Assistant (Typing)
    Grade: GS-1106-7
    Salary:  $29,990 per annum

5.    The offer of change to a lower grade position in paragraph (1) is in lieu of separation by reduction-in-force.  Please indicate whether you will accept this offer by completing and returning within five (5) work days the Offer Acknowledgement Form, Enclosure (3) to the Director of Personnel, ADF.  Failure to accept the offer within the time limits will be considered a declination and unless other employment becomes available you will be separated by reduction-in-force at the close of business (COB) on January 31, 1996.

6.    This reduction-in-force notice does not reflect on your service or conduct.  Paragraph two (2) states the sole reasons for this action.  You may use this notice as a reference if you seek other employment.

7.    A copy of the regulations and instructions governing reduction-in-force are provided as Enclosure (4).  You may also see the retention registers and any other records which have a bearing on your case.  You may see this information and discuss the action planned in your case by contacting:

    Ms. Constance Smith-Field, Director of Personnel
    African Development Foundation
    Washington, D. C.
    Telephone:  (202) 673-3916

(13)

Attachment 4(c)

8.    You can appeal this action to the U. S. Merit Systems Protection Board (MSPB), Washington Regional Office, 5203 Leesburg Pike, Suite 1109, Falls Church, VA 22041-3473 in writing if you believe the reduction-in-force regulations have not been correctly applied in your case.  Enclosure (5) is a copy of the MSPB regulations and appeal form.  You may appeal at any time beginning the day after the effective date of the action but not later than 20 calendar days after the effective date.  An appeal should give the reasons why you believe the agency action was improper.  The appeal may include such matters as the extent of the competitive area and competitive level, the determination of your retention standing, and your qualifications for some job held by a person you could displace.

WILLIAM R. FORD  President
African Development Foundation

(14)

Form 50-B
7/91
U.S. Office of Personnel Management
PM Supp. 296-33, Subch. 4

Attachment 4(c)

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| COBB, JANICE E. | | | 02/04/96 |

| FIRST ACTION | SECOND ACTION |
|---|---|
| 5-A. Code 5-B. Nature of Action | 6-A. Code 6-B. Nature of Action |
| 740   POSITION CHANGE | |
| 5-C. Code 5-D. Legal Authority | 6-C. Code 6-D. Legal Authority |
| PNM   REG. 351.603 | |
| 5-E. Code 5-F. Legal Authority | 6-E. Code 6-F. Legal Authority |
| VRH   5 U.S.C. 5362(A) | |

| 14. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| PROCUREMENT ASSISTANT (TYPING) | OFFICE ASSISTANT (TYPING) |
| A9406 | A9508 |

| Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 01102 | 07 | 09 | $31746.00 | PA | GS | 00303 | 06 | 00 | $31746.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $30726 | $1020 | $31746 | | $30726 | $1020 | $31746 | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| 4150000000 | 4150000000 |
| AFRICAN DEVELOPMENT FOUNDATION | AFRICAN DEVELOPMENT FOUNDATION |
| OFFICE OF BUDGET, PLANNING & ADMIN | OFFICE OF BUDGET, PLANNING & ADMIN |
| WASHINGTON, D.C. | WASHINGTON, D.C. |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 – None   3 – 10-Point/Disability   5 – 10-Point/Other  2 – 5-Point   4 – 10-Point/Compensable   6 – 10-Point/Compensable/30% | 0 – None   2 – Conditional  1 – Permanent   3 – Indefinite | | YES [ ]   NO [X] |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| BASIC LIFE PLUS ADDL OPT W/S   TIMES PAY & STD OPT & FAM OPT | NOT APPLICABLE | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| FICA & CSRS (PARTIAL) | 03/22/71 | FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 – Competitive Service   3 – SES General  2 – Excepted Service   4 – SES Career Reserved | E – Exempt   N – Nonexempt | AN–ADF | 7777 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks
RETAINED GRADE WILL NOT BE USED FOR PURPOSES OF
REDUCTION-IN-FORCE.
RETAINED GRADE WILL BE USED TO DETERMINE EMPLOYEE'S PAY,
RETIREMENT AND INSURANCE BENEFITS, AND PROMOTION AND
TRAINING ELIGIBILITY.
EMPL ENTITL TO RETAIND GRD OF GS-07 THRU 02/03/98
DUE TO REORGANIZATION AS A RESULT OF REDUCTION IN FORCE.

| 47. Approving Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| | |

| 48. Agency Code | 48A. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|

Part 50-316

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

**DISABILITY CERTIFICATE**

**CALVIN L. GRIFFIN, M.D., P.C.**
1160 Varnum Street N.E., Suite 108
Washington, DC 20017

Telephone: (202) 526-4400

Date 7-17-95

This is to certify that ___Janice Cobb___

has been under my professional care and was:

☐ Totally Incapacitated          ☐ Partially Incapacitated

from_____ to_____

Remarks: Patient is on limited duty.
Should only do sedentary work.

Dr.___Calvin L. Griffin___

#13101 — Medical Arts Press   1-800-328-2179

(13)

FREDERICK B. HENDRICKS, M.D., F.A.C.S.
2141 K STREET, N.W., SUITE 308
WASHINGTON, D.C. 20037

*Urology*

January 11, 1997

RE:    Janice Cobb
DOB:

(202) 293-9244
Fax: (202) 331-1326

To whom it may concern:

This patient is being cared by me professionally. She has a bladder condition that causes unavoidable urges to urinate quite frequently.

She is currently under treatment and at some point in the future should improve.

At the present time, however, she needs to urinate at least every hour or two.   These urges cannot ignored without an accident happening.

It is my hope that her employer will take this under consideration and recognize her need to excuse herself to the rest room as necessary and not an elective action.

If further information is desired, it will be happily provided.

Very truly yours,

*Fred*

Frederick B. Hendricks, MD

FBH/pja

(6)

*Calvin L. Griffin, M.D., P.C.*

1160 VARNUM ST. N.E., SUITE 108
WASHINGTON, DC 20017

TELEPHONE: (202) 526-4400

April 15, 1997

Tom Wilson, Director
Office of Budget and Finance Administration
Africian Development Foundation
1400 I Street, N. W.
10th Floor
Washington, D. C. 20005

RE: Janice Cobb-Hennix

Dear Sir:

The above named patient is currently under my professional care
for multiple medical problems.

Ms. Cobb-Hennix has a chronic medical disability which is char-
acterized by remissions and exacerbation.

Please provide her with the necessary work environment that will
not further complicate her disability.

For further information and/or assistance, you may contact my
office at the above address and telephone number.

Sincerely,

Calvin L. Griffin, M.D.

(2)



# AFRICAN DEVELOPMENT FOUNDATION

**DATE:**        June 20, 1997

**TO:**          Tom Wilson, Director
                 Office of Budget, Finance and Administration

**FROM:**        Janice Cobb-Henny
                 Office Assistant

**SUBJECT:**     Letter from Doctor Griffin

In response to your memo, dated May 19, 1997, regarding the issues raised in the letter from Doctor Griffin, that you provide me a "work environment" that will not further complicate my disability, please refer to the document enclosed.

When I saw Doctor Griffin on June 16, 1997, for medical care, he advised me to used the enclosed document which address your request for specific information regarding the nature and effect of my "chronic medical disability" and the "necessary work environment I require.

If you still have questions, please call him directly on (202) 526-4400.

*Calvin L. Griffin, M.D., P.C.*

1160 VARNUM ST. N.E., SUITE 106
WASHINGTON, DC 20017

TELEPHONE: (202) 526-4400

May 6, 1997

To whom it may concern:

This letter addresses Janice Cobb-Hennix's illness.

In response to a request to answer Section 2g of Form Ca-2, it is my medical opinion that the restrictions placed upon Ms. Cobb-Hennix has aggravated her present medical condition, as well as caused exacerbation of her medical condition.

Ms. Cobb-Hennix was taking oral dosages of Cytoxan. Cytoxan is used to interfere with the growth of susceptible proliferating cells. The mechanism of action is thought to involve cross-linking of cell DNA.

In taking this medication, she is required to intake ample fluids, even force fluids into her system. This will necessitate frequent voiding. Forced fluids intake helps to assure a large amount of urine output.

This process reduces the time the medication remains in the bladder. Otherwise, she may experience adverse reactions, for which she has shown some symptoms.

thout frequent voiding, which helps to prevent cystitis, the patient ould experience hemorrhagic cystitis, bladder cancer, fribrosis of the urinary bladder with or without accompanying cystitis or atypical urinary bladder epithelial cells may appear in the urine.

The aforementioned bladder injuries are directly linked to not eliminating cyclophosphamide metabolites that the human body produces when Cytoxan is ingested.

By Ms. Cobb-Hennix being restricted in her freedom to void frequently, this has caused her to suffer from cystitis and has gravely aggravated her physical well being.

Along with the deterioration of her physical condition, the patient is found to be suffering from acute stress, anxiety and other stress related conditions by being denied the proper access that her condition demands.

Contact my office at the above address or telephone number if more information is needed.

Sincerely,

Calvin L. Griffin, M.D.

*To EEO Counselor Clarence Turner - Please place this in the EEO counseling file. Attorney-client privilege waived for this correspondence. Joseph D. Gebhardt 10/23/97*

October 23, 1997

Mr. Joseph D. Gebhardt
1748 N Street, N.W.
Washington, D.C. 20036
Phone (202) 496-0400
FAX (202) 4960404

Dear Mr. Gebhardt:

In reference to our telephone conversation today, here is a copy of the Washington Post article on Lupus and information on how bladder problems could be one of the side effects caused by taking Cytoxan.

This information about Cytoxan can be found on page 18 of a publication entitled "Systemic Lupus Erythematosus, published by the National Institute of Health, National Institute of Arthritis and Musculoskeletal and Skin Diseases. I will mail you a copy of the publication today.

Yesterday, I asked the Personnel Director, Connie Smith-field, for permission to look into my medical record file. She informed me that she did not have a medical file set up for me. She questioned me as to why I wanted to see it. She said I should already have copies of everything she has.

