Janice Cobb-Hennix v. ADF

EEOC No. 100-A2-7581X

Exhibit PP

11/04/97  16:23  ☎304  5407        Job Accomm. Net.                      @001

# A FAX FROM:



## President's Committee on Employment of People with Disabilities'

## Job Accommodation Network

JAN

Date: 11/4/97                                                  Day #1

To: Nate Fields

From: Lyndi Batiste

Notes: Mr. Fields. I had time to run the database search I mentioned. I summarized accommodation issues for people with lupus in general + also gave specific examples from our database.

Also being faxed is a summary of court cases involving leave time. I hope this information is useful.

Please let me know if I can be of further assistance.

We are transmitting __9__ pages, including the cover page. If you do not receive all of the pages, please call us at the appropriate number.

Job Accommodation Network
West Virginia University
918 Chestnut Ridge Rd.
Suite 1
P.O. Box 6080
Morgantown, WV 26506-6080

800-ADA-WORK (800-232-9675) or
800-526-7234 in the U.S. (Voice or TDD)
800-526-2262 in Canada (Voice or TDD)
304-293-7186 Commercial
304-293-5407 FAX



## President's Committee on Employment of People with Disabilities




JOB ACCOMMODATION NETWORK

The following is a list of common accommodation issues based on calls our office has received:

1. Fatigue is often a problem and suggested accommodations include reduced hours, flexible scheduling, rest breaks, transfer to a less physically demanding job, sometimes working from home, and ergonomic workstation design.

2. Stress is also frequently a problem for people with lupus. Accommodation suggestions include reduction of stress in the current position and transfer to another position which is not so stressful.

3. Many people with lupus are sensitive to light and need adjustment to the lighting in their workstation.

4. Some people with lupus are sensitive to temperatures and need to have the temperature of the workstation regulated.

5. People with lupus often can't meet the physical demands of a job and need accommodations related to lifting, standing, walking, etc. Accommodations might include equipment to reduce the physical requirements (eg. material lifts), job transfer to a less physically demanding job, and perhaps job restructuring.

6. A frequent accommodation request for people with lupus is leave time either for medical treatment or due to fatigue. The accommodation, of course, would be to allow the leave time unless an undue hardship.

These are some of the more common issues which were addressed in our cases involving people with lupus. There may be other issues which come up and need to be addressed.

918 Chestnut Ridge Road, Suite 1   WVU P.O. Box 6080         Morgantown, WV 26506-6080

United States    ADA-WORK       Commercial        FAX          DIAL-JAN (BBS)         Canada
(800) 526-7234   (800) 232-9675 (304) 293-7186   (304) 293-5407 (800) 342-5526        (800) 526-2262
                                All lines Voice/TDD
                Internet Website: http://janweb.icdi.wvu.edu/

November/December 1994   In The Mainstream   5

from repeated experiences in uncomfortable and unproductive interviews.

At the same time, however, he emphasized the need to attend to the social-psychological dynamics of the interview situations. He argued that an applicant with a visible disability must assume that the interviewer will be plagued by numerous unformulated concerns related to it, which must be ferreted out and addressed. Thus, Simon's behavior at the interview revolved around what he identified as the centrally important psychological dynamics of that setting.

His sense of confusion regarding the legitimate role the disability should have during the process of a job search has been resolved, for the time being, by his decision to disclose the disability in advance. He perceives an intricate connection between this resolution and his own emerging acceptance of himself as a skilled professional who has a disability.

*[Editor's note: This article reported on approaches to disclosure when the individual's disability is visible. There is a general belief in the rehabilitation and disability communities that job-seekers with hidden disabilities rarely disclose their impairments—ever. Mainstream's 1995 Annual Conference, "No More Conflicts: Resolving Hidden Disability Concerns and Workplace Decisions" will explore this latter issue in March of next year. For a complete agenda of our 1995 Annual Conference, call (301) 654-2400 (Voice/TDD).]*

❖ ❖ ❖

# Employing Individuals with Lupus

*by Fritz Rumpel*

## Some Background Information

Lupus is a chronic inflammatory disease that can affect various parts of the body, especially the skin, joints, blood and kidneys. The body's immune system normally makes proteins called antibodies to protect the body against viruses, bacteria and other foreign materials. These materials are called antigens.