I told her an employee has the right to look at their personnel and/or medical files and I just wanted to exercise my rights She told me that she had my medical documents mixed up with other papers and she had not had a chance to set up file for me. As soon as she set up one for me, she will let me see it.

JANICE COBB-HENNIX

C12  WEDNESDAY, OCTOBER 8, 1997   THE WASHINGTON POST

## JUDY MANN

# The Harsh Realities of Lupus

Lupus is a devastating disease affecting some 1.4 million Americans—and 90 percent of them are women. All too often, the disease is dismissed as something in their minds—a malaise manifesting itself in such vague symptoms as prolonged fatigue and joint pain.

But what really is happening is the woman's immune system has lost its ability to distinguish between the body's own cells and tissues and foreign invaders. The immune system attacks the skin, joints, blood and major organs such as kidneys.

Symptoms vary widely among patients, which makes the disease difficult to diagnose. Pain can move from joint to joint and be accompanied by swelling, redness or heat, and weight gain. Skin rashes and sores on the lining of the nose and mouth are other symptoms. Lupus, from the Latin for "wolf," took its name from the red, butterfly-shaped rash that can appear on the upper cheeks and over the bridge of the nose, the same area where a wolf's face is marked.

There are three types of lupus: discoid, which manifests itself primarily on the skin; systemic, which is the most severe and can affect any organ in the body; and drug-induced, which usually fades when the patient stops taking whatever medication has caused the lupus symptoms.

Lupus is chronic. There is no known cure, and it can be fatal: CBS's Charles Kuralt died of it. It affects more people than multiple sclerosis, cystic fibrosis, sickle cell anemia or leukemia, according to the Lupus Foundation of America, yet it is poorly understood, and research into it is poorly funded compared with other diseases.

It is best treated when diagnosed early, but patients often are not diagnosed correctly until they get to a rheumatologist. Glenda Amoo-Sarmiento, a former president of the Lupus Foundation, was ill for 11 years before lupus was identified as the culprit.

To counter widespread ignorance about the disease, the foundation has secured the pro bono services of Saatchi & Saatchi Business Communications of Rochester, N.Y., and has developed a high-impact public service campaign scheduled to be launched here today.

The campaign features startling video and print images of women and asks the provocative question: "Why don't we believe the pain of lupus is real? Maybe because most of its victims are women."

One ad designed for print media shows a beautiful young woman. Written across her shirt in neat script is this message: "If I were a man would you take my pain more seriously?"

"Lupus doesn't scare people," says Ann Hayden, the executive creative director at Saatchi & Saatchi, who masterminded the campaign. "It's not understood as a serious disease. If you say cancer to me, I understand intuitively, 'Oh, my gosh, devastating, can kill you, chemotherapy.' With lupus, you say, 'I've heard of that.' Because the symptoms are fuzzy, the disease is not perceived as being really serious. People think, 'Come on, buck up. Yes, you've got this disease, but it's not that serious.' There's a pathology around diminishing something you don't understand. And you might ask if it's not diminished because people who are suffering are young and female and of childbearing age, and there's a lot going on in their life.

"If guys came in and said, 'I'm exhausted, and I can't move my joints in the morning,' this gets taken seriously," Hayden says. By contrast, she tells the story of a woman whose disease was flaring up and whose doctor asked if she had a boyfriend. Two weeks later, she nearly died.

Lupus patients face "a social unacceptance in the world at large, and it happens in their own families," Hayden says. Is the person managing or does she have a real illness? This can be a serious problem at work, when a person's supervisor doesn't realize that an employee who has lupus may need flexibility in terms of workload and schedule. Stress can aggravate it.

Saatchi & Saatchi donated the creative talent for the campaign, including director Floria Sigismondi, who lost a close friend to the disease. Lowell "Bud" Paxon, creator and co-founder of the Home Shopping Network and chairman of Paxon Communications, and his wife paid for the production costs. They have a daughter who has the disease.

The campaign's tag line is "Stop the Sickness." Almost 40 of the nation's magazines have agreed to use the ads, as have all of the radio and television stations owned by Paxon Communications and other radio and TV outlets. The ads are a first stage in a long-range campaign to raise public awareness of the disease, to secure better funding for research and, eventually, to find the cause and a cure. As one of the ads makes clear: The disease is real, and so is the pain. It is in a woman's body, not in her head.

For patients whose kidneys or central nervous systems are affected by lupus, a type of drug called an immunosuppressive may be used. Immunosuppressives, such as azathioprine (Imuran) and cyclophosphamide (Cytoxan), restrain the overactive immune system by blocking the production of some immune cells and curbing the action of others. These drugs may be given by mouth or by infusion (dripping the drug into the vein through a small tube). Side effects may include nausea, vomiting, hair loss, bladder problems, decreased fertility, and increased risk of cancer and infection. The risk for side effects increases with the length of treatment. As with other treatments for lupus, there is a risk of relapse after the immunosuppressives have been stopped.

**Because some treatments may cause harmful side effects ... promptly report any new symptoms to the doctor.**

In special circumstances, patients may require stronger drugs to combat the symptoms of lupus. For patients who cannot take corticosteroids, a type of immunosuppressive drug called methotrexate (Folex, Mexate, Rheumatrex) may be used to help control the disease. Patients who have many body systems affected by the disease may receive intravenous gamma globulin (Gammagard, Gammar, Gamimune), a blood protein that increases immunity and helps fight infection. Gamma globulin also may be used to control acute bleeding in patients with thrombocytopenia or to prepare a person with lupus for surgery.

Working closely with the doctor helps ensure that treatments for lupus are as successful as possible. Because some treatments may cause harmful side effects, it is important to promptly report any new symptoms to the doctor. It is also important not to stop or change treatments without talking to the doctor first.

Because of the nature and cost of the medications used to treat lupus, their potentially serious side effects, and the lack of a cure, many patients seek other ways of treating the disease. Some alternative approaches that have been suggested include special diets, nutritional supplements, fish oils, ointments and creams, chiropractic treatment, and homeopathy. Although these methods may not be harmful in and of themselves, no research to date shows that they help. Some alternative or complementary approaches may help the patient cope or reduce some of the stress associated with living with a chronic illness. If the doctor feels the approach has value and will not be harmful, it can be incorporated into the patient's treatment plan. However, it is important not to neglect regular health care or treatment of serious symptoms.



## AFRICAN DEVELOPMENT FOUNDATION
Monday, May 19, 1997

**To:**          **Janice Cobb Hennix**
              **Office Assistant**

**From:**        **Tom Wilson, Director**
              **Office of Budget, Finance and Administration**

**Subject:**      **Letter from Doctor Griffin**

I have received a letter from Doctor Calvin Griffin stating that you have a chronic medical disability and requesting that we provide you with a work environment that will not further complicate your disability.

In order for the Foundation to effectively address the issues raised in this letter we require more information. In particular, we require information which will clearly and specifically identify the nature and effect of the 'chronic medical disability' identified by Dr. Griffin and information which will clearly and specifically identify the 'necessary work environment' mentioned by Dr. Griffin.

Please provide this information in writing directly to me. If you wish, we can meet to discuss this matter. Thank you for your cooperation.

(1)

*Calvin L. Griffin, M.D., P.C.*

1160 VARNUM ST. N.E., SUITE 108
WASHINGTON, DC 20017

TELEPHONE: (202) 526-4400

December 3, 1997

Mr. Nathaniel Fields
Vice President
African Development Foundation
1400 I Street, N.W., 10th Floor
Washington, DC 20005

**Re:** **Janice Cobb-Hennix**
**Damage to Bladder Caused by Failure to Reasonably Accommodate**
**in the Workplace**

Dear Mr. Fields:

The above patient has been under my professional care since 1994. She has systemic lupus erythematosus, commonly called SLE or lupus.

As part of her treatment, Mrs. Cobb-Hennix takes oral dosages of Cyclophosphamide (Cytoxan). In taking this medication, she is required to ingest large quantities of fluids throughout the day. The fluid intake is necessary in order to reduce the time that the drug remains in the bladder. Otherwise, she may experience adverse reactions, including hemorrhagic cystitis, bladder cancer and/or fibrosis of the urinary bladder. In addition, atypical urinary bladder epithelial cells may appear in the urine.

As a consequence, the medication necessitates frequent urination. Mrs. Cobb-Hennix has to go to the restroom 3-4 times an hour. Failure to do so would be detrimental to her health and cause complications in addition to her lupus.

In my opinion, the African Development Foundation's failure to accommodate Mrs. Cobb-Hennix damaged her health. Because she was not afforded the necessary restroom breaks, she suffered bladder damage (chronic cytoxan cystitis) that required a surgical operation in December 1996. Following this operation, I reiterated her need for reasonable accommodations. The Foundation again failed to make the reasonable accommodations. Mrs. Cobb-Hennix again suffered bladder damage, resulting in another surgical operation in March 1997. This time, a precancerous growth was found in her bladder. She has so far received over twelve medical

*Calvin L. Griffin, M.D., P.C.*

1160 VARNUM ST. N.E., SUITE 108
WASHINGTON, DC 20017

TELEPHONE: (202) 526-4400

treatments for her bladder injury.   Another series of six
medical treatments began recently.

Due to the Foundation's failure to reasonably accommodate
Mrs. Cobb-Hennix, she has sustained permanent injury to her
bladder and will require ongoing medical care as a result.

For further information and/or assistance, please do not
hesitate to contact me.

Sincerely,

Calvin L. Griffin, M.D.

cc: Mrs. Janice Cobb-Hennix
    Mr. Joseph D. Gebhardt

*Request For*
*Job Restructuri*

**AFRICAN DEVELOPMENT FOUNDATION**

August 20, 1995

SUBJECT:     Processing the Mail

TO:          Tom Wilson, Director
             Office of Budget and Finance

FROM:        Janice Cobb *JCett*
             Procurement Assistant, OBFA

Effectively immediately, I am requesting that I be remove temporarily from the responsibility of doing the mail based on my Doctor's instructions (see attached Disability Certificate).

On several occasions I discussed with Genevieve Peterson the problem required to perform this task due to physical exertion. This task physical requirements exceeds the limitation placed on me by my doctor, as stated on my disability certificate, and to continue performing this task will only impede my recovery.