In an autoimmune disorder such as lupus, the immune system loses its ability to tell the difference between foreign substances (antigens) and its own cells and tissues. The immune system then makes antibodies directed against "self." These antibodies, called "auto-antibodies," react with the "self" antigens to form immune complexes. The immune complexes build up in the tissues and can cause inflammation, injury to tissues, and pain. Lupus is not contagious, and has no known cause or cure.

Symptoms and complications of lupus will vary with the individual. They include: "butterfly-shaped" rash over the face; skin rash after exposure to the sun; sores in the mouth and throat; fever, weight loss or hair loss; fatigue, at times extreme; arthritis in one or more joints; color changes in fingers and toes caused by circulation problems; kidney inflammation; problems involving the central or peripheral nervous system: pain, numbness and tingling, seizures, mental disorder, stroke, etc.; and low blood counts, including anemia and low platelet counts.

Treatment for lupus varies with the nature and severity of symptoms. For instance, nonsteroidal anti-inflammatory drugs (NSAIDS) are used to treat mild or moderate inflammation; corticosteroids for more serious inflammation; and antimalarial drugs such as hydroxychloroquine use for skin and joint complications. New treatments and treatment combinations are on the horizon.

For most people, lupus is a mild disease affecting only a few organs. For others, it may cause serious and even life-threatening problems. More than 16,000 Americans develop lupus each year. It is estimated that 500,000 Americans have been diagnosed with lupus.

## Lupus and the Americans with Disabilities Act of 1990

The ADA defines an "individual with a disability" as a person who has a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or is regarded by the employer as having such an impairment.

Neither the law nor its regulations list all diseases or conditions that make up "physical or mental impairments" because it would be impossible to provide a comprehensive list. However, the ADA defines a physical impairment as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine."

So while we tend to think of someone with a physical disability

as a person with paraplegia who uses a wheelchair, or someone who is blind or deaf, most persons with lupus would also fall under the ADA definition of an individual with a disability.

Whether the person is a qualified individual with a disability depends on whether the applicant or employee meets the legitimate skill, experience, education, or other requirements of the employment position that he or she seeks or holds, and whether he or she can perform the essential functions of the position with or without reasonable accommodation.

### What Kinds Of "Reasonable Accommodations" Will An Employee With Lupus Require?

It varies with the individual. Many persons with lupus experience chronic fatigue; some are extremely photosensitive; and others have difficulty in fingering and handling.

The following are real-life examples of accommodations that have been made or recommended for three individuals who have lupus:

- An employee with lupus who works in the sewing industry has limitations in grasping scissors. She was provided with electric scissors that reduced the need for grasping and the hand strength one would have to have to manipulate manual scissors.

- An individual with lupus works with a computer terminal in an office setting. He is sensitive to florescent lights and to radiation emitted from his computer monitor. The overhead lights were changed from florescent to broad spectrum by using a special filter that fits onto the existing light fixture. A radiation shield was placed over the computer monitor. The shield blocks electromagnetic radiation and eliminates static electricity as well as glare and reflections.

- An employee with lupus was having difficulty completing all of his work in the office due to overall body weakness. These possible accommodations were identified by a consultant: Frequent rest breaks, working at home on a part-time basis, job sharing, job restructuring (which means reallocating or exchanging with other employees marginal functions — not essential functions — of the job), and a flexible work schedule.

The Equal Employment Opportunity Commission's technical assistance manual on the ADA states that "[r]easonable accommodation is a modification or adjustment to a job, the work environment, or the way things usually are done that enables a qualified individual with a disability to enjoy an equal employment opportunity."

Among the types of reasonable accommodations cited by the EEOC that are relevant to workers with lupus are: job restructuring, modified work schedules, flexible leave policies, acquisition or modification of equipment and devices, and reassignment to a vacant position (this accommodation needs only to be considered for a current employee, not an applicant).