As you know, I have had one relapse from over exerting myself. If I continue to performed the newly assigned duties which requires physical exertion, another relapse may occur again.

My Doctor released me to return to work in April based on the work I described to him in my present Job Performance Standards which can be mainly accomplished sitting and does not require any physical exertion.

In order for me to gain full recovery from my illness and to better concentrate on my duties, I am requesting that my Doctor's instructions stated on my Disability Certificates particularly, the one dated July 17, 1995, requesting that I only do "Sedentary Work", "Light Duty" i.e., work which can be accomplished sitting or involves occasionally standing and walking. Copies of the certificates were given to the Timekeeper and Genevieve Peterson.

Since my return to work back in April, I have increased my hours of work from 4 hours to 6 hours. If my doctor's instructions are followed I believe I will soon be working 8 hours a day.

COBB                                                    Page 2

Although I am working 6 hours I can perform duties assigned
to me fully and I have accomplished the following: created and
implemented a new supply form; pre-typed Purchase Orders and
SF-1's to save preparation time when I am not in the Office
to type them; set up a tracking system for the Procurement
Requests; and I am in the process of creating a Postal Mail
Service Survey to be sent to all the CLOs to determine the
length of time the mail takes to arrive in-country and to
determine how many U.S. Postal errors have occurred so we will
know how well we are performing this task. (please note this
information can be used to complete a Postal Survey we received
last week from the U.S. Postal Service). The above
accomplishments have made, or will make the completion of my
assigned tasks much easier.

My request of elimination of the tasks outlined in this memo
is only a temporary condition.

My goal is to be part of the solution of problems, not the
problem.

If you and Ms. Peterson would like to discuss this matter with
me further, please let me know.


cc: Genevieve Peterson

(18)

*Request for
Flexible Work Plac*



# AFRICAN DEVELOPMENT FOUNDATION

August 31, 1995

SUBJECT:   Flexible Alternative Workplace        CONFIDENTIAL

TO:       Tom Wilson, Director
          Office of Budget and Finance

FROM:     Janice E. Cobb *Jacobb*
          Procurement Assistant, OBFA

A few weeks ago I discussed with you the possibility of the
use my  residence as an alternate flexible workplace due to
my connective tissue disease which requires me to get periods
of rest due to fatigue.  At the time you stated it was a good
idea.

By working at home (flexible workplace) during a 3-hour work
schedule will allow me to better concentrate on my work duties
in the Office of Budget and Finance.  My workload has increased
since my return back to work from my extended illness.  The
objective of this agreement is to provide better working
environment suited for my medical condition.

I can especially concentrate better on reviewing the monthly
telephone bills because there will not be the normal
interruptions as in the official duty station.  There is
presently 8-month backlog of telephone bills needing review
to identify the offices to be charged for the calls made, and
to detect possible abuse.  This  massive backlog could easily
be eliminated if I perform this task at home.

Other tasks which can be performed at the flexible workplace
are:

     (1) Prepare purchase requests, purchase orders and
contracts, with a typewriter supplied by the Government.

     (2) Contact potential vendors for supplies, equipment,
goods and services.

     (3) Prepare supply acquisitions.

These tasks will be performed as outlined in my Job performance
standards and elements.

I am requesting that this arrangement begin September 17, 1995,
or sooner, and ends when I am released by my doctor to perform

*(8)*

2

an 8-hour work schedule.  I would like for my tour of duty to
be 7:30 a.m-12:30 p.m at the official duty station.  I can
continue normal duties during the 5 hours which requires me
to be physically present in the Office of Budget and Finance.
The other 3 hours of work (outlined above) can be performed
in the flexible workplace between the hours of 2:30-6:00 p.m
which will constitute an 8-hour work day schedule producing
full-time work for the Office of Budget and Finance.

The following are proposed guidelines:

A.    The timekeeper will have a copy of my work schedule.
      My time and attendance shall be recorded in the same
      manner as if performing official duties at the
      official duty station.

B.    If leave is taken, I will notify my supervisor in
      accordance with established procedures.

C.    I will continue to work in pay status while working
      at the flexible workplace.

D.    If I am furnished with Government equipment, I will
      maintain the equipment in accordance with established
      procedures.  Government shall maintain and service
      government-owned equipment.  The government shall
      provide miscellaneous supplies such as pencils, pens,
      paper, stapler, etc., commonly used in the normal
      work situation.

E.    If business-related long distance phone calls are
      made over my personal phone line, I will be reimbursed
      when approve by my supervisor.  I will provide a
      copy of the long distance telephone bill on which
      business-related log distance calls were incurred
      when applying reimbursement.  My personal phone
      line will be available for business-related calls
      when I am working at the flexible workplace.

F.    I will meet with my supervisor on each day to receive
      new assignments and review completed work as
      necessary, or appropriate.

G.    All assigned work will be completed according to,
      and agreed upon work procedures, guidelines,
      and standards stated in the Job Performance Plan.

From: Tom Wilson
Priority: Normal
TO: Janice Cobb
Subject: R-: Overtime Pay
------------------------- Message Contents -------------

*a flexible*
*Work Schedule*

    Is there any way possible for my tour of duty be
    ged from 8;30-5p.m to 7:30-4:00p.m. temporarily,
although, I will continue to work from 7:30-5:00 p.m, so
the over-ime will be included?  In this way, the system
should not kick out my overtime hours I worked when I come
in early, and I can get paid for the overtime hours already
worked for the past two pay periods.

If this can be done, I thank you kindly--jc

I will have to talk to Connie about this whole situation.

(18)



*Flexible Work Schedule*

## AFRICAN DEVELOPMENT FOUNDATION

April 12, 1996

SUBJECT:   Flexible Work Schedule

TO:        Tom Wilson, Director
           OBFA

FROM:      Janice Cobb, Office Assistant
           OBFA

I am requesting to work a flexible work schedule, hours between 7:30 a.m-7:00 p.m which would permit me to work overtime when necessary and to use a minimum amount of leave for medical reasons.

This flexible work schedule will not prevent me from doing my tour of duty as receptionist from 8:30 a.m -5:00 p.m. .

APPROVED_____   DATE_____

From: Tom Wilson   9/12/96  11:47 AM
Priority: Normal
CC: Connie Jenkins
TO: Janice Cobb
Subject: Re: Re: Re: Re: advance leave
- ---------------------------- Message Contents ----------------------------

    After talking to Connie, and remembering the difficulty
I had getting Nate to approve the last bit of leave, I
would like for you to give me a memo describing:

    a - in general terms, the reason why you need
advance sick leave (e.g. recurring medical appointments
which cannot be handled outside of work hours,
medications, etc.)

    b- an indication of how long you see this need
lasting (e.g. 1 year, 5 years)

    c - an indication of how you might pay the leave
back (e.g. after illness goes into remission, by offset
after retirement, etc.)


    With all this, I can try to get a decision on this so
we can resolve this issue.  Thanks.


    Tom, If this means you are denying my request for advance sick
leave for this pay period, please indicate on the memo I gave
you and give me a copy.  thanks--jc  It does not mean that.  I am simply
requesting more information.

    Tom, I will not have the information you are requesting
before \
my timesheet goes in for this pay period today.  So,are you going to
approve the
8 hours of advance sick for this pay period or not?  I will approve
it   ut I want to get this all resolved before it comes up again.  Ok?

(15)



EQUAL ACCESS
TO REST ROOM

## AFRICAN DEVELOPMENT FOUNDATION

**January 28, 1997**

**TO:**     Tom Wilson, Director
            Office of Budget, Finance
            and Administration

**FROM:**   Janice Cobb-Hennix
            Office Assistant

On several occasions, I have discussed with you, the Administrative Services Officer, and the Foundation's President, the problem outlined in the enclosed letter from my physician, i.e., a need to go to the rest room when I have to.

The continuation of <u>not</u> being able to , or delaying going to the rest room to relieve myself when I need to, has aggravated a bladder condition I have to the extent that I had to have surgery in December 1996, and is presently under medical treatment.

This problem has cause me to lose time away from work, further escalated my medical expenses, and I had to ask coworkers for donated leave, plus requested additional advance sick leave.

I have tried the method suggested by the Administrative Services Officer, i.e., calling her on the telephone each time I need to go to the rest room so she can get front desk coverage, however, the majority of the time, I cannot reach her by telephone, nor can I get anyone else on the telephone to respond.  I have repeatedly requested a solution to this urgent problem over the past 6-8 months with no avail.

I hope you will consider the seriousness of this problem and come up with a resolution so my bladder condition will not worsen.

cc:
William Ford, President, ADF
Genevieve Peterson, Admin. Services Officer, OBFA
Connie Smith-Field, Personnel Officer

From: Janice Cobb
Priority: Normal
TO: Tom Wilson
CC: Genevieve Peterson
BCC: Janice Cobb
Subject: Late Arrival

*Modified Work Schedule*

------------------------- Message Contents -------------------------

Tom, as you know I have been under doctor care trying to correct a medical problem. Because I am unable to sleep at night because of this medical problem, and sometimes on the way to work, I have to stop and take care of it, I might run a few minutes late occasionally until this problem is correct. I will be glad to provide you with documentation from my doctor about this medical problem. I don't have the exactly date I will be going to the hospital for surgery for it, but the admitting office is trying to get me the earlier date as possible.

As for this morning, this was one of those occasions I was having medical problems which caused me to get here a few minutes late. Once I got here, the elevators were not working, electrical power was off which made me get here 15 mins late.

This policy of documenting me as being late if I don't get here exactly 8:30 a.m, I hope allowances will be made for the reason stated above and for circumstances beyond my control.

I will keep you posted on my medical progress.

Thank you in advance for your understanding in this matter.---JCH

*Request for flexible work Schedule*

(31



## AFRICAN DEVELOPMENT FOUNDATION

**DATE:**   July 25, 1997

**TO:**    Tom Wilson, Director
           Office of Budget, Finance and Administration

**FROM:**  Janice Cobb-Hennix
           Office Assistant, OBFA

**SUBJECT:** Elimination of my Travel Coordinating Job Duties

I have received your memorandum of July 11, 1997, in which
you responded to my concerns about major job duties of mine
that are being transferred to other employees.  I thank you
for your prompt response; however, I must point out that
some of your statements do not match up with the reality I
am experiencing.