As is often stated, reasonable accommodations must be determined on a case-by-case basis. Each potential or current employee, each employer and each job together present a unique set of circumstances. Because of the variety of functional limitations that lupus can encompass, a performing a job analysis to determine the essential functions of a particular job is especially important in order to properly accommodate persons with this disability.

### Resources

*Lupus Foundation of America, Inc.*
4 Research Place
Suite 180
Rockville, MD 20850-3226
(301) 670-9292; (800) 558-0121

LFA assists local chapters in their efforts to provide supportive services to individuals living with lupus; to educate the public about lupus; and to support research into the cause and cure of lupus. Volunteers, through an extensive network of over 500 constituent chapters, subchapters, branches, support groups and international associated groups, provide the majority of services which link the Lupus Foundation to thousands of lupus patients and their families.

*Arthritis Foundation*
1314 Spring Street, NW
Atlanta, GA 30309
(404) 872-7100; (800) 283-7800

The Arthritis Foundation provides information and referral on issues involving the employment of individuals with arthritis or lupus, including job placement, vocational rehabilitation, career counseling, job accommodations, and assistive devices, special equipment, and vocation aids.

*American Lupus Society*
3914 Del Amo Boulevard
Suite 922
Torrance, CA 90503
(213) 542-8891; (800) 331-1802

❖ ❖ ❖

Case 1:06-cv-01572-PLF   Document 14-47   Filed 02/02/2007   Page 6 of 16

11/04/97  18:26  ☎304 · 5407          Job Accomm. Net.                              ⌀005

## President's Committee on Employment of People with Disabilities




JOB ACCOMMODATION NETWORK

The following are examples of accommodations that have been suggested for individuals who have Lupus. These suggestions are from cases in our database. The examples not exhaustive but should give you an idea regarding the types of accommodations often needed for people with Lupus.

*A programmer who has Lupus was ordered by her doctor to cease all typing which is an essential function of her job.

Accommodation suggestions which were offered by JAN: look into assigning keystrokes to a foot pedal; ergonomic keyboard; voice recognition software to eliminate the need for keying.

*A corporate trainer who has Lupus has difficulty with standing and walking when giving presentations, and trouble with the daily activity of shopping.

Accommodation suggestions which were offered by JAN: for giving presentations she could use a sit/stand/lean stool to support her weight when standing; reduce the amount of walking she may need to do during presentations by asking an audience member to help pass out training materials; for shopping she should use a shopping cart to assist her as a mobility aid and to carry items; frequent rest breaks were suggested as well as good planning procedures.

*An employee who works at a computer terminal has Lupus. The employee is sensitive to flourescent lights and to the radiation emitted from the computer monitor.

Accommodation suggestions which were offered by JAN: overhead lights could be changed from flourescent to broad spectrum by using a special filter that fits onto the existing light fixture; for the computer monitor it was suggested that the individual use a radiation shield which blocks the electromagnetic radiation and eliminates static electricity as well as glare reflections.

|  918 Chestnut Ridge Road, Suite 1  |  WVU P.O. Box 6080  |  Morgantown, WV 26506-6080  |
| United States | ADA-WORK | Commercial | Canada | DIAL-JAN (BBS) |
| (800) 526-7234 | (800) 232-9675 | (304) 293-7186 | (800) 526-2262 | (800) 342-5526 |

All lines voice/TDD

*Another caller had difficulty completing all of his work in the office due to overall body weakness related to Lupus.

Accommodation suggestions which were offered by JAN: allow the employee to take frequent rest breaks and possibly work at home on a part-time basis; consider job sharing, job restructuring to eliminate marginal functions, and a flexible work schedule.

*An executive secretary for a hospital has Lupus and as a result has problems with back ache while sitting.

Accommodation suggestions which were offered by JAN: use of an ergonomic chair; proper lumbar support cushions; consider adjustable height workstation to alternate between standing and sitting.

*A health care worker who has Lupus has low vision due to Lupus. She has difficulty viewing her computer screen and paper copies.