You assured me that I will continue to be responsible for
voucher preparation for travel carried out by OBFA staff.
As you know, OBFA staff do not travel.  My major travel
coordinating responsibilities have involved preparation
of travel voucher documents for our Board members.  These
duties have already been transferred away from me to
another employee.

I am forced to believe that your plan to decentralize
travel documents preparation necessarily involves mini-
mizing and reducing the work I have done and am capable
of continuing to do.  Although you have informed me that
the transfer of my job functions is not related to my
ongoing participation in the EEO process, I am forced to
conclude from the timing of this transfer that such a
connection exists.


cc:  EEO Counselor Clarence Turner



## AFRICAN DEVELOPMENT FOUNDATION

26 September, 1997

**To:**        **Clarence Turner**
           **EEO Counselor**

**From:**      **Constance Smith-Field**
           **Personnel Officer**

**Subject:**   **ADF Response to Requested Accomodations**

After our meeting with you, and based on internal discussions among our
management team, attached is the Foundation's response to the accomodations
requested by Ms Cobb-Hennix.  Please call me if you have any questions.

The Foundation has reviewed the accommodations requested by Ms Janice
Cobb-Hennix. We have responded to each of them based on the information we
now possess. It should be noted, however that the Foundation has not received
a comprehensive medical opinion regarding the nature and severity of her
illness and about the specific accommodations, from a medical perspective,
which could be employed so she can perform her duties.

Therefore, in the interest of gaining a clearer, more specific understanding of
how the accommodations she has requested relate to her disability and how we
can fully meet our legal and regulatory responsibilities, we are requesting that
our own physician, selected by the Foundation on the basis of expertise
regarding the condition from which she suffers, examine her to determine exactly
what her disabilities are and what work she can do.

**Responses to Specific Requested Accommodations**

*1. Removal of receptionist duties from her job.*

Receptionist duties constitute the bulk of her job and performance of those
duties is necessary to the Foundation. Given the small size of the Foundation
and its limited personnel ceiling, at this time there are no unencumbered
positions, for which she is qualified, to which she could be reassigned. We have
tried to accommodate her in her receptionist position by providing relief during
scheduled breaks in the morning and afternoon, a one hour lunch break, a
replacement while she distributes the incoming mail and relief on an as-needed
basis during other times. In addition, we have provided her with extensive sick
leave over the past several years, including advanced sick leave and
participation in the voluntary leave program.

Further, we are not aware of how removal of receptionist duties and assignment
to a new position would accommodate her disability. In order to further assess
this, we are requesting that our own physician examine her to determine exactly
what her disabilities are and what work she can do.

*2. Reassignment to a new supervisor.*

Ms Cobb-Hennix has been assigned to her present supervisor based on the
administrative nature of her duties. The Administrative Officer has full
responsibility within the Foundation for managing and coordinating
administrative services including, among other things, incoming and outgoing
mail, telephone service, security, visitor reception and travel administration.
Supervising the receptionist is time-consuming because of the need to
coordinate relief, train temporary workers in our systems and a number of other
issues. Our Director of Administration and Finance, the only other viable
candidate to supervise Ms Cobb-Hennix, is fully committed to a number of other

projects and cannot spare the time required for this function. In any case, as indicated above, it is not clear to us how this request would accommodate her disability.

*3. Flexible work schedule, based upon her medical need for accommodation.*

The nature of the function requires the receptionist to be on duty during our business hours of 8:30 in the morning to 5:00 in the evening. It is thus not feasible to authorize a flexible work schedule. We recognize the need for her to be able to take time off for medical treatments, etc. She has requested authorization to work compensatory overtime in the mornings between the time she arrives at work and the time we open our doors. We are willing to authorize this to allow her to carry out her travel-related responsibilities during that time provided that there is work to be done and that there is a clear understanding that she will accomplish this work during that period.

*4. Authorization of residence as alternate workplace.*

This is not a feasible alternative for the receptionist position.

*5. Authorization of participation in volunteer leave program.*

Ms Cobb-Hennix already is authorized to participate in this program. We have no objection to her continuing.

*6. Desk audit for current job, going back for at least one year.*

We will arrange for a desk audit within the next two months. However, the relationship of such an audit to her request for accommodation is not clear to us.

*7. Back pay.*

It is not clear to us what she is requesting back pay for.

*8. Appropriate RIF rights and remedies.*

During our reduction-in-force, 18 of our 49 staff were separated involuntarily and one took early retirement. We had an outside consultant review our work to ensure that the reduction-in-force was carried out according to pertinent laws and regulations. Nevertheless, we are willing to allow her own representative to review our work to determine if we made any errors adversely affecting Ms Cobb-Hennix.

*9. Development of a written Agency policy prohibiting discriminatory and retaliatory harassment.*

The Foundation has such a policy in its regulations published pursuant to the Rehabilitation Act of 1973, which can be found at 22 CFR 1510. These regulations, in turn, incorporate by specific reference the Equal Employment Opportunity regulations found at 29 CFR 1613 and their express prohibition against reprisal.

### 10. Compensatory damages (up to #300,000)

We are not willing to pay compensatory damages. At this point we are not satisfied that Ms Cobb-Hennix suffered damages as the result of any act or omission by the Foundation for which compensation would be proper.

### 11. Award of reasonable attorney fees.

We will not pay attorney fees for similar reasons.

### 12. Corrected performance appraisal.

Ms Cobb-Hennix has refused to discuss her performance appraisal with Mr. Wilson and consequently, we are unable to assess what items she believes need to be corrected. Upon receipt of her draft appraisal, she advised Mr. Wilson that she intended to file an EEO complaint and did not wish to discuss the appraisal. Mr. Wilson remains willing to discuss her performance appraisal with her and consider various changes as he routinely does with his other staff.

# REQUEST FOR ACCOMMODATION
## FOR PERSONS WITH DISABILITIES

A.   **Employee Name:**      Janice Cobb-Hennix

B.   **Position:**           Office Assistant

C.   **Department:**         Office of Budget, Finance and Administration

D.   **Director:**           Tom Wilson

E.   **Supervisor:**         Constance Smith-Field

F.   **Date Submitted:**     December 4, 1997

G.   **Please describe your disability and the impact it has on your ability to perform the requirements of your job:**

I suffer from systemic lupus erythematosus, commonly called lupus. The disease and its debilitating effects are described in the attached letter from Calvin L. Griffin, M.D., dated December 3, 1997. As that letter explains, and as explained by the prior documents submitted to the Foundation over the past several years, the disease and the medications I take make it difficult for me to perform the comparatively inflexible requirements of the Receptionist position in the absence of reasonable accommodation. As examples, I must leave the reception work station 3-4 times an hour to go to the restroom, leaving the reception area unattended. It is often difficult for me to come to work by 8:30 a.m., when the Foundation opens its door and its telephones. These and other manifestations of my disability require accommodations, or else I cannot perform the requirements of my position without detriment to my health. My disability also makes it difficult for me to perform both as a Receptionist and as a Travel Specialist in the absence of the accommodations proposed below.

H.   **Briefly describe the proposed accommodation:**

**The Receptionist Position**

1.    Designate a staff member other than Mrs. Cobb-Hennix to be available to perform the Receptionist duties starting at 8:30 a.m. in the event Mrs. Cobb-Hennix is unable to come to work at 8:30 a.m.

2.    In the event Mrs. Cobb-Hennix is unable to start work at 8:30 a.m., she or her husband will contact her supervisor, Constance Smith-Field, at home, prior to 8:30

a.m. If Ms. Smith-Field cannot be reached, Mrs. Cobb-Hennix will contact Jennifer Parker, secretary to the Director of the Office of Budget, Finance and Administration, at the office, prior to 8:30 a.m.

3.      On mornings when Mrs. Cobb-Hennix is running late, she will endeavor to arrive at the office no later than 10:00 a.m. When she does arrive, she will immediately assume her duties as a Receptionist.

4.      Physically locate the work station of another staff member, to be designated by the Foundation (e.g., a secretary), within earshot of the Receptionist's work station so that when Mrs. Cobb-Hennix has to go to the restroom (3 or 4 times an hour), she can call out to (not have to telephone) the staff member, who will temporarily perform the Receptionist duties until Mrs. Cobb-Hennix returns from the restroom. If Mrs. Cobb-Hennix calls out and does not receive a verbal response from the staff member, Mrs. Cobb-Hennix will assume that the staff member is away from his/her work station, or is otherwise engaged, and will temporarily forward all incoming telephone calls to the telephone of another staff member, to be designated by the Foundation, until such time she returns from the restroom and is able to resume her Receptionist duties.

5.      Whenever the staff member referred to in paragraph 4 above returns to his/her work station after an absence, he/she will view the Reception work station to ascertain if Mrs. Cobb-Hennix is there, and if she is not there, will temporarily perform the Receptionist duties until Mrs. Cobb-Hennix returns to the Reception work station.

6.      If, while performing her duties as a Receptionist, Mrs. Cobb-Hennix is called upon to perform a pressing travel-related function, she will call out to the designated staff member referred to in paragraph 4 above, who will temporarily perform the Receptionist duties until such time as Mrs. Cobb-Hennix completes the travel-related task. If Mrs. Cobb-Hennix calls out and does not receive a verbal response from the staff member, Mrs. Cobb-Hennix will assume that the staff member is away from his/her work station, or is otherwise engaged, and will temporarily forward all incoming telephone calls to the telephone of another staff member, to be designated by the Foundation, until such time she completes the travel-related task and is able to resume her Receptionist duties.

7.      If, due to Mrs. Cobb-Hennix's duties as Receptionist, a backlog of work develops with respect to her duties as Travel Specialist, as much time as is necessary will be put aside every Thursday for Mrs. Cobb-Hennix to work exclusively on travel-related matters in order to eliminate the backlog. During this time, the Foundation will either designate another staff member (or members) or hire a temporary worker to temporarily perform the Receptionist's duties, until such time Mrs. Cobb-Hennix finishes her Travel-related work and is able to resume her Receptionist duties.