Accommodation suggestions which were offered by JAN: screen magnification software, larger sized monitor, external magnification; hand/stand magnifier for paper copies and closed circuit television system; can also enlarge paper copies on photo copier.

These examples are brief but should provide you with a general idea of accommodations that have been considered. Please keep in mind that all accommodations must be made on a case by case basis. No two situations are exactly alike.

Lupus Erythematosus is a Chronic Inflammatory and sometimes disabling disease, which causes the body to fight against itself. There are three types of Lupus: Discoid (DLE), the milder form, which affects only the skin, Systemic (SLE), the more serious form, which can affect the heart, blood vessels, lungs, kidneys, nervous system, blood, skin, joints, brain, muscles, or membranes, or any combination of these, and Drug Induced Lupus (DIL), which usually disappears when the drug is discontinued. Lupus is NOT a contagious nor malignant disease.

Lupus affects men, women, and children of all ages and races. Women of childbearing age are more commonly affected. Almost one million Americans and about 25,000 North Carolinians are diagnosed with Lupus.

Lupus may produce one or any combination of the following symptoms: excessive fatigue and weakness, low-grade fever, chills, muscle aches, blood cell changes, kidney problems, joint pain and swelling, skin rashes, chest pains, weight loss, shortness of breath, allergy to the sun, ulcer-like sores, mental changes, and paralysis. Lupus can be fatal with severe blood cell changes, kidney problems, heart problems, and/or lung problems. Symptoms may come and go rapidly and seem unbelievable to others besides the patient. When physical symptoms are not visible, the Lupus patient many times has been known to be put down by family, friends, and/or doctors. This may lead the patient to think it's all in his or her mind.

Folks may have this disease and not be aware of it due to the difficulty of diagnosis. Lupus can mimic almost any other disease; there are blood tests that can be run to help your doctor in diagnosis. With early, accurate diagnosis and adequate care, the Lupus patient today has a better chance for a longer life than 10 to 20 years ago.

The cause of Lupus is unknown. Research has shown that symptoms of Lupus may show an increase during times of emotional and physical stress, excessive sun or heat exposure, infections, following pregnancy, fatigue, and medication in certain persons. Lupus Research is being done at many medical centers across the country. <u>Your contribution for Lupus Medical Research will help find the cause and cure of Lupus and its related diseases.</u>

### LUPUS PATIENT GUIDELINES

*Get enough rest and eat well-balanced meals. Proper nutrition is essential.
*Avoid emotional and physical stress and fatigue.
*Avoid excessive exposure to direct sunlight and fluorescent lights.
*Avoid exposure to contagious and infectious disease.
*Follow your doctor's suggestions.
*Take your medications as directed.
*Keep a record of all your medicines.
*Learn all you can about Lupus and develop a positive attitude about having this chronic disease. A good way to do this is by joining and supporting your local Lupus chapter.

"LUPUS IS MORE PREVALENT THAN, AND CAN BE JUST AS SERIOUS AS, MUSCULAR DYSTROPHY, MULTIPLE SCLEROSIS, HODGKINS DISEASE, CYSTIC FIBROSIS, PERNICIOUS ANEMIA, OR LEUKEMIA."

---

ONLY THROUGH UNITED EFFORT WILL LUPUS EDUCATION AND AWARENESS CONTINUE
PLEASE HELP US HELP LUPUS PATIENTS BY CONTINUING YOUR FINANCIAL SUPPORT.