8.     Mrs. Cobb-Hennix will take lunch between 12:30 p.m. and 1:30 p.m.  In addition, she will have four 15 minute rest breaks per day, at 9:15 a.m., 11:00 a.m., 2:00 p.m. and 4:00 p.m.  Between 4:15 and 4:30 p.m., Mrs. Cobb-Hennix will attend to her duties concerning the Foundation's mail.  The breaks are to be provided whether or not Mrs. Cobb-Hennix arrives at work on a particular day at 8:30 a.m.  During these rest breaks and lunch hour, the Foundation will designate another staff member to temporarily perform the Receptionist duties.

9.     Due to her illness, Mrs. Cobb-Hennix is required to visit with and be treated by her doctors on a regular basis.  During such times when she is out of the office, the Foundation will designate another staff member or hire a temporary worker to temporarily perform the Receptionist duties.  To the degree possible, Mrs. Cobb-Hennix will provide the Foundation with two days' notice before each doctor's appointment.

### Alternative Accommodation: Full-Time Travel Specialist

1.     Remove Mrs. Cobb-Hennix from the Receptionist position and designate her as the Foundation's full-time Travel Specialist, having the agency-wide duties and responsibilities described in the attached proposed position description.  This one accommodation would eliminate the need for most of the accommodations described above. Mrs. Cobb-Hennix would require no more than the same work flexibility enjoyed by other non-disabled, non-Receptionist staff members with respect to restroom access and rest breaks.  This accommodation would also permit the Receptionist duties to be performed in a normal, uninterrupted fashion by a person (or persons) who is (are) not are afflicted with a medical disability that is incompatible with the requirements of that position.

· 2.     Assign appropriate additional duties and responsibilities (excluding Receptionist duties) to the Travel Specialist position that Mrs. Cobb-Hennix could perform after she fully performs all of her Travel-related responsibilities.

3.     Permit Mrs. Cobb-Hennix to work at home to perform Travel-related responsibilities on those occasions when she experiences debilitating flare-ups, is physically unable to come to the office, and is advised by her doctor not to leave her home.  Much of the travel-related work can be performed at home, such as reconciling credit card bills, drafting requests for visas, reviewing travel vouchers, etc.  To be able to work at home, Mrs. Cobb-Hennix must provide her supervisor with a note from her doctor's office which documents that Mrs. Cobb-Hennix has contacted the doctor's office concerning her condition and documents the medical necessity of her having to remain at home.

3

4.    A desk audit will determine the grade level for the Travel Specialist position.

**Accommodation Relating to Both Positions**

1.    On occasions when Mrs. Cobb-Hennix seeks overtime work, she is to submit her request no later than the day before the day on which the overtime work is to be performed.

**I.    In order to evaluate your accommodation request, the Foundation may need to discuss your request with your physician(s) or medical practitioner(s). Accordingly, please provide the following information and complete and sign the release:**

**Physicians or Medical Practitioners who can provide additional information:**

**Name:** Calvin L. Griffin, M.D.        **Phone number:**  (202) 526-4400

**Type of practice/specialty:** Rheumatology

A letter from Dr. Griffin in support of this request for accommodation is attached.

**Name:** Frederick B. Henricks, M.D.        **Phone number:**  (202) 293-9244

**Type of practice/speciality:** Urology

**Name:** Kevin J. O'Connell, M.D.        **Phone number:**  (301) 295-4611

**Type of practice/speciality:** Urology

## RELEASE

I hereby authorize the listed physicians or medical practitioners to provide (additional) oral and/or written medical information related to my disability to the African Development Foundation so that the Foundation can evaluate this request for accommodation.

SIGNATURE: _Junne Cobb-Hennix_    Date: _12-4-97_

4

**J.    Supervisor's Recommendation:**

Supervisor's Signature: _____ Date: _____

**K.    Director's Recommendation:**

Director's Signature: _____ Date: _____

**L.    DECISION/ACTION:**

Vice President's Signature: _____ Date: _____

5



# AFRICAN DEVELOPMENT FOUNDATION

May 12, 1997

TO:         Tom Wilson, Director
            Office of Budget and Finance

FROM:       Janice Cobb-Hennix
            Office Assistant

SUBJECT:    Claims for Compensation


Please find enclosed claim forms I am submitting for compensation due to injury on
the job.   There are sections you need to complete.  Please note, these forms must be
submitted in a timely manner.   I think they have to be submitted within 10 days after
you received them.

Free feel to discuss the information regarding my claim.

Thank you in advance for your cooperation in this matter.

Federal Employee's Notice of
Traumatic Injury and Claim for
Continuation of Pay/Compensation

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs



Employee: Please complete all boxes 1 - 15 below. Do not complete shaded areas.
Witness: Complete bottom section 16.
Employing Agency (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.

**Employee Data**

| 1. Name of employee (Last, First, Middle) | 2. Social Security Number |
|---|---|
| Cobb, Janice Eleanor | |

| 3. Date of birth   Mo.   Day   Yr. | 4. Sex ☐ Male  ☒ Female | 5. Home telephone (301 ) 248-7284 | 6. Grade as of date of injury   6 Level   0000 Step |

7. Employee's home mailing address (Include city, state, and zip code)

3104 Ramsgate Place

Fort Washington, Maryland  20744

8. Dependents
☒ Wife, Husband
☐ Children under 18 years
☐ Other

**Description of Injury**

9. Place where injury occurred (e.g. 2nd floor, Main Post Office Bldg., 12th & Pine)

1400 I Street, N.W., 10th Floor
Washington, D.C.  20005

| 10. Date injury occurred   Mo. Day Yr.   12 02 96 | Time   8 30 ☒ a.m.   5 00 ☒ p.m. | 11. Date of this notice   Mo. Day Yr.   06 12 97 | 12. Employee's occupation   Office Assistant |

13. Cause of injury (Describe what happened and why)

Not being able to go to the rest room when I needed to, due to severe urgency/frequency because of daily intake of medication for a chronic medical disability.  I am required to drink large quantities of water to flush medication from my bladder.  Because I was was not able to go to the rest room when I needed to, medication stayed in my bladder longer than it should, which aggravated my bladder.

| a. Occupation code |
|---|

14. Nature of injury (Identify both the injury and the part of body, e.g., fracture of left leg)

    INTERSTITIAL CYSTITIS     (bladder)

    Delay in filing this report was due to receiving confirmation
    from my physicians.

| b. Type code | c. Source code |
|---|---|

| OWCP Use - NOI Code |
|---|

**Employee Signature**

15. I certify, under penalty of law, that the injury described above was sustained in performance of duty as an employee of the United States Government and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by my intoxication. I hereby claim medical treatment, if needed, and the following, as checked below, while disabled for work:

☒ b. Continuation of regular pay (COP) not to exceed 45 days and compensation for wage loss if disability for work continues beyond 45 days. If my claim is denied, I understand that the continuation of my regular pay shall be charged to sick or annual leave, or be deemed an overpayment within the meaning of 5 USC 5584.

☒ a. Sick and/or Annual Leave

Signature of employee or person acting on his/her behalf   _Janice E. Cobb-Kenney_   6-12/97

Any person who knowingly makes any false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both.

Have your supervisor complete the receipt attached to this form and return it to you for your records.

**End of Employee Report**

**Witness**

16. Statement of witness (Describe what you saw, heard, or know about this injury)

| Name of witness | Signature of witness | Date signed |
|---|---|---|
| Address | City | State | Zip Code |

Form CA-1
Rev. No. 1988

**rvisor's Report  Please complete information requested below:**

er's Report

| icy name and address of reporting office (include city, state, and zip code) | OWCP Agency Code |
|---|---|
| | OSHA Site Code |
| | Zip Code |

18. Employee's duty station (Street address and zip code)                          Zip Code

| 19. Regular work hours | From: : ☐ a.m. ☐ p.m.  To: : ☐ a.m. ☐ p.m. | 20. Regular work schedule | ☐ Sun. ☐ Mon. ☐ Tues. ☐ Wed. ☐ Thurs. ☐ Fri. ☐ Sat. |
|---|---|---|---|

| 21. Date of Injury  Mo. Day Yr. | 22. Date notice received  Mo. Day Yr. | 23. Date stopped work  Mo. Day Yr.  Time: : ☐ a.m. ☐ p.m. |
|---|---|---|
| 24. Date pay stopped  Mo. Day Yr. | 25. Date 45 day period began  Mo. Day Yr. | 26. Date returned to work  Mo. Day Yr.  Time: : ☐ a.m. ☐ p.m. |

27. Was employee injured in performance of duty? ☐ Yes  ☐ No  (If "No," explain)

28. Was injury caused by employee's willful misconduct, intoxication, or intent to injure self or another? ☐ Yes (If "Yes," explain) ☐ No

| 29. Was injury caused by third party? ☐ Yes  ☐ No (If "No," go to item 31.) | 30. Name and address of third party (include city, state, and zip code) |
|---|---|

| ?  ame and address of physician first providing medical care (include city, state, zip code) | 32. First date medical care received  Mo. Day Yr. |
|---|---|
| | 33. Do medical reports show employee is disabled for work? ☐ Yes ☐ No |

34. Does your knowledge of the facts about this injury agree with statements of the employee and/or witness? ☐ Yes ☐ No (If "No," explain)

| 35. If the employing agency controverts continuation of pay, state the reason in detail. | 36. Pay rate when employee stopped work  $            Per |
|---|---|

**Signature of Supervisor and Filing Instructions**

37. A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of fact, etc., in respect of this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception:

Name of supervisor (Type or print)

Signature of supervisor                                  Date

Supervisor's Title                                        Office phone

38. Filing instructions
☐ No lost time and no medical expense: Place this form in employee's medical folder (SF-66-O)
☐ No lost time, medical expense incurred or expected: forward this form to OWCP
☐ Lost time covered by leave, LWOP, or COP: forward this form to OWCP
☐ First Aid Injury

Form CA-1
Rev. Nov. 1989

## Disability Benefits for Employees under the Federal Employees Compensation Act (FECA)

The FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following benefits for job-related traumatic injuries:

(1) Continuation of pay for disability resulting from traumatic, job-related injury, not to exceed 45 calendar days. (To be eligible for continuation of pay, the employee, or someone acting on his/her behalf, must file Form CA-1 within 30 days following the injury; however, to avoid possible interruption of pay, the form should be filed within 2 working days. If the form is not filed within 30 days, compensation may be substituted for continuation of pay.)