**MEMBERSHIP/CONTRIBUTION APPLICATION**

NAME: _____
ADDRESS: _____
CITY: _____ STATE: _____ ZIP: _____
TELEPHONE: ( ) _____

DUES: Individual ($12/yr) $ _____
Family ($18/yr) $ _____
Honorary Member ($25/yr) $ _____
Business Associate ($35/yr) $ _____
Patron ($50/yr) $ _____
Contribution $ _____
Total Enclosed $ _____

DUES AND CONTRIBUTIONS (MEMORIALS AND DONATIONS) ARE TAX DEDUCTABLE
MAKE CHECKS OR MONEY ORDERS PAYABLE TO THE WINSTON-TRIAD LUPUS CHAPTER, NCLF, INC.
2841 FOXWOOD LANE  WINSTON-SALEM, NC 27103

11/04/97  18:28  ☎304  5407  Job Accomm. Net.  @008

# LUPUS

## THE HIDDEN HANDICAP

A DISEASE



YOU SHOULD KNOW ABOUT

LFA, INC.
WINSTON-TRIAD LUPUS CHAPTER

---

**LFA, INC.**
**WINSTON-TRIAD CHAPTER**
**NORTH CAROLINA LUPUS FOUNDATION, INC.**
IS A NON-PROFIT ORGANIZATION OPERATED BY VOLUNTEERS

Our purpose is to lend moral support to Lupus patients and their families, stimulate public and professional awareness of the disease through educational programs, and help provide financial support for Lupus Research.

We hold meetings open to the community each month on Sunday at 2:30 p.m. at Highland Presbyterian Church Activity Building, 2329 Cloverdale Ave., Winston-Salem, NC.

Lupus books and articles are available at the meetings and Lupus information packets are free to all patients. Talks by the Medical Profession are given at monthly meetings and a newsletter, including current Lupus articles and Chapter news, is printed monthly.

For literature or information, write or call

**WINSTON-TRIAD LUPUS CHAPTER**
**2841 FOXWOOD LANE**
**WINSTON-SALEM, NC  27103**

**HOTLINES**

(919) 768-1493    RUTH/JIM BANBURY

(919) 923-1849    JUDY ZIEVERINK



"A Chapter of the Lupus Foundation of America, Inc."

---

**MEDICAL ADVISORY BOARD**

DR. ERL WATTS, Cardiologist, Chairman
Bowman Gray School of Medicine
Winston-Salem, NC

DR. PATRICIA ADAMS, Nephrologist
Bowman Gray School of Medicine
Winston-Salem, NC

DR. CHARLES E. HOWELL, Dermatologist
Forsyth Memorial Hospital
Winston-Salem, NC

DR. JOSEPH L. JORIZZO, Dermatologist
Bowman Gray School of Medicine
Winston-Salem, NC

DR. A. STANLEY LINE, JR., Internal Medicine
Forsyth Memorial Hospital
Winston-Salem, NC

DR. CHARLES E. McCALL, Internal Medicine
Bowman Gray School of Medicine
Winston-Salem, NC

DR. DENNIS McCUNNIFF, OB-GYN
Forsyth Memorial Hospital
Winston-Salem, NC

DR. WILLIAM M. MATHENEY, Neurologist
Bowman Gray School of Medicine
Winston-Salem, NC

DR. DOUG METCALF, Rheumatologist
Forsyth Memorial Hospital
Winston-Salem, NC

DR. ELLIOTT SEMBLE, Rheumatologist
Bowman Gray School of Medicine
Winston-Salem, NC

DR. SARA SINAL, Pediatrician
Bowman Gray School of Medicine
Winston-Salem, NC

DR. JOHN R. SOUTHARD, JR., Dermatologist
Forsyth Memorial Hospital
Winston-Salem, NC

DR. GARY RAYNER, Rheumatologist
Bowman Gray School of Medicine
Winston-Salem, NC

**ADVISORS**

ROBERT E. FIELDS III, ESQ.
Winston-Salem, NC

G. THOMPSON MILLER, Attorney-at-Law
Lexington, NC

ORDER FORM                                        #500-A

# ARM-A-LITE
# FILTER RAY
# SLEEVE SHIELDING

Distributed for The Lupus Foundation of America,
Inc. by:                                   NCLF, Inc.
         Winston-Triad Lupus Chap.
         2841 Foxwood Lane
         Winston-Salem, NC 27103
         (919) 768-1491

Quant'y                               Price     Amount
___  2 ft. filter shields           @ 3.00    $_____
___  4 ft. filter shields           @ 5.00    $_____
     plus s.& h. partial case                 $ 1.25
     10% discount on case orders
___  case/s 24 filters ea.          @ 4.50    $_____
     postage and handling per case            $ 11.25
                              TOTAL $_____

SHIP TO:
Name: _____
Address: _____
City,State: _____   PHONE# _____

Make check out to: LFA,Inc.,Winston-Triad Lupus
Chapter, NCLF,Inc. at above address. Thank You.