(2) Payment of compensation for wage loss after the 45 days, if disability extends beyond such period.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where necessary.

(5) Full medical care from either Federal medical officers and hospitals, or private hospitals or physicians, of the employee's choice. Generally, 25 miles from the place of injury, place of employment, or employee's home is a reasonable distance to travel for medical care; however, other pertinent facts must also be considered in making selection of physicians or medical facilities.

At the time an employee stops work following a traumatic, job-related injury, he or she may request continuation of pay or use sick or annual leave credited to his or her record. Where the employing agency continues the employee's pay, the pay must not be interrupted until:

(1) The employing agency receives medical information from the attending physician to the effect that disability has terminated;

(2) The OWCP advises that pay should be terminated; or

(3) The expiration of 45 calendar days following initial work stoppage.

If disability exceeds, or it is anticipated that it will exceed, 45 days, and the employee wishes to claim compensation, Form CA-7, with supporting medical evidence, must be filed with OWCP. To avoid interruption of income, the form should be filed on the 40th day of the COP period. Form CA-3 shall be submitted to OWCP when the employee returns to work, disability ceases, or the 45 days period expires.

For additional information, review the regulations governing the administration of the FECA (Code of Federal Regulations, Title 20, Chapter 1) or Chapter 810 of the Office of Personnel Management's Federal Personnel Manual.

### Privacy Act

In accordance with the Privacy Act of 1974 (Public Law No. 93-579, 5 U.S.C. 552a) and the Computer Matching and Privacy Protection Act of 1988 (Public Law No. 100-503), you are hereby notified that: (1) The Federal Employees' Compensation Act, as amended (5 U.S.C. 8101, et seq.) is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor. In accordance with this responsibility, the Office receives and maintains personal information on claimants and their immediate families. (2) The information will be used to determine eligibility for and the amount of benefits payable under the Act. (3) The information collected by this form and other information collected in relation to your compensation claim may be verified through computer matches. (4) The information may be given to Federal, State, and local agencies for law enforcement and for other lawful purposes in accordance with routine uses published by the Department of Labor in the Federal Register. (5) Failure to furnish all requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits. (Disclosure of a social security number (SSN) is voluntary; the failure to disclose such number will not result in the denial of any right, benefit or privilege to which an individual may be entitled. Your SSN may be used to request information about you from employers and others who know you, but only as allowed by law or Presidential directive. The information collected by using your SSN may be used for studies, statistics, and computer matching to benefit and payment files.)

### Receipt of Notice of Injury

This acknowledges receipt of Notice of Injury sustained by
(Name of injured employee)

Which occurred on (Mo., Day, Yr.)

At (Location)

Signature of Official Superior                    Title                    Date (Mo., Day, Yr.)

Form CA-1
Rev. Nov. 1989

**Notice of Occupational Disease and Claim for Compensation**

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs



Employee: Please complete all boxes 1 - 18 below. Do not complete shaded areas.
Employing Agency (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.

**Employee Data**

1. Name of employee (Last, First, Middle)
Cobb, Janice Eleanor

2. Social Security Number

3. Date of birth   Mo.   Day   Yr.

4. Sex  female

5. Home telephone ( 301 ) 248-7284

6. Grade as of date of last exposure  GS-6   Level   Step  100

Employee's home mailing address (include city, state, and zip code)
3104 Ramsgate Place

Fort Washington, Maryland

Zip Code 20744

8. Dependents
[X] Wife/Husband
[ ] Children under 18 years
[ ] Other

**Claim Information**

9. Employee's occupation
Office Assistant

10. Occupation code

11. Date you first became aware of disease or illness
Mo. Day Yr.
12   02   96

12. Location (address) where you worked when disease or illness occurred (include city, state, and zip code)
1400 I  Street, N.W., Washington, D.C.    20005

Date you first realized the disease or illness was caused or aggravated by your employment
Mo.  Day  Yr.
5   6   97

13. Explain the relationship to your employment, and why you came to this realization
Not being able to go to the rest room when I needed to, due to severe urgency/frequency because of daily intake of medication for my chronic medical disability.    I am required to drink large quantities of water to flush medication from my bladder.  Because I was not able to go to the rest room when I needed to, medication stayed in my bladder longer than it should, which aggravated my bladder causing the present condition.

14. Nature of disease or illness
Interstitial Cystitis

OWCP Use - NOI Code

b. Type code   c. Source code

15. If this notice and claim was not filed with the employing agency within 30 days after date shown above in item #12, explain the reason for the delay.
Awaiting for confirmation from my physicians.

16. If the statement requested in item 1 of the attached instructions is not submitted with this form, explain reason for delay.
Awaiting for confirmation from my physicians.

17. If the medical reports requested in item 2 of attached instructions are not submitted with this form, explain reason for delay.
Awaiting for confirmation from my physicians.

**Employee Signature**

18. I certify, under penalty of law, that the disease or illness described above was the result of my employment with the United States Government, and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by my intoxication. I hereby claim medical treatment, if needed, and other benefits provided by the Federal Employees' Compensation Act.

Signature of employee or person acting on his/her behalf  _Janice Cobb-Henry_   Date  6-11-97

Have your supervisor complete the receipt attached to this form and return it to you for your records.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled, is subject to felony criminal prosecution and may, under appropriate provisions, be punished by a fine or imprisonment, or both.

**Official Supervisor's Report of Occupational Disease: Please complete information requested below**

Supervisor's Report

18. Agency name, and address of reporting office (include city, state, and zip code)

OWCP Agency Code

OSHA Site Code

Zip Code

20. Employee's duty station (Street address and zip code)

Zip Code

| 21. Regular work hours | From: | : | ☐ a.m. ☐ p.m. | To: | : | ☐ a.m. ☐ p.m. | 22. Regular work schedule | ☐ Sun. | ☐ Mon. | ☐ Tues. | ☐ Wed. | ☐ Thurs. | ☐ Fri. | ☐ Sat. |

23. Name and address of physician first providing medical care (include city, state, zip code)

| 24. First date medical care received | Mo. | Day | Yr. |

25. Do medical reports show employee is disabled for work?    ☐ Yes    ☐ No

| 26. Date employee first reported condition to supervisor | Mo. | Day | Yr. | 27. Date and hour employee stopped work | Mo. | Day | Yr. | Time | : | ☐ a.m. ☐ p.m. |

| 28. Date and hour employee's pay stopped | Mo. | Day | Yr. | Time | : | ☐ a.m. ☐ p.m. | 29. Date employee was last exposed to conditions alleged to have caused disease or illness | Mo. | Day | Yr. |

| 30. Date returned to work | Mo. | Day | Yr. | Time | : | ☐ a.m. ☐ p.m. |

31. If employee has returned to work and work assignment has changed, describe new duties

Was injury caused by third party?

☐ Yes    ☐ No
If "No," go to Item 34.

33. Name and address of third party (include city, state, and zip code)

Signature of Supervisor

A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of fact, etc., in respect to this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception:

Name of Supervisor (Type or print)

Signature of Supervisor                                    Date

Supervisor's Title                                          Office phone

CA-2

## Disability Benefits for Employees under the Federal Employees' Compensation Act (FECA)

The FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following general benefits for employment-related occupational disease illness:

Full medical care from either Federal medical officers and hospitals, or private hospitals or physicians of the employee's choice.

(2) Payment of compensation for total or partial wage loss.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where necessary.

The first three days in a non-pay status are waiting days, and no compensation is paid for these days unless the period of disability exceeds 14 calendar days, or the employee has suffered a permanent disability. Compensation for total disability is generally paid at the rate of 2/3 of an employee's salary if there are no dependents, or 3/4 of salary if there are one or more dependents.

If an employee is in doubt about compensation benefits, the OWCP District Office servicing the employing agency should be contacted. (Obtain the address from your employing agency.)

For additional information, review the regulations governing the administration of the FECA (Code of Federal Regulations, Title 20, Chapter 1) or Chapter 810 of the Office of Personnel Management's Federal Personnel Manual.

## Privacy Act

In accordance with the Privacy Act of 1974 (Public Law No. 93-570, 5 U.S.C. 552a), you are hereby notified that:

(1) The Federal Employees' Compensation Act, as amended (5 U.S.C. 8101, et seq.) is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor. In accordance with this responsibility, the office receives and maintains personal information on claimants and their immediate families.

(2) The information will be used to determine eligibility for and the amount of benefits payable under the Act.

(3) The information may be used by other agencies or persons in matters relating directly or indirectly to the matter of the claim, so long as such agencies or persons have received the consent of the individual claimant, or compiled with the provisions of 20 CFR 10.

(4) Failure to furnish all requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits (disclosure of a social security number is voluntary; the failure to disclose such number will not result in the denial of any right, benefit or privilege to which an individual may be entitled).

## Receipt of Notice of Occupational Disease or Illness

This acknowledges receipt of notice of disease or illness sustained by:
(Name of injured employee)

I was first notified about this condition on  (Mo., Day, Yr.)

At (Location)

Signature of Official Superior                    Title                    Date (Mo., Day, Yr.)

This receipt should be retained by the employee as a record that notice was filed.

* U.S. Government Printing Office: 1986-202-861/85155

CA-2
(Rev. 3/86)

# Instructions for Completing Form CA-2

Complete all items on your section of the form. If additional space is required to explain or clarify any point, attach a supplemental statement to the form. In addition to the information requested on the form, both the employee and the supervisor are required to submit additional evidence as described below. If this evidence is not submitted along with the form, the responsible party should explain the reason for the delay and state when the additional evidence will be submitted.