# A FAX FROM:

## President's Committee on Employment of People with Disabilities

### Job Accommodation Network — JAN

Date: __11/4/97__

Fax #2

To: __Nate Fields__

From: __Linda Batiste__

Notes: _____

We are transmitting __6__ pages, including the cover page. If you do not receive all of the pages, please call us at the appropriate number.

Job Accommodation Network
West Virginia University
918 Chestnut Ridge Rd.
Suite 1
P.O. Box 6080
Morgantown, WV  26506-6080

800-ADA-WORK  (800-232-9675) or
800-526-7234 in the U.S. (Voice or TDD)
800-526-2262 in Canada (Voice or TDD)
304-293-7186 Commercial
304-293-5407 FAX

## Types of Reasonable Accommodation

### Unpaid Leave as a Reasonable Accommodation

*Whether Leave is a Reasonable Accommodation*

Most authority indicates that unpaid leave *is* a form of reasonable accommodation. Unpaid leave may be an appropriate reasonable accommodation when an individual expects to return to work after getting treatment for a disability, recovering from an illness, or taking some other action in connection with his/her disability, such as training a guide dog.

The EEOC has consistently taken the position that unpaid leave can be a reasonable accommodation. Appendix to 29 C.F.R. § 1630.2(o). In addition, a number of courts have held that leave is a form of reasonable accommodation in particular circumstances. For example, in Williams v. Widnall, 79 F.3d 1003, 5 AD Cases 663, 666 (10th Cir. 1996) and in Schmidt v. Safeway, 864 F. Supp. 991, 996, 3 AD Cases 1141 (D. Ore. 1994), the courts stated that an employer may have to provide an employee with a leave of absence so he could get treatment for alcoholism. Similarly, in Corbett v. National Products Co., 4 AD Cases 987 (E.D. Pa. 1995), the court also held that leave may be required for an employee to get treatment for his disability. Likewise, in Hudson v. MCI Telecommunications Corp., 5 AD Cases 1099 (10th Cir. 1996), the court observed that "a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation." In Vjaliz v. New York City Board of Education, 4 AD Cases 345, 347 (S.D.N.Y. 1995), the court held that if the plaintiff proves that she would be able to return to work after a temporary leave of absence, then the leave *is* a possible reasonable accommodation.

Of course, another question that arises is how much leave an individual must be given as a reasonable accommodation. This is likely to be fact-specific -- depending on whether a particular amount of time imposes an undue hardship on the employer. However, in Dockery v. North Shore Medical Center, 909 F. Supp. 1550, 1551 (S.D. Fla. 1995), the court noted that -- as a matter of law -- a one-year leave of absence will *not* be required as a reasonable accommodation.

### *Whether Employee's Job Must be Held Open During Leave*

Although there is general agreement that unpaid leave is a form of reasonable accommodation, there is *disagreement* on what this means -- specifically, whether it means that an employee's job must actually be held open. The EEOC takes the position that unpaid leave means holding the employee's job open, unless doing so would cause an undue hardship. See EEOC Fact Sheet: "The FMLA, the ADA, and Title VII of the Civil Rights Act of 1964" at p. 7 (question 14). This Fact Sheet is included as Appendix E of this Manual.

However, some management attorneys have argued that unpaid leave does *not* mean holding the job open, but simply means putting the individual in an unpaid leave *status*. It is unlikely that many courts will adopt this position because, in reality, it would give the individual very little as a reasonable accommodation. In fact, in both Schmidt v. Safeway and Corbett v. National Products Co., the courts implied that the job must be held open; the courts stated that the employer is required to provide the leave if it is likely that the employee will be able to *perform the duties of the job* after the treatment. Schmidt, 3 AD Cases at 1146, Corbett, 4 AD Cases at 990. Moreover, from a management perspective, the argument is risky; if an employer is only putting the individual in an unpaid leave *status*, it will be nearly impossible for the employer to *ever* argue that providing unpaid leave imposes an undue hardship.