## Employee (or person acting on the employee's behalf)

Complete items 1 through 18 and submit the form to the employee's supervisor along with the statement and medical reports described below. Be sure to obtain the Receipt of Notice of Disease or Illness completed by the supervisor at the time the form is submitted.

### 1) Employee's statement

On a separate narrative statement attached to the form, the employee must submit the following information:

a) A detailed history of the disease or illness from the date it started.

b) Complete details of the conditions of employment which are believed to be responsible for the disease or illness.

c) A description of specific exposures to substances or stressful conditions causing the disease or illness, including locations where exposure or stress occurred, as well as the number of hours per day and days per week of such exposure or stress.

d) Identification of the part of the body affected. (If disability is due to a heart condition, give complete details of all activities for one week prior to the attack with particular attention to the final 24 hours of such period.)

e) A statement as to whether the employee ever suffered a similar condition. If so, provide full details of onset, history, and medical care received, along with names and addresses of physicians rendering treatment.

### 2) Medical report

a) Dates of examination or treatment.

b) History given to the physician by the employee.

c) Detailed description of the physician's findings.

d) Results of x-rays, laboratory tests, etc.

e) Diagnosis.

f) Clinical course of treatment.

g) Physician's opinion as to whether the disease or illness was caused or aggravated by the employment, along with an explanation of the basis for this opinion. (Medical reports that do not explain the basis for the physician's opinion are given very little weight in adjudicating the claim.)

### 3) Wage loss

If you have lost wages or used leave for this illness, Form CA-7 should also be submitted.

## Supervisor (Or appropriate official in the employing agency)

At the time the form is received, complete the Receipt of Notice of Disease or Illness and give it to the employee. In addition to completing items 19 through 34, the supervisor is responsible for filling in the proper codes in shaded boxes a, b, and c on the front of the form. If any expense or lost time is incurred or expected, the completed form must be sent to OWCP within ten working days after it is received. In a separate, narrative statement attached to the form, the supervisor must:

a) Describe in detail the work performed by the employee. Identify fumes, chemicals, or other irritants or situations that the employee was exposed to which allegedly caused the condition. State the nature, extent, and duration of the exposure, including hours per days and days per week, requested above.

b) Attach copies of all medical reports (including x-ray reports and laboratory data) on file for the employee.

c) Attach a record of the employee's absence from work caused by any similar disease or illness. Have the employee state the reason for each absence.

d) Attach statements from each co-worker who has first-hand knowledge about the employee's condition and its cause. (The co-workers should state how such knowledge was obtained.)

e) Review and comment on the accuracy of the employee's statement requested above.

The supervisor should also submit any other information or evidence pertinent to the merits of this claim.

## Item Explanations  Some of the items on the form which may require further clarification are explained below.

**14. Nature of the disease or illness**
Give a complete description of the disease or illness. Specify the left or right side if applicable (e.g., rash on left leg; carpal tunnel syndrome, right wrist).

**19. Agency name and address of reporting office**
The name and address of the office to which correspondence from OWCP should be sent (if applicable, the address of the personnel or compensation office).

**20. Employee's duty station, street address and zip code**
The street address and zip code of the establishment where the employee actually works.

**23. Name and address of physician first providing medical care**
The name and address of the physician who first provided medical care for this injury. If initial care was given by a nurse or other health professional (not a physician) in the employing agency's health unit or clinic, indicate this on a separate sheet of paper.

**24. First date medical care received**
The date of the first visit to the physician listed in item 23.

**32. Was the injury caused by third party?**
A third party is an individual or organization (other than the injured employee or the Federal government) who is liable for the disease. For instance, manufacturer of a chemical to which an employee was exposed might be considered a third party if improper instructions were given by the manufacturer for use of the chemical.

## Employing Agency - Required Codes

**Box a (Occupation Code), Box b (Type Code), Box c (Source Code), OSHA Site Code**
The Occupational Safety and Health Administration (OSHA) requires all employing agencies to complete these items when reporting an injury. The proper codes may be found in OSHA Booklet 2014, Record Keeping and Reporting Guidelines.

**OWCP Agency Code**
This is a four digit (or four digit plus two letter) code used by OWCP to identify the employing agency. The proper code may be obtained from your personnel or compensation office, or by contacting OWCP.

SPECIAL ORDER/FORMULARY ADDITION REQUEST FORM
(this form may be used for trial requests)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THIS FORM MUST BE COMPLETED IN FULL BEFORE THIS REQUEST WILL BE PROCESSED. A DEPARTMENT
HEAD SIGNATURE MUST APPEAR ON THIS FORM. SPECIAL OR ONE TIME REQUESTS ARE HANDLED ON AN
INDIVIDUAL BASIS. A MINIMUM OF 3-5 WORKING DAYS ARE REQUIRED TO PROCESS AND ASSURE THE
MEDICATION IS AVAILABLE IN SUFFICIENT QUANTITIES FOR YOUR PATIENT. IT IS IMPERATIVE THAT
THIS FORM IS FULLY COMPLETED TO AVOID DELAYS.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

_____4/1/97_____          _____4/1/97_____
DATE REQUESTED                    DATE NEEDED

_____          _____
Patient's name and SSN            Patient's phone # (if needed)

_____ inpatient    _____ ward    ____X____ outpatient

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRADE NAME OF DRUG: _DMSO____ GENERIC NAME:_____ DOSAGE FORM: _Intravesical-
                                                                         site instillation_

ESTIMATED NUMBER OF PATIENTS TO USE DRUG:_____/MONTH
                                                        / YEAR

DOSAGE STRENGTH:_____ COST:_____
              (please call ext. 52118 or the main pharmacy for cost data)

----------------------------------------------------------------------
CURRENT FORMULARY ALTERNATIVES OR CLASS REPRESENTATIVES:

____none_____     _____     _____

_____     _____     _____

JUSTIFICATION FOR SPECIAL ORDER/FORMULARY ADDITION: (must include disease/indication for
use, documentation of failure with above formulary alternatives, documentation of serious
side effects, documentation of drug interactions, previous trails with other agents and
any other pertinent information: _____
____Chronic_cystitis_c_severe_urgency/frequency_____

_____

COMPARED TO OTHER FORMULARY AGENT(S), IS THE DRUG YOUR DEPARTMENT REQUESTING:

_____ more cost effective    _____ more effective    _____ safer

_____ an alternative route of administration    _____ an alternative dosage form

__X__ no other alternative    _____ other (please explain above)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

            I.C. HERRING
_____LCDR, MC, _____ 30          KIRSTEN LIGHT
REQUESTER/DEPT/DIVISION           LT MC USNR
      UROLOGY                     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
                                  UROLOGY RESIDENT
_____          REQUESTER/PAGE/EXT
SIGNATURE, DEPARTMENT HEAD
                                  ___4/1/97___
                                  DATE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PLEASE READ BACK OF FORM FOR POLICIES AND PROCEDURES REGARDING SPECIAL ORDER/FORMULARY
ADDITION REQUESTS.

NNHC UROLOGY    PATIENT CHECK-IN SHEET

CK-IN TIME *1315*                    APPT. TIME _____

E *7Apr97*

E (FEMALE)    NEW PT.    FOLLOW-UP    PEDS    WALK-IN: WITH  WITHOUT
                                                        APPT.  APPT.
:SULTATION        PRE-OP            (POST-OP)

)CEDURES:                    DOCTOR: _____

  X-RAYS:                            MINOR SURGERY:

5    NEPHROSTOGRAM              PROSTATE BIOPSY  SP-TUBE PLACEMENT
     RETROGRADE PYELOGRAM       VASECTOMY    SCROTAL EXCISION
3    PERICATH RUG               CIRCUMCISION  WART REMOVAL

  OTHER:                            LAB EXAMS:

:TOSCOPY/DIALATION    FR/PVR  CMG        URINALYSIS
:NT-PLACEMENT         STENT-REMOVAL      URINE CULTURE
EMOTHERAPY            INJECTION          POST-VAS EXAM
 TUBE CHANGE          CATH-PLACEMENT     CHLAMYDIA SCREENING
.DING TRIAL           CIC

_____

)LLOW-UP TO BE SCHEDULED: _____

ROCEDURES: _____ *DMSC instillation q week. x 6 weeks.*

AB WORK: _____

                    CANCER PATIENT DATA

IAGNOSIS:
TAGE:
ISTOLOGY CELL TYPE:
EAR OF DIAGNOSIS:
NITIAL TREATMENT AND DATE: _____
ATE OF PROGRESSION: _____   SITE AND STAGE: _____

                        TREATMENT OF PROGRESSION: _____

                        RECOMMENDED FOLLOW-UP DATE: _____
        30 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
                        FOLLOW-UP STUDIES/LAB TEST: _____
    HENNIX-COBB, JANICE ELEANO  COMMENTS: _____
    HENNIX, RANDOLPH      NSG
    3100745 F USAF FAM MBR RE

.AVMEDCEN Case 1:06-cv-01572-PLF    Document 13-2    Filed 02/02/2007    Page 57 of 64
sonal Data - Privacy Act of 1974 (PL 93-579)    Automated Version of SF600
Printed: 01 Apr 1997@131

UROLOGY CLINIC    KINEL,KRISTIAN J                01 Apr 1997    1313    FU    BBIA
REF:                                      CMT:
RSN·

3P:      PULSE:       RESP:        TEMP:        HT:        WT:
========================================================================
ADDITIONAL COMMENTS:


F/U   TURBT random (3/20/97)
Pt continues to have urgency/frequency.
(8 times/night,
>8 times

Path → chronic inflammation c̄ hemorrhage
+ scar atypia consistent c̄
cyclophosphamide use.
∅ malignant cells.

⚹ Imp: Chronic cystitis 2° to cytoxan use/
symptomatic

Plan:  Will initiate Tx c̄ DMSO x 6 wks.
Ditropan 5 mg po tid.
F/U c̄ Cysto in 1 yr.
RTC in 6 wks.