### *Leave for a Definite vs. Indefinite Time*

Of course, another question that arises regarding unpaid leave is whether an employer has to hold the job open for an *indefinite* period of time. This situation arises when an employee says s/he simply doesn't have any idea when s/he can come back. The situation also arises if an employee continually requests more and more leave after the expiration of prior leave; this pattern arguably reflects a request for indefinite leave.

In an amicus brief to the Ninth Circuit, the EEOC recently stated that, "[t]he mere fact that an individual with a disability does not know exactly how long his recovery will take does not automatically render his leave request unreasonable." See EEOC Amicus Curiae brief in Sanders v. Arneson Products, Inc., No. 95-15349 (N.D. Ca. 1995) at 11. In addition, the EEOC stated that the fact that someone might ask for more than one leave of absence to accommodate his disability also does not render the proposed accommodation unreasonable as a matter of law. Id.

III-15

at 12. Significantly, however, the EEOC acknowledged that "there may be some situations in which an employee's chances of returning to work after a leave of absence are so remote or the amount or number of leaves needed is so extensive or open-ended that an individual cannot be said to be a qualified individual with a disability as a matter of law." Id. at 12.

Most courts have been clearer on the issue, holding that an employer does *not* have to provide *indefinite leave* as a reasonable accommodation. For example, in Myers v. Hose, 50 F.3d 278, 4 AD Cases 391 (4th Cir. 1995), the court held that an employer had no obligation to provide indefinite leave to a bus driver who had diabetes, a heart condition, and hypertension. Similarly, in August v. Offices Unlimited, Inc., 981 F.2d 576, 2 AD Cases 401 (1st Cir. 1992), a state law case using the Rehabilitation Act for guidance, the court noted that the plaintiff was not a qualified individual with a disability when he had been completely and totally disabled for a period beginning two months before his termination and continuing into the indefinite future. Likewise, in Rogers v. International Marine Terminals, Inc., 87 F.3d 755 n.2, 5 AD Cases 1115 (5th Cir. 1996), the court held that the employer was not required "to make reasonable accommodation in the form of an indefinite leave of absence." In Hudson v. MCI Telecommunications Corp., 5 AD Cases 1099 (10th Cir. 1996), the court considered the reasonable accommodation claim of an individual whose doctor's reports and notes indicated that the impairment was not permanent, but did not indicate *when* the employee would be able to return to her job. The court considered this to be a request for "unpaid leave of indefinite duration" and held that an employer does not have to provide such leave as a reasonable accommodation. In Monette v. Electronic Data Systems, No. 95-1114, 1996 U.S. App. LEXIS 18646 (6th Cir. 1996), the court noted that "employers are under no duty to *keep employees on unpaid leave indefinitely.*" See also Morton v. GTE North, Inc., 922 F. Supp. 1169, 5 AD Cases 524, 535 n.11 (N.D. Tex. 1996) ("[t]his court doubts that indefinite leave could ever be demanded as a reasonable accommodation").

Employers also have an argument that even if indefinite leave is *technically* a reasonable accommodation, it would nearly always impose an undue hardship on the employer because the employer *needs* the job filled — in a predictable time frame — with a regular employee.