KRISTEN KINEL
LT MC USNR
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
UROLOGY RESIDENT

========================================================================
1/           COBB-HENNIX,JANICE ELEANOR    F43
                          FEMALE           W:202-673-3916    H:301-248-7284
              Spon: HENNIX,RANDOLPH        CIC: TPC
              CS:                          Rank: MSG        D:
6             Unit:                        RR: NNMC OUTPATIENT RECORDS

| MEDICAL RECORD | ABBREVIATED MEDICAL RECORD |
|---|---|

PERTINENT HISTORY, CHIEF COMPLAINT, AND CONDITION ON ADMISSION (Enter date of admission) DATE: 3/12/97

CHIEF COMPLAINT: Urgency / frequency

HPI: 51 y.o. BF c̄ ⬆ frequency/urgency x ~3mo. S/p Cysto 12/17/96 by Dr. Hendrick at Wash. Hosp (c̄ bx → induse (severe dysplasia/CIS) at L ureteral orifice. Pt continues to have persistent urgency/frequency, ⬆ gross hematuria post-op. U/S kidneys (11/96) → nl.

PMHx: SLE since '94 (Tx c̄ prednisone + Cytoxan x 1½ yrs)
HTN (well controlled)
h/o Herpes Zoster

PSHX: R Dismembered pyeloplasty 1975

Childhood Illnesses: ∅

Tobacco: none
EtOH: none
Meds: K-dur 20mEq qd
Cytoxan 50mg po tid
Prednisone 15mg po qd
Plaquenil 200 mg po bid
Zantac 150 mg/ pl bid
Allergies: Copaten 25 mg po qd
Reminn ? tab qd
NKDA
ROS: NC

PHYSICAL EXAMINATION:
T: 77° P: 79 R:     BP: 138/82 HT: 5.5 WT: 184 lbs

DATE: 3/12/97    Pt is a 51 yo ♀ in NAD

HEENT: nl

NECK: ∅ masses

RESP: clear B

CV: regular s̄ murm.

ABD: soft, NT, ∅ masses, healed scars

BACK: ∅ CVA tnd

GU: diffused

NEURO: Intact

IMP: Bladder dysplasia/CIS

PLAN: TURBT random

KRISTEN KINEL
LT MC USNR
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
UROLOGY RESIDENT

PROGRESS (Enter date of discharge and final diagnosis)

Staff Note: 51 y.o. ♀ p/w hx of IC by cuxian institution as well as CIS. No slides available, plan @ RTC FBBx's to complete eval. Chem 16/ Defined
Procedure Note: Date: 3/20/97    of Matthews Urology
Pre-op Dx: CIS/Dysplasia
Post-op Dx: same
Procedure: Random Bladder 6x.
Surgeons: Kin / Matthews
Anes: sed.    EBL: min.    Fluids: 600cc LR
Path: Bladder 6x/Cytol
Pt TOW in stable condition

D/C Note: Date: 3/20
Adm. Dx: CIS / Dysplasia
Procedure: Bladder 6x
Meds: Tylenol, Floxin

Pt to f/u in Urology Clinic on 4/1 at 1300.
Condition: Good
Disposition: Home

SIGNATURE OF PHYSICIAN KRISTEN KINEL
LT MC USNR
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
UROLOGY RESIDENT

DATE: 3/20/97

IDENTIFICATION NO.

ORGANIZATION

PATIENT'S IDENTIFICATION (For typed or written entries give:Name - last, first, middle; grade; date; hospital or medical facility)

REGISTER NO.

WARD NO.

ABBREVIATED MEDICAL RECORD
Standard Form 539

GENERAL SERVICES ADMINISTRATION AND
INTERAGENCY COMMITTEE ON MEDICAL
RECORDS
FIRMR (41 CFR) 201-45.505
OCTOBER 1975

rsonal Data - Privacy Act of 1974 (PL 93-579)    DIVISION: NNMC BETHESDA, MD
Printed: 06 Mar 1997@0919    omated version of SF600

HENDRICKS,FREDERICK B    06 Mar 1997    0919    FU    FOIA

CLINICAL COMMENTS:

Pt c̄ possible IC or CIS → see enclosed notes. Also has lupus. On cytoxan, prednisone, etc — starting 1994.

Bladder sx quite bothersome: frequency, ~~urgently~~ urgency — Likely needs re-biopsy will arrang g

F.B. Hendricks
CAPT MC USNR
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
UROLOGIST

HENDRIX-COBB,JANICE ELEANOR    F43
31 Oct 1945    FEMALE    W:202-673-3916    H:301-248-7284
Spon: HENDRIX,RANDOLPH    CIC:
SS:    Rank: MSG    G:
UN CG FOA,    RR: LAB OUT-PATIENT RECORDS

**FREDERICK B. HENDRICKS, M.D., F.A.C.S.**
2141 K STREET, N.W., SUITE 308
WASHINGTON, D.C. 20037

*Urology*

(202) 293-9244
Fax: (202) 331-1326

January 11, 1997

RE:  Janice Cobb
DOB:

To whom it may concern:

This patient is being cared by me professionally. She has a bladder
condition that causes unavoidable urges to urinate quite
frequently.

She is currently under treatment and at some point in the future
should improve.

At the present time, however, she needs to urinate at least every
hour or two.  These urges cannot ignored without an accident
happening.

It is my hope that her employer will take this under consideration
and recognize her need to excuse herself to the rest room as
necessary and not an elective action.

If further information is desired, it will be happily provided.

Very truly yours,

Fred

Frederick B. Hendricks, MD

FBH/pja

FREDERICK B. HENDRICKS, M.D., F.A.C.S.
2141 K STREET, N.W., SUITE 308
WASHINGTON, D.C. 20037

*Urology*

(202) 293-9244
Fax: (202) 331-1326

January 11, 1997

Sylvester Booker, MD
525 School Street, SW
Washington, DC  20024

RE:   Janice Cobb
DOB:

Dear Dr. Booker:

Janice asked me to write to you.  She saw me in the office on
12-2-96, complaining of marked urinary frequency and urgency.  She
had also been passing some blood.

Cystoscopy revealed a lesion in the bladder.  This was biopsied at
the Washington Hospital Center on 12-17-96.  A pre cancerous change
was noted in the tissue.  The dysplasia was almost sufficient to
call it carcinoma insitu.

I saw her in the office on 1-10-97.  I went over the results with
her.  She is now feeling much improved.  Symptoms have completely
subsided.  A follow-up cystoscopy will be carried out in three
months.  The prognosis is good.

Warm regards,

Frederick B. Hendricks, MD

FBH/pja

# WASHINGTON HOSPITAL CENTER
## DEPARTMENT OF PATHOLOGY

SURG PATH #S96-16279

**Clinical Diagnosis and History:**
POSSIBLE INTERSTITIAL CYSTITIS.

**Gross Description:**                                       PING HE, MD/smb
Specimen is labeled "random bladder biopsy".

Specimen is received in formalin and consists of multiple irregular
tan-pink focally hemorrhagic fragment of soft tissues measuring 0.6 by 0.6
by 0.3 cm. in aggregate.
Multiple sections/1 cassette
Entire specimen embedded.

# FINAL DIAGNOSIS

Bladder, random biopsy, showing severe dysplasia/carcinoma in-situ with
partially sloughed mucosa.  There is chronic inflammation, fibrosis,
telangiectasia and extravasated erythrocytes in lamina propria.  No
unequivocal invasion is noted.

*Phone diagnosis to Dr. Hendricks, 12/20/96, BMS.
 Fax: Dr. Hendricks, 12/23/96.

                                  ** Report Electronically Signed Out  **
                                  BARRY M. SHMOOKLER, M.D./lel 12/23/96

Stains/Procedures
RECUTx2
L4

LAST PAGE

COBB-HENNIX,JANICE ETFO

SURGICAL PATHOLOGY          Date received:   51     F              615315
     REPORT                 12/17/96
                            Date printed:        FREDERICK B HENDRICKS, MD
                            12/23/96

Form No. 1049

# WASHINGTON HOSPITAL CENTER
## OPERATIVE REPORT

**PATIENT:** Cobb Hennix, Janice E
**OPERATION DATE:** 12/17/96

**MEDICAL RECORD NO.:** 061-53-15

PAGE 2

catheter was introduced into the bladder and the balloon was expanded to 5 cc. This was connected to drainage. The return was clear. Patient was transferred to the stretcher and returned to the recovery room awakening and in good condition. She received one gram of Ancef during the course of the procedure.

DICTATED BY FREDERICK B. HENDRICKS, MD

SIGNATURE OF SURGEON _____  DATE _____

FREDERICK B. HENDRICKS, MD

cc:     FREDERICK B. HENDRICKS, MD

SR:mdi:jmm
D: 12/17/96
T: 12/18/96
Doc: 18927

Copy for FREDERICK B. HENDRICKS, MD

# WASHINGTON HOSPITAL CENTER
## OPERATIVE REPORT

**PATIENT:** Cobb Hennix, Janice E  
**OPERATION DATE:** 12/17/96  
**SURGEON:** FREDERICK B. HENDRICKS, MD  
**FIRST ASSISTANT:**  
**SECOND ASSISTANT:**

**MEDICAL RECORD NO.** 061-53-15  
**DATE OF BIRTH:** :  
**SSN:** :

**PREOPERATIVE DIAGNOSIS:**     POSSIBLE INTERSTITIAL CYSTITIS.

**POSTOPERATIVE DIAGNOSIS:**     POSSIBLE INTERSTITIAL CYSTITIS.

**OPERATION TITLE OR DESCRIPTION:** CYSTOSCOPY, BLADDER BIOPSY.

**PROCEDURE:** The patient was placed in the supine position on the cysto table and general anesthesia induced. Perineum and vagina were prepared with Betadine solution and draped.

Cystoscopy carried out with #22 French cystoscope. The bladder appeared generally normal with the exception of one area on the back wall just to the left of the left ureteral ostium. A very red, angry area was present approximately 1 cm in diameter which bled on distention of the bladder. It appeared to be a Hunner's ulcer but could possibly be carcinoma in situ.

With the biopsy forceps, the area was very thoroughly biopsied. Multiple fragments were sent to pathology. Following completion of the biopsy, the area was thoroughly coagulated with the Bugbee electrode.

At the completion, hemostasis was complete and the instrument was removed. A #18 French Foley