*Leave for Unreliable/Unpredictable Attendance*

Yet another related issue is whether unpaid leave must be provided for someone whose attendance is unreliable and/or unpredictable. As noted in Chapter 2 of this manual (on

III-16

"Qualified" issues), there is broad agreement that reliable attendance is required to perform most jobs. Therefore, most courts say that an employer does *not* have to provide leave for an employee who will be unable to maintain predictable attendance. For example, in Carr v. Reno, 23 F.3d 525, 3 AD Cases 434 (D.C. Cir. 1994), the court said that an employee is not qualified if he has prolonged, frequent, and unpredictable absences. Similarly, in Jackson v. Veterans Admin., 22 F.3d 277, 3 AD Cases 483 (11th Cir.), reh'g denied en banc, 30 F.3d 1500 (11th Cir.), cert. dismissed, 115 S. Ct. 657 (1994), the court said that a housekeeper who had very unpredictable and sporadic attendance due to severe arthritis was not qualified. In Price v. S-B Power Tool, No. 95-2075 (8th Cir. 1996), the court agreed with the employer that the plaintiff had been lawfully terminated because she was absent more than three percent of her scheduled work time. In that case, the court specifically analyzed the nature of the work -- an assembly line where each person had specific duties -- in determining that the employee was not qualified based on her unpredictable attendance. Similarly, in Kennedy v. Applause, Inc., 3 AD Cases 1734, 1737 (C.D. Cal. 1994), aff'd on other grounds, 1996 U.S. App. LEXIS 18786 (9th Cir. 1996), the court considered the ADA claim of an employee with Chronic Fatigue Syndrome, whose own doctor's note indicated that she could not maintain regular attendance. The court held that since the plaintiff "could not maintain a regular and reliable level of attendance at her job," she was not qualified. Therefore, the employer was not required to provide the "open-ended" schedule which the employee needed.

On the other hand, in Dutton v. Johnson County Board, 859 F. Supp. 498, 3 AD Cases 808, 815 (D. Kan. 1994), the court noted that "[r]egular attendance is no doubt an essential part of almost every job, but the question is one of degree." The Dutton court found that it could be reasonable to allow the plaintiff to use accrued, unscheduled leave to cover unpredictable absences due to illness. Similarly, in Carlson v. Inacom Corp., 885 F. Supp. 1314, 1321, 4 AD Cases 600 (D. Neb. 1995), the court specifically analyzed whether the employer had to accommodate unscheduled absences. The court noted that "[g]enerally and broadly speaking, an employee 'cannot perform [her] job successfully without meeting some threshold of both attendance and regularity'" (citing Walders v. Garrett, 765 F. Supp. 303, 1 AD Cases 1797 (E.D. Va. 1991), aff'd, 956 F.2d 1163, 2 AD Cases 656 (4th Cir. 1992)). However, the court stated that "the requisite levels of attendance and regularity depend upon the circumstances of each employment position" (citing School Board of Nassau County, Fla. v. Arline, 480 U.S. 273, 287-88, 1 AD Cases 1026 (1987)).

# What is Reasonable Accommodation?

Reasonable accommodation is a key factor which allows many people with disabilities to achieve equal employment status in the workplace. A reasonable accommodation is a change or adjustment to a job or work environment that allows a person with a disability to participate in the job application process, to perform essential job functions, or to enjoy benefits and privileges of employment equal to those enjoyed by employees without disabilities. A reasonable accommodation may include but is not limited to :

* making a workplace readily accessible to and usable by people with disabilities,
* job restructuring,
* providing and modifying equipment and devices,
* providing readers and interpreters,
* part-time or modified work schedules, and
* reassignment to a *vacant* position.

Reasonable accommodation should take place in an individual's original position first. If no possible accommodation would allow the individual to perform the essential functions of that job, reassignment can be considered for accommodation purposes. In the past, courts have disagreed upon reassignment as reasonable accommodation under section 501. Under the 1992 amendments, the EEOC regulations state that under section 501, federal agencies must reassign employees who can no longer perform in their original position due to disability unless undue hardship would result. The reassignment provision for federal agencies is considered an affirmative action obligation rather than a reasonable accommodation obligation, as it would be considered under the ADA.

An employer is required to provide a reasonable accommodation to a qualified applicant or employee with a disability unless providing that accommodation would pose an *undue hardship* on the business. Undue hardship is determined by assessing the size, type and budget of the employer's business and the nature of the cost of the accommodation. It must be determined whether or not the accommodation would require significant difficulty or expense to implement. A larger employer may be able to bare a more significant cost than a smaller employer based upon the number of employees and the budget the employer has to work with